## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CLARA DAYE, on behalf of herself and all
others similarly situated,

      Plaintiff,

vs.                                                                       No. CIV 14-0759 JB/SCY

COMMUNITY FINANCIAL SERVICE
CENTERS, LLC, d/b/a SPEEDY LOAN,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Opposed Motion for Class Certification,

filed November 27, 2015 (Doc. 60)("Motion").  The Court held a hearing on February 2, 2015.

The primary issues are: (i) whether the Court must consider individualized issues to resolve

Plaintiff Clara Daye's claims; and (ii) whether Daye presents common issues that predominate

over individualized issues.   Because Daye contends that language contained in all of the

proposed class members' loan documents violates the law, the Court need not consider each

proposed class member's loan documents or transactions to determine Defendant Speedy Loan's

liability.   The Court's resolution of Daye's questions will decide all class members' claims,

making those questions appropriate for class certification.   The Court will therefore certify a

class action under rule 23 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

Speedy Loan is a "loan company with twelve stores in New Mexico."  Brief in Support of

Plaintiff's Opposed Motion for Class Certification on November 27, 2015 (Doc. 61)("Brief").

Speedy Loan made four separate loans to Daye.  See Complaint for Damages ¶ 1, at 1, filed

August 22, 2014 (Doc. 1)("Complaint").  Daye argues that each loan Speedy Loan made was a

"payday loan," as § 58-15-2(H) of the New Mexico Small Loan Act of 1955, N.M. Stat. Ann.

1978 §§ 58-15-1 to -39 ("Small Loan Act"), defines the term.  Complaint ¶ 29, at 5.  Daye argues

that Speedy Loan's loans violated New Mexico's laws regarding payday loans by charging more

than double the authorized rate, illegally renewing the loans, and failing to provide many of the

other required loan terms that the Small Loan Act sets forth.  See Complaint ¶¶ 36-38, at 6-7; id.

¶¶ 51-53, at 8-9.  Daye contends that, even though Speedy Loan knew its lending practices were

unlawful, it attempted to manipulate its disclosures to make its loans appear similar to

installment loans, which are subject to less restrictive regulation under New Mexico law.  See

Complaint ¶ 2, at 1.

Daye also argues that Speedy Loan violated the Truth in Lending Act, 15 U.S.C. §§ 1601

- 1667f ("TILA"), by under-disclosing the finance charge, the annual percentage rate, and the

total number of payments in its loan paperwork.  Complaint ¶¶ 78-79, at 13.  Next, Daye alleges

that Speedy Loan violated the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693−1693r

("EFTA"), by conditioning its extension of credit on repayment by preauthorized electronic

funds transfer.  Complaint ¶¶ 80-81, at 13-14.  Finally, Daye contends that Speedy Loan's

conduct violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. 1978 §§ 57-12-1 to -26

("UPA").  Day alleges that Speedy Loan committed the same violations against hundreds or

thousands of people.  See Complaint ¶ 65, at 10.

## PROCEDURAL BACKGROUND

Daye "moves to certify this case as a class action and appoint her counsel as counsel for

the class."  Motion at 1.  Daye seeks certification of one overarching class, which includes all

class members, and four subclasses.  Brief at 3.  The Class consists of all persons who, beginning

four years before Daye filed the Complaint, entered into a loan with Speedy Loan.  See Motion

at 1.  The proposed subclasses are as follows:

1.  The "Payday Loan Subclass" consists of all members of the class who entered into a loan with Speedy beginning four years prior to the filing of this action, and EITHER (a) Speedy conditioned the loan upon repayment by means of preauthorized debit authorization OR (b) Speedy accepted preauthorized debit authorization and either the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days.  The members of the Payday Loan Subclass assert a right to relief under the UPA and other legal theories for Speedy's illegal payday loans.

2.  The "EFTA Subclass" consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, and whose loan was conditioned upon repayment by means of preauthorized electronic fund transfer.  The members of the EFTA Subclass assert a right to relief under the EFTA.

3.  The "TILA Subclass" consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, in which EITHER (a) the loan paperwork disclosed a "Total of Payments" and "Finance Charge" lower than the true amounts, OR (b) the form contract did not state the dates upon which the first payment or any subsequent payments were due, or whether the payments were due weekly, monthly, or otherwise, or the number of payments.  The members of the TILA Subclass assert a right to relief under the TILA.

4.  The "Deceptive Disclosure Subclass" consists of all members of the class who entered into a loan with Speedy that disclosed a "Total of Payments" and "Finance Charge" lower than the true amounts.  The members of the Deceptive Disclosure Subclass assert a right to relief under the UPA.

Brief at 3-4 (internal footnotes omitted).



1.      __The Brief in Support of the Motion to Certify__.

Daye describes how Speedy Loan's loans violated the law under each of the four subclasses.  First, she alleges that all of Speedy Loan's loans to the Payday Loan Subclass members -- which include all proposed class members -- violated New Mexico Law.  See Brief at 4.  She states that Speedy Loan offered a single loan product during the relevant time period, which it refers to as an "installment loan."  Brief at 4.  Daye asserts that, to apply for a loan, Speedy Loan required customers to provide their bank account and routing numbers to be used for electronic fund transfers.  See Brief at 4.  She argues that, because Speedy Loan conditioned its loans on repayment by preauthorized electronic fund transfer, its loans constitute "payday loans" under New Mexico law.  Brief at 5.  She contends that, under the Small Loan Act, New Mexico subjects payday loans to "strict requirements."  Brief at 6.  Daye asserts that Speedy Loan's loans "failed to meet the requirements of the Small Loan Act."  Brief at 6.  Daye states that, because Speedy Loan's loans violate the Small Loan Act, they violate the UPA, which prohibits "unfair or deceptive trade practices," N.M. Stat. Ann. § 57-12-2(D)), and "unconscionable trade practices," N.M. Stat. Ann. § 57-12-2(E).  She argues that all members have the same legal claims against Speedy Loan "based on its unlawful payday lending practices."  Brief at 7.

Second, Daye contends that, Speedy Loan's loans  violate the EFTA for the same reasons that they constitute payday loans.  See Brief at 8.  She states that the EFTA makes it illegal to "condition the extension of credit to a consumer's repayment by means of preauthorized electronic fund transfers."  Brief at 9 (citing 15 U.S.C. § 1693k).  Third, Daye alleges that Speedy Loan's form contracts uniformly fail to disclose payment due dates, as the TILA requires.  See Brief at 9.  She asserts that every form contract loan "did not state the dates upon

which the first payment or any subsequent payments were due," giving all TILA Subclass members the same cause of action.  Brief at 9.

Fourth, Daye contends that Speedy Loan under-disclosed the total amount of payments that each borrower had to pay ("Total of Payments") and applicable Finance Charge.  Brief at 9.  She argues that these misrepresentations "violate the TILA and constitute unfair or deceptive trade practices under the UPA."  Brief at 10.  She states that the Deceptive Disclosure Subclass includes all persons within the statute of limitations to whom such misrepresentations were made.  See Brief at 10.

Daye then argues that the Court should certify this case as a class action.  See Brief at 10.  She describes how the TILA and the UPA "explicitly provide[] for class actions."  Brief at 11 (citing 15 U.S.C. § 1640(a) and N.M. Stat. Ann. § 57-12-10(E)).  She argues that she meets all four of rule 23(a) of the Federal Rules of Civil Procedures' class certification requirements.  See Brief at 12.  Regarding rule 23(a)'s numerosity requirement, she asserts that the subclasses will contain the following amounts of people: (i) around 32,000 members in the Payday Loan Subclass; (ii) around 6,000 members in both the EFTA and the TILA Subclasses;[1] and (iii) around 29,000 members in the Deceptive Disclosure Subclass.[2]

_____

[1]The only reason that the TILA and EFTA Subclasses are so much smaller than the other subclasses is because the TILA and the EFTA both have one-year statutes of limitations, which restrict the number of proposed class members who have valid claims under these statutes.  See Brief at 3-4.  The members in these subclasses, however, are also members of the Payday Loan Subclass, which includes all proposed class members, and nearly all of them are also in the Deceptive Disclosure Subclass.  See Brief at 3-4; Tr. at 42:10-18 (Court, Mattison)(stating that the only reason that every proposed class member is not in the EFTA Subclass is because the EFTA has a one-year statute of limitations).

Furthermore, Daye asserts that the only reason that the Deceptive Disclosure Subclass is smaller than the Payday Loan Subclass is because "[e]very now and then, by sheer chance, Speedy actually disclosed the total of payments correctly," so a borrower might be in the other subclasses, but not the Deceptive Disclosure Subclass.  Tr. at 66:10-18 (Mattison).  Daye

Regarding rule 23(a)'s commonality requirement, Daye presents the following common questions:

1. Whether Speedy's loans are payday loans under the Small Loan Act;

2. Whether Speedy's loans complied with the Small Loan Act's requirements for payday loans;

3. Whether Speedy's loans violated the UPA with regard to their violation of the Small Loan Act;

4. Whether Speedy's loans are void or it would otherwise be inequitable for Speedy to retain or collect unlawful interest;

5. Whether Speedy conditioned loans on ACH withdrawals in violation of the EFTA[;]

6. Whether Speedy under-disclosed the Finance Charge and Total of Payments, in violation of the TILA and the UPA;

7. Whether Speedy failed to list the payment schedule fully and accurately, in violation of the TILA.

Brief at 14. She states that all of these questions could generate common answers apt to drive the litigation's resolution. See Brief at 14. Along the same lines, she argues that her claims and the proposed class members' claims "all arise from identical loan agreements and from the same course of conduct by the Defendant." Brief at 15. Daye further asserts that her counsel will adequately represent the class, because: (i) Daye's interests align with the rest of the class; and (ii) her attorneys "have extensive experience litigating TILA and UPA cases and in bringing class actions." Brief at 16-17.

---

compared this situation to a broken clock in that twice a day it tells the right time. See Tr. at 66:10-12 (Mattison).

[2]In the Brief, Daye notes that this number is an estimate. She states that she has reviewed only 100 out of the 200 sample loan files that Speedy Loan produced. She states that, of the first 100 loan files, 90 of them under-disclosed the Total of Payments and Finance Charge. See Brief at 12. She argues that, if "90% of all contracts made inaccurate disclosures, then the Deceptive Disclosure Subclass will have approximately 29,000 members." Brief at 12.

With respect to rule 23(b)'s requirements, Daye asserts that common questions predominate.  See Brief at 17-18.  Specifically, she states that, when cases involve "the legality of standardized documents or conduct," they are generally appropriate for class resolution, "because the document or conduct is the focal point of the analysis."  Brief at 18.  She argues that this case is especially apt for class resolution, because no individual liability questions exist, meaning that there "are no individual inquiries necessary to resolve this case or which pose the kind of problems that are barriers to class certification."  Brief at 18.  Finally, she contends that the class action mechanism is the superior method for resolving the Proposed Class' claims.  See Brief at 19-20.

### 2. **The Response.**

Speedy Loan opposes class certification.   See Defendant's Response to Plaintiff's Opposed Motion for Class Certification, filed December 31, 2015 (Doc. 70)("Response").   It argues that common questions of fact and law do not exist.  See Response at 5.  For the Payday Loan Subclass, Speedy Loans asserts that "the proposed subclass is actually more restrictive than all customers who have loans that may have violated the SLA."  Response at 6.  It states that Daye limits the class to those borrowers who obtained loans that not only violate the Small Loan Act, but also violate the UPA.  See Response at 7.  Speedy Loan argues that, to determine whether a Small Loan Act violation rises to the level of a UPA claim requires individual determinations whether each loan was unconscionable or misleading.  See Response at 7. Speedy Loan concedes that whether it violated the Small Loan Act "may be a common question."  Response at 7.  Nonetheless, it argues that, even if the Small Loan Act violations were common to every class member, "the common answer will not result in a common

resolution," because the Court must make case-by-case determinations to resolve Daye's claims. Response at 7-8.

Speedy Loan next asserts that Daye cannot form the EFTA Subclass. See Response at 9-10. It states that each loan agreement "makes clear that electronic fund transfers are wholly optional." Response at 10. It argues that the only way to show that the loans required electronic transfers is to show that the "totality of the circumstances" make alternative payment methods illusory. Response at 10. It contends that making such a showing defeats commonality, because it requires the Court to make individualized determinations whether each loan made alternative methods appear illusory. See Response at 10.

Speedy Loan argues that the TILA Subclass "suffers from the same infirmities that afflict the Payday Loan Subclass (supra) and the Deceptive Disclosure Subclass." Response at 10. It states that each loan has a different payment schedule which may or may not conflict with the loan's front-page representations. See Response at 11. In short, Speedy Loan argues that the Court must examine each loan document to determine whether misrepresentations exist, thereby defeating commonality. See Response at 11.

Similarly, Speedy Loan contends that the Deceptive Disclosure Subclass requires the Court to analyze individual loans. It states that "Speedy Loan's defenses are specific to each case, or each of the numerous variations of cases." Response at 11. It observes that Daye concedes "that not all of the disclosed finance charges, payments, and payment schedules were inaccurate." Response at 11. It argues that a variation among each of the loans destroys commonality. See Response at 11-12.

Speedy Loan asserts that, for the same reasons that Daye does not meet rule 23's commonality requirement, she does not meet rule 23's typicality requirement. See Response at

12.  It asserts that, because Daye's claims or defenses are not typical of the class members' claims and defenses, she will not adequately protect the class' interests.  <u>See</u> Response at 12.  Specifically, Speedy Loan argues that it can assert different defenses against different class members.  <u>See</u> Response at 12.  For the Payday Loan Subclass, Speedy Loan contends that its defenses to alleged UPA violations depend on "the specific facts and circumstances surrounding each loan."  Response at 13.  It asserts that the Court must examine each loan's specific amount, interest rate, repayment schedule to determine whether Speedy Loan made false or misleading statements, in addition to considering each individual loan customer to determine whether it acted unconscionably.  <u>See</u> Response at 3.  In sum, Speedy Loan argues that "not a single one of the classes satisfies the prerequisites for certification under Fed. R. Civ. P. 23(a)."  Response at 15.

### 3.    The Reply.

Daye replied on January 14, 2016.  <u>See</u> Reply in Support of Plaintiff's Opposed Motion for Class Certification, filed January 14, 2016 (Doc. 74)("Reply").  To begin, Daye observes that, by failing to address the following issues, Speedy Loan concedes that Daye has met the following class certification requirements: (i) predominance and superiority under rule 23(b)(3); (ii) numerosity under rule 23(a)(1); and (iii) adequacy of Daye's counsel under rule 23(a)(4).  Daye further notes that, even though Speedy Loan challenges commonality, it does not show that the differences it raises between loan documents "have any bearing on whether the Court should certify a class in order [to] resolve the common legal claims of those customers."  Reply at 1.  She then clarifies the class definition, asserting that "the overarching class and the Payday Loan Subclass are identical, and include all of Speedy's borrowers during the relevant period of time."  Reply at 3.  She states that "[a]ll of these borrowers are entitled to relief of some kind from

Speedy, although the extent of the relief may vary."  Reply at 3.  In other words, she argues, the "other three subclasses are subsets of the class."  Reply at 3.  She asserts that using subclasses "is the most streamlined method for the Court to proceed with this case."  Reply at 4.

Daye then describes how each of the subclasses meet rule 23's commonality requirement. See Reply at 5.  She emphasizes that all of Speedy Loan's loans "uniformly failed to comply with New Mexico's detailed regulation of payday loans, including limits on interest rates and renewals, the requirement of specific disclosures, and so forth."  Reply at 5.  She argues that these Small-Loan-Act violations also constitute a UPA violation.  See Reply at 5.  She points out that Speedy Loan repeatedly concedes that "the question of whether the payday loans are void is a common question suitable for class resolution."  Reply at 5.  Daye argues that this common issue is sufficient to allow the Court to certify the Payday Loan Subclass.  See Reply at 5.

In response to Speedy Loan's contention that the Court cannot certify the class because of Daye's UPA claims, Daye argues that differences in loan documents are not salient to her claims, because payday loans "constitute *per se* violations of the UPA by virtue of their uniform failure to comply with the Small Loan Act."  Reply at 5-6.  She argues that making payday loans that violate the Small Loan Act "is unfair and deceptive" per se, and "does not call for individualized proof."  Reply at 6.  She asserts that the Court need not consider each individual case, because unlike common-law fraud claims, UPA claims do not require the plaintiff to show detrimental reliance.  See Reply at 6.  Daye stresses that UPA claims seek to make it easier than the common law to fight deceptive practices by requiring less particularized evidence than common-law claims.  See Reply at 6.

Regarding the EFTA Subclass, Daye asserts that all of Speedy Loan's form contracts "conditioned the extension of credit on repayment by means of preauthorized electronic funds

transfer." Reply at 8. To rebut Speedy Loan's contention that electronic transfer is optional, Daye argues that Speedy Loan presents all borrowers with forms authorizing them to debit the borrower's account. See Reply at 8. She argues that a common question exists whether the forms, which all contain the same provisions regarding payment, require electronic transfers. See Reply at 8.

As to the TILA Subclass, Daye asserts that all proposed class members' loans include one or more TILA violations, including: (i) an under-disclosed Total of Payments and Finance Charge, and/or (ii) an inadequate Payment Schedule. See Reply at 10. Daye contends that the Court can identify whether these disclosures violate the TILA by looking at the face of one document, "without individualized evidence." Reply at 10. She argues that, while some members' loans may include one or the other violation, "the common question is whether Speedy's loans violated the TILA in at least one of two ways." Reply at 10.

Daye asserts that the Deceptive Disclosure Subclass is similar to the TILA subclass, but includes borrowers who entered into contracts "up to four years prior to the filing of the action," while the TILA limits the TILA Subclass to borrowers who entered into contracts "no earlier than one year prior to the filing of this action." Reply at 11. The only other difference, Daye contends, is that the Deceptive Disclosure Subclass includes class members whose damages relate only to misrepresentations regarding the Finance Charge and the Total of Payments. See Reply at 11. Daye argues that any variations between loans do not foreclose commonality, because all proposed class members "entered into loans that included the same deceptive under-disclosure of the Total of Payments and Finance Charge." Reply at 11. Finally, Daye asserts that her claims are typical of all class members, because her loan contracts contain each violation she alleges. See Reply at 12-13.

4.      **The Hearing.**

The Court held a hearing on February 2, 2016.  <u>See</u> Transcript of Hearing (taken February 2, 2016)("Tr.").[3]  Speedy Loan began by stating that its main dispute with certification related to commonality.  <u>See</u> Tr. at 6:9-11 (Kochersberger).  It admitted that there are some viable classes here, but argued that the subclasses must be defined more narrowly.  <u>See</u> Tr. at 7:23-8:2 (Kochersberger); <u>id.</u> at 9:5-7 (Kochersberger)("[T]here may be a number of properly formed subclasses if we can get to the point that they're properly defined.").  Speedy Loan expressed difficulty understanding Daye's Payday Loan Subclass definition, arguing that it should be divided into two subclasses: one in which Speedy Loan required electronic fund transfers, and one in which Speedy Loan allowed the transfers, and the loan had a maturity period of less than 120 days.  <u>See</u> Tr. at 27:18-22 (Kochersberger); <u>id.</u> at 34:1-11 (Kochersberger).  Daye argued that there was no need for two separate classes, because the proposed subclass members all had the same claims and would use the same evidence to prove those claims; the two characteristics merely identify those proposed class members rather than dividing them into different groups.  <u>See</u> Tr. at 29:7-11 (Mattison).

Speedy Loan's main contention against certification was that, under its interpretation of Daye's Brief, Daye argues that circumstances outside the loan contract caused the legal violations, which requires the Court to analyze each individual loan transaction.  <u>See</u> Tr. at 34:10-16 (Kochersberger)(asserting that the Court would have to consider individual consumers' knowledge and experience).  Speedy Loan recognized that, if Daye truly intended to prove her claims on the basis of form loan contracts, without referencing individualized evidence, the Court could certify that class.  <u>See</u> Tr. at 52:2-5 (Court, Kochersberger)(admitting that whether

---

[3]The Court's citations to the transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

certain contractual language in every loan contract violates the TILA is a common issue among all class members); id. at 45:17-46:8 (Kochersberger).  Speedy Loan stated that it disputed class certification only if Daye intended to prove her claims through a totality of the circumstances approach.  See Tr. at 45:17-46:8 (Kochersberger).

Daye asserted that she intended to prove her claims on the basis of form loan contracts and standardized procedures, refuting Speedy Loan's understanding of her claims.  See Tr. at 18:10-12 (Mattison).  Daye stated that she did not assert that circumstances outside the loan documents caused the legal violations.   See Tr. at 18:10-12 (Mattison); id. at 21:5-11 (Mattison)(stating that Daye did not intend to prove her claims by considering "what was in the minds of the lender and the borrower or what signs may be on the wall," but by considering "the text of this loan contract"); id. at 39:9-22 (Mattison)(asserting that Daye does not argue procedural unconscionability or reliance).  Instead, she contended that the same statements in each loan contract caused the alleged legal violations.  See Tr. at 18:10-12 (Mattison).  She argued that she can prove Speedy Loan's liability using the same evidence for all class members: standard loan procedures and standard form contracts.  See Tr. at 5:3-6 (Mattison).  "We're really just looking at the legal import of form contracts."  Tr. at 5:8-9 (Mattison).

Regarding the TILA and Deceptive Disclosure Subclasses, Daye argued that she will similarly use the exact same loan documents to prove her claims.  See Tr. at 58:12-18 (Mattison).  Daye further asserted that the Court can determine which loans contain inaccurate disclosures of the Total of Payments and Finance Charge in seconds, preventing the Court from devoting more of its time to individual questions than to common questions.  See Tr. at 47:22-25 (Mattison).  Daye stated that an Excel spreadsheet, which both parties together "have been working on diligently for a long time," reveals precisely which loans contained inaccurate disclosures, and

the amount by which they under-disclosed the Total of Payments and Finance Charge.  See Tr. at 48:23-49:10 (Mattison); Example of Spreadsheet (submitted at the hearing on February 2, 2016)(Doc. 81).  Daye argued that the extent of the under-disclosure is a damages issue; what matters at the class certification stage is that the loan documents all contain the same type of deficiencies.  See Tr. at 14:18-20 (Court, Mattison).  She argued that, because all loans contain the same deficiencies, the Court can resolve all class members' claims at once by determining whether this under-disclosure violates the TILA and the UPA.  See Tr. at 14:18-20 (Court, Mattison).

After Daye clarified that she sought only to prove her TILA and UPA claims using the common loan contract, Speedy Loan agreed that the questions for these subclasses "would be numerous and common to all of the folks and you can make a decision on that."  Tr. at 53:14-16 (Kochersberger).  See id. at 55:6-11 (Kochersberger)("[T]he way that it's crafted in the reply it seems like a class that we can't really mount any opposition to.");  id. at 59:13-60:11 (Kochersberger)(stating that the Court could certify these subclasses, because "all the loan contracts said" that "payments are due on your payday").

Speedy Loan made several other concessions at the end of the hearing.  It admitted that the question whether Speedy Loan requires electronic funds transfers likely meets rule 23's predominance requirement.  See Tr. at 35:23-36:2 (Kochersberger). It acknowledged that Daye also satisfies rule 23's superiority and numerosity requirements.  See Tr. at 36:8-17 (Kochersberger).  It also conceded that Daye's counsel is adequate under rule 23(a)(4).  See Tr. at 36:21-24 (Court, Kochersberger).  Because Speedy Loan argues in its Response that class certification would prevent it from asserting individual defenses, the Court asked Speedy Loan what defenses it could mount against any one individual.  See Tr. at 43:14-19 (Court).  Speedy

Loan responded that it could argue that it did not require electronic funds transfer, because some people might have paid with cash, but the Court observed that Speedy Loan's defense could be raised against all class members.  See Tr. at 44:1-45:13 (Court, Kochersberger).

Speedy Loan then admitted that, under Daye's argument that the loan contract itself requires electronic funds transfer, the Court could certify a class.  See Tr. at 45:17-21 (Kochersberger)("[I]f the plaintiff is defining the class as simply everyone who signed the money document as being required to enter into an electronic funds transfer agreement then that's a class.").  It stated that, as long as Daye does not intend to introduce evidence about verbal representations in individual loan transactions, the Court could certify that subclass.  See Tr. at 45:17-46:8 (Kochersberger).  In the end, Speedy Loan conceded that the Court could likely certify Daye's various subclasses, but argued that they should be litigated as different class actions, not one class action with various subclasses.  See Tr. at 74:1-20 (Kochersberger)(stating that "there are a number of common questions" and that "each class is defined by those common questions," but that there are different classes).  Daye argued that the overarching question is whether Speedy Loan overcharged the proposed class members for their loans and provided them with improper disclosures.  See Tr. at 74:24-75:2 (Mattison).  Daye concluded the hearing by pointing out that, even though Speedy Loan concedes class certification on several issues, the parties vigorously disputed each claim's merits.  See Tr. at 68:14-69:8 (Mattison).

### LAW REGARDING CERTIFYING CLASS ACTIONS UNDER RULE 23(b)(3).

Rule 23 sets forth the requirements for certifying a class action under the federal rules.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all of rule 23(a)'s requirements; and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-

(b).  The plaintiff[4] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that effect . . . .").

In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts to a preponderance of the evidence.[5]  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir.

---

[4]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed. 2015).  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[5]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued a case stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed. 2015)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly

2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2551-52 (2011)(Scalia, J.)("Wal-Mart").  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's

---

adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013)(Ginsburg, J.).

To reconcile these two directives, the Court will find facts for the purposes of class certification by a preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent case's merits stage.  This approach is analogous to preliminary injunction practice, and, although the Tenth Circuit has not endorsed it, other circuits have approved of this approach.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.

    **1.**    **Requirements Applicable to All Classes: Rule 23(a).**

All classes must satisfy rule 23(a)'s prerequisites:

    **(a)**    **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

        **(1)**    the class is so numerous that joinder of all members is impracticable;

        **(2)**    there are questions of law or fact common to the class;

        **(3)**    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

        **(4)**    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982))(citing Reed v. Bowen, 849 F.2d at 1309)  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy.

        **a.**       **Numerosity.**

Rule 23(a)(1) requires that the proposed class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption."  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)).  Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable."  Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(citation omitted).  See

Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(Ryan, J.)(noting that rule 23(a)(1) is not a "strict numerical test"; holding, however, that where the class comprises over 1,100 persons, the suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable." (citation omitted)).

"Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993)(Kane, J.). See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible."). The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. 668, 683 (D.N.M. 2011)(Browning, J.). At the other end of the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable. See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.). See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

  b.  **Commonality.**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2)(emphasis added). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common

questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'"  (citations omitted)).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart, 131 S. Ct. at 2551.

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to each claim's validity that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 131 S. Ct. at 2550-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 131 S. Ct. at 2547.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 131 S. Ct. at 2547-48.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class

member] the victim of one common discriminatory practice." 131 S. Ct. at 2548. The Supreme

Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 131 S. Ct. at 2550-51 (emphasis in original)(quoting Nagareda, supra, at 132). In

EQT Production Co. v. Adair, the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its

discretion by failing to consider the significance of this common conduct to the broader litigation.

        The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

        That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In <u>Wal-Mart</u>, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  131 S. Ct. at 2546.  From this observation, he then concluded:

        Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

<u>Wal-Mart</u>, 131 S. Ct. at 2561.  Thus, the common question or questions cannot be "incidental" nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

      **c.**    **Typicality.**

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  <u>See</u> Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests

are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001). The Supreme Court of the United States has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  "Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality." DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).  "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d at 1199.  Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982))("In determining whether the typicality and commonality requirements have been fulfilled, either common

questions of law or fact presented by the class will be deemed sufficient."); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." (citations omitted)).

        **d.**    **Adequacy.**

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement protects the due-process interests of unnamed proposed class members -- who are bound by any judgment in the action. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the

experience and competence of the attorney representing the class may inform the court's analysis.  See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.  Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, this analysis has likely now been moved entirely to rule 23(g).[6]  This difference matters little, except that now district courts should not refuse to certify a class on the basis of inadequacy of counsel alone.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes

---

[6]The 2003 amendments to rule 23 created rule 23(g), entitled "class counsel."  Fed. R. Civ. P. 23(g).  This subsection contains its own adequacy-of-counsel analysis.  See Fed. R. Civ. P. 23(g)(1)-(2).

did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."  7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, <u>Federal Practice & Procedure</u> § 1768, at 389-93 (3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit."  <u>Lowery v. City of Albuquerque</u>, 273 F.R.D. at 680 (citation omitted).

### 2.    <u>Different Categories of Classes: Rule 23(b).</u>

Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)."  <u>Adamson v. Bowen</u>, 855 F.2d at 675.  <u>See</u> <u>DG v. Devaughn</u>, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)    Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)    prosecuting** separate actions by or against individual putative class members would create a risk of:
> >
> > > **(A)    inconsistent** or varying adjudications with respect to individual putative class members

that would establish incompatible standards of conduct for the party opposing the class; or

**(B)**   adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)**   the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)**   the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   The matters pertinent to these findings include:

**(A)**   the putative class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)**   the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

**(C)**   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)**   the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).   "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."   Gonzales v. City of Albuquerque, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court

must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added).  Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the interest of class members in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation that class members have already commenced; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

### i.        The Predominance Requirement.

Rule 23(b)(3) first requires questions common to the class to predominate over those that are individualized.  See Fed. R. Civ. P. 23(b)(3).  A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member."  Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common

question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

There is little uniform guidance on how to assess when common issues predominate over individual ones.  Moreover, there is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance -- with the Sixth and Seventh Circuits, on one side and the Third, Tenth and Eleventh Circuits on the other.  The Honorable Richard A. Posner, United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  The Sixth Circuit defines predominance in a similar manner.  See In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir.

2012).  The Sixth and Seventh Circuits, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

The Third, Tenth, and Eleventh Circuits stake out a different test.

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (emphasis in original)(citations omitted).[7]  The Eleventh Circuit, however, imposes a different,

---

[7]The Eleventh Circuit first adopted this test in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and in 2010 in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 . . . .

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence

more rigorous, second step: the district court's trial plan must spend more time adjudicating the

common questions than it does adjudicating the individual questions.[8]

_____

offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

   [8]Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim.  Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication.   Current case law remains unclear whether subclassification and issue certification can help satisfy predominance, or if these techniques are separate from the predominance inquiry.  The Fifth Circuit staked out a clear answer to this question in Castano v. American Tobacco Co.:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action.  A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted).  The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Gunnells v. Healthplan Servs., Inc., 348 F.3d at 446-47.  Despite Judge Niemeyer's concern with creating a Circuit split, the Second Circuit, the Seventh Circuit, and the Ninth Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001.  See

The Tenth Circuit followed the Eleventh Circuit's approach in <u>CGC Holding Co., LLC v.</u>

<u>Broad and Cassel</u>:

> [W]e must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate.   Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not.   Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

<u>CGC Holding Co., LLC v. Broad & Cassel</u>, 773 F.3d at 1087-88.   The Tenth Circuit then

considered whether reliance "is susceptible to general and classwide proof."   773 F.3d at

1088-90.   It concluded that it could infer reliance where "circumstantial evidence that can

be used to show reliance is common to the whole class.   That is, the same considerations

could lead a reasonable factfinder to conclude beyond a preponderance of the evidence

that each individual plaintiff relied on the defendants' representations."   773 F.3d at

1090.   It is clear, given the Tenth Circuit's repeated citations to Eleventh Circuit case

law, including <u>Klay v. Humana</u>, that the Tenth Circuit has adopted the Eleventh Circuit's

test of comparing the total time the district court most likely will spend on common

versus individual questions.   <u>See</u> <u>CGC Holding Co., LLC v. Broad & Cassel</u>, 773 F.3d at

---

<u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 167-69 (2d Cir. 2001); <u>Jefferson v. Ingersoll Int'l Inc.</u>, 195 F.3d 894, 898 (7th Cir. 1999).

     The Eleventh Circuit has refrained from taking a side on this question.   <u>See</u> <u>Borrero v. United Healthcare of N.Y., Inc.</u>, 610 F.3d 1296, 1310 n.5 (11th Cir. 2010).   The Tenth Circuit also appears to have refrained from taking a side.   <u>See</u> <u>Monreal v. Potter</u>, 367 F.3d at 1237 n.12.

1087.[9]  The Third Circuit has adopted a similar approach.  See Marcus v. BMW of North

America, LLC, 687 F.3d 583 (3d Cir. 2012).

In light of the Tenth Circuit's analysis in CGC Holding Co., LLC v. Broad & Cassel, the

Court concludes that, to determine whether predominance is satisfied, it must first "*characterize*

the issues in the case as common or not, and then *weigh* which issues predominate.  773 F.3d at

1087 (emphases in original).  The Court also thinks that Wal-Mart and Comcast Corp. v.

Behrend have changed the landscape for the predominance analysis overall.  For example, there

are some old cases that state that rule 23(b)(3) "does not require that common questions be

dispositive or significant; it only requires that common questions predominate."  In re Potash

Antitrust Litig., 159 F.R.D. 682, 699 (D. Minn. 1995)(Kyle, J.).  Similarly, the Second Circuit

had said that the fact that the answer to a common question is not disputed -- for example, if the

parties have stipulated to the answer or the court has already ruled -- does not affect either its

commonality or its ability to predominate.  See In re Nassau Cty. Strip Search Cases, 461 F.3d

219, 228 (2d Cir. 2006)(Straub, J.)("That the class-wide proof comes in the form of a simple

concession rather than contested evidence certainly shortens the time that the court must spend

adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed

class, which is the central concern of the predominance requirement.").  The Court believes that

the days of submitting a long list of allegedly common issues -- some dispositive, some not

dispositive, some significant, some not significant, some upon which the Court has already ruled,

some which remain unanswered, some of which are not disputed, some of which the parties have

_____

[9]The Tenth Circuit cites to a section of Newberg for its predominance analysis, which
directs courts to "first characterize the issues in the case as common or individual and then weigh
which predominate."  Newberg § 4:50.

stipulated -- are over.  The common issues have to be real issues -- not phantom issues -- or else the analysis will not mean anything.[10]

A defendant's desire to assert individual counterclaims does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985); Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).  A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is limited after Wal-Mart.[11]  Other recurring individual issues present more serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[12]

---

[10]In a post-Wal-Mart case, the Supreme Court wrote that plaintiffs need not "prove that the predominating question will be answered in their favor" at the class certification stage.  Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. at 1196.

[11]Limitations defenses are an especially common breed of affirmative defense.  The statute of limitations defense does not typically defeat predominance:

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[12]Despite the concern about the individual issues involved in fraud cases, there are at least three situations in which courts typically find common issues predominant in fraud cases:

(ii) differences in the applicable law in a multi-state, state law-based class actions,[13] see Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents such a challenge to predominance that class

---

"(1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance."   Newberg § 4:58.   Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.   See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized.");   In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).   The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.   See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[13]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in a pre-Wal-Mart/Comcast opinion, stated:

No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

. . . .

Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. . . .  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1015-20.

certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

Finally, despite earlier case law, recent Supreme Court case law makes clear that damages determinations, whether they relate to classwide damages or individual damages, can defeat predominance.  See Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013).  In Comcast Corp. v. Behrend, the Supreme Court held that the plaintiffs' method for determining classwide damages -- a regression model not based on any particular one of the plaintiffs' four liability theories -- was inadmissible to prove classwide damages.  See 133 S. Ct. 1433.  The Third Circuit had allowed the plaintiffs' method to establish damages without deciding "whether the methodology was a just and reasonable inference or speculation."  133 S. Ct. at 1433 (quoting 655 F.3d 182, 206 (3d Cir. 2011)).  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents'
> model falls far short of establishing that damages are capable of measurement on
> a classwide basis.  Without presenting another methodology, respondents cannot
> show Rule 23(b)(3) predominance: Questions of individual damage calculations
> will inevitably overwhelm questions common to the class.

Comcast Corp. v. Behrend, 133 S. Ct. at 1433.  In short, Justice Scalia stated that, without any reliable method for establishing classwide damages, individual issues relating to determining classwide damages defeated predominance.  See 133 S. Ct. at 1433.

The Court thinks that Comcast Corp. v. Behrend is relevant not only to classwide damages, but also to individual damages determinations, in three ways.  First, at the class certification stage, the Court cannot ignore how individual damages are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  A class can have individual damage calculations, but the Court must consider the issues of individual damages calculations at the

class certification stage.  Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

### ii.       The Superiority Requirement.

The second requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.  The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation. These claims are the heart and soul of the class action, as the Supreme Court reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)). The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately. While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive. See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria."). The first factor, "the class members' interests in individually controlling the prosecution . . . of

separate actions," closely tracks the money value of the individual cases.   Fed. R. Civ. P.

23(b)(3)(A).   When individual actions are practical, they are preferred; the United States has a

"deep-rooted historic tradition that everyone should have his own day in court," and adjudicating

individual disputes is the core activity of our judicial scheme.   Martin v. Wilks, 490 U.S. 755,

762 (1989)(quoting 18C Charles Alan Wright et al., Federal Practice  Procedure, Jurisdiction &

Related Matters § 4449, at 417 (1981)).   The proposed class members' emotional connection to

the case may also be relevant: the stronger the attachment, the more reticent the court should be

to certify the case.   See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013);

Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003).   Another recurring issue that

arises in relation to this factor is when the invoked statute provides greater remedies for

individual suits than for class suits, either by imposing a damage cap for class actions which does

not apply to individual actions, or by granting statutory damages to individual plaintiffs while

requiring class plaintiffs to prove actual damages.   See, e.g., Fair Debt Collection Practices Act,

15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000.00 and class action damages at

$500,000.00); TILA, 15 U.S.C. § 1640(a) (capping individual damages at $5,000.00 and class

action damages at $500,000.00).   Although claims under these statutes may be more lucratively

brought as individual actions, courts should assess the real-world likelihood that class members

would bring their own actions, which implicates another factor the court should consider: the

likelihood that proposed class members know they have a claim and whether they are savvy

enough to pursue it.   See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla.

2009)(finding superiority because "class members [most likely do not] understand the provisions

well enough to know that it may be financially worthwhile to spend the time and effort to litigate

these matters").  As the Honorable Loretta A. Preska, Chief United States District Judge for the

Southern District of New York, wrote,

> while the potential for higher individual recoveries exists, realizing that potential
> requires assuming that each putative class member is aware of her rights, willing
> to subject herself to all the burdens of suing and able to find an attorney willing to
> take her case.  Those transaction costs are not insubstantial and have prompted
> other courts in this Circuit to conclude that litigating as a class is superior.

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007).  See Jancik v.

Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11

(D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not

likely to know their rights and are therefore not likely to pursue these claims on their own.").

The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning

the controversy already begun by . . . class members," is closely linked to the first factor.  Fed. R.

Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to consider the

interests of individual members of the class in controlling their own litigations and carrying them

on as they see fit.  In this connection the court should inform itself of any litigation actually

pending by or against the individuals."  Fed. R. Civ. P. 23 advisory committee's notes (citations

omitted).  This passage suggests that the extent to which proposed class members have already

filed individual claims is probative evidence of the extent to which they will continue to file

individual claims in the event of certification denial, and indicates a higher "interest[] in

individually controlling the prosecution."  Fed. R. Civ. P. 23(b)(3)(A).  It is also probative

evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely

representing that they are to enhance his argument for certification.

In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful

fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed

class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B).  The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) and are sent notice of their claim, but fail to file an individual claim or even to opt out of the class, and (iii) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it provides one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun."  Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Penn.)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been

certified to pursue certain claims, redundant classes should generally not be certified.  See William B. Rubenstein, Newberg on Class Actions § 4:70 (5th ed. 2015)("[I]f a *class action* case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture."  (emphasis in original)).  Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.

The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.  Fed. R. Civ. P. 23(b)(3)(C).  The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.  See Newberg § 4:71.

The second prong is whether the particular court at issue is a desirable forum for the litigation.  Some issues that reliably influence the determination of this prong include: (i) the parties', witnesses', or class counsel's geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the harm's locus, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).  "The particular court at issue" does not refer only to the desirability of the United States District Court for the

- 43 -

District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004); if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

The fourth, final, and most important factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D); Newberg § 4:72 (naming the manageability factor as "the most critical concern in determining whether a class action is a superior means of adjudication").  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  The principal concern in a manageability inquiry is individualization.  A proposed class' size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).  Accordingly, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> The predominance analysis has a tremendous impact on the superiority analysis
> for the simple reason that, the more common issues predominate over individual

issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184 (internal citations and quotation marks omitted).  See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism."  Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).   Most techniques that are truly "procedural" are fair game: cases can be bifurcated, trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question how to distribute the damages among the class can be addressed with less formality.[14]

---

[14]The defendants have a due-process right to have any damages against them proven in court.  The question how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.   The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.   The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart, 131 S. Ct. at 2561.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See, e.g., Wal-Mart, 131 S. Ct. at 2561.  The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven.  See Wal-Mart, 131 S. Ct. at 2561.  When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action.  Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.

In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment.  The Seventh Amendment contains two clauses:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation

which post-dates the Founding -- violates the trial-by-jury clause.  Whatever the merits of this

argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.  It is the
> Constitution which we are to interpret; and the Constitution is concerned, not with
> form, but with substance.  All of vital significance in trial by jury is that issues of
> fact be submitted for determination with such instructions and guidance by the
> court as will afford opportunity for that consideration by the jury which was
> secured by the rules governing trials at common law.  Beyond this, the Seventh
> Amendment does not exact the retention of old forms of procedure.  It does not
> prohibit the introduction of new methods for ascertaining what facts are in
> issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931).  The only restriction that

the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal

and equitable issues -- the former of which must be submitted to a jury and the latter of which a

judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to

preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S.

500, 510-11 (1959).

> The court should take care when deciding which issues may and should be
> severed for separate trial and the order in which to try them[, as] the right to trial
> by jury on legal claims may not (except under "the most imperative
> circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122.

## ANALYSIS

Daye demonstrates that she complies with all of rule 23(a)'s requirements, because her

proposed class is numerous, it has common issues, her claims are typical of other class members'

claims, and she is an adequate representative.  Daye also meets rule 23(b)'s requirements,

because the common issues predominate, and because a class action is the superior method for

litigating the issues.  Accordingly, the Court will certify the proposed class and four subclasses.

## I.   DAYE SATISFIES RULE 23(a)'S REQUIREMENTS.

To certify a class, Daye must show that she meets all of rule 23(a)'s requirements: numerosity, commonality, typicality, and adequacy.  See Fed. R. Civ. P. 23(a); Reed v. Bowen, 849 F.2d at 1309.  Because Daye intends to prove her claims using common language and representations in every loan contract, the Court concludes that common questions exist.  Daye further demonstrates that she complies with each of rule 23(a)'s other requirements.

### A.   DAYE SATIFIES THE NUMEROSITY REQUIREMENT.

Rule 23(a)(1) requires that the proposed class membership be sufficiently large to warrant a class action.  See Trevizo v. Adams, 455 F.3d at 1162.  Daye asserts that the subclasses will contain the following amounts of people: (i) around 32,000 members in the Payday Loan Subclass; (ii) around 6,000 members in both the EFTA and the TILA Subclasses; and (iii) around 29,000 members in the Deceptive Disclosure Subclass.  See Brief at 12.  As the Court stated in the procedural section, the subclasses are not exclusive; all of the Deceptive Disclosure, EFTA, and TILA Subclass members are also Payday Loan Subclass members.  See Brief at 3-4.  The only reason that the TILA and EFTA Subclasses are so much smaller than the other subclasses is because the TILA and the EFTA both have one-year statutes of limitations, which restrict the number of proposed class members who have valid claims under these statutes.  See Brief at 3-4.

Although it is said that there is "no set formula," Rex v. Owens, 585 F.2d at 436, or "strict numerical test" for determining when a class is sufficiently numerous for joinder to be impracticable, Bittinger v. Tecumseh Prods. Co., 123 F.3d at 884 n.1, the reality is that a per se numerosity threshold seems to exist somewhere south of 150 proposed class members, see Mullen v. Treasure Chest Casino, LLC, 186 F.3d at 624 (holding that "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement"); Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. 312, 436 (D.N.M. 2015)(Browning, J.)("This class

- 48 -

contains over 1,367 members, which easily clears rule 23(a)(1)'s bar.").   The Court cannot practically join 32,000 people into this litigation, nor could it "manage a non-class lawsuit where over [32,000] plaintiffs are expected to move and respond to motions on an individual basis." Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. at 436.   This class is therefore large enough to meet rule 23(a)'s numerosity requirement.   See Trevizo v. Adams, 455 F.3d at 1162; Lowery v. City of Albuquerque, 273 F.R.D. at 683 (concluding that joinder of "several hundred tenants and homeowners" would be impracticable); Cook v. Rockwell Int'l Corp., 151 F.R.D. at 384.   Speedy Loan does not object to numerosity in its Response.   See Reply at 1 (arguing that Speedy Loan concedes that Daye has met the numerosity requirement by failing to address it).   Moreover, after Daye clarified that she sought to prove her claims using only a common loan contract and standard procedures, Speedy Loan agreed that the class was sufficiently numerous to comply with rule 23.   See Tr. at 36:8-17 (Kochersberger); id. at 53:14-16 (Kochersberger); id. at 55:6-11 (Kochersberger); id. at 59:13-60:11 (Kochersberger).

### B.   DAYE SATISFIES THE COMMONALITY REQUIREMENT.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."   Fed. R. Civ. P. 23(a)(2).   To meet this requirement, Daye's claims "must depend upon a common contention" which is "capable of classwide resolution." Wal-Mart, 131 S. Ct. at 2551.   In other words, the determination of the truth or falsity of the "common contention" must "resolve an issue that is central to the validity of each one of the claims in one stroke."   Wal-Mart, 131 S. Ct. at 2551.

The heart of Speedy Loan's objection to certification is that the Court must examine each loan document or transaction to determine whether misrepresentations exist, or whether Speedy Loan conditioned the loan on an electronic funds transfer.   See Response at 7-8 (objecting to certification of the Payday Loan Subclass on the ground that the Court must make case-by-case

determinations whether the transaction violated the UPA as unconscionable); Response at 10 (stating that the Court must examine the procedures surrounding the loan transaction to determine whether the loan officer conditioned the loan on electronic funds transfers); Response at 11 (arguing that the Court must examine each loan document to determine whether it contains misrepresentations); Response at 11-12 (stating that the Court must analyze each loan document to determine whether misrepresentations exist).  If the Court had to examine each loan document to determine liability, it would agree with Speedy Loan that commonality would not exist.  See Moore v. Apple Inc., 309 F.R.D. 532, 546 (N.D. Cal. 2015)(Koh, J.)(denying class certification, because the proposed class members had materially different contracts that would require the court to devote substantially more time resolving individual contracts' meaning).  As the Court explains below, it need not make such an inquiry, and on that basis, concludes that Daye satisfies the commonality requirement.

Speedy Loan acknowledges in its Response that any issues that do not require individual analysis are proper for certification. See Response at 7 (admitting that the question whether Speedy Loan violated the Small Loan Act "may be a common question," because it does not require the Court to analyze each loan or transaction).  For the same reason Speedy Loan concedes commonality on this issue, it concedes commonality on other issues that do not require individual analysis at the hearing.  See Tr. at 52:2-5 (Court, Kochersberger)(admitting that whether certain contractual language in every loan contract violates the TILA is a common issue among all class members); id. at 45:17-46:8 (Kochersberger); id. at 45:17-46:8 (Kochersberger) (stating that it disputes class certification only if Daye intends to prove her claims through a totality of the circumstances approach).  Speedy Loan therefore recognizes that, when the Court can resolve a question for all similarly situated class members without regard to individual

circumstances, it is common among all class members.  See Wal-Mart, 131 S. Ct. at 2551 (noting that "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers").  The Court can resolve the remaining questions without considering individual circumstances.

First, the Court can resolve the Payday Loans Subclass' claims and the EFTA Subclass' claims without considering each document or transaction, making the questions at issue common.  Daye alleges that all of Speedy Loan's loans "uniformly failed to comply with New Mexico's detailed regulation of payday loans" in the same way.  Reply at 5.  She asserts that the same language in each loan contract causes the loans to violate the Small Loan Act, making them void, and similarly causes them to violate the UPA.  See Reply at 5-6.  Contrary to Speedy Loan's initial understanding of Daye's requests, Daye does not ask the Court to consider each loan transaction, because she argues that the language that Speedy Loan uses in all its loan documents "constitute[s] per se violations of the UPA by virtue of [its] uniform failure to comply with the Small Loan Act."  Reply at 5-6 (arguing that making payday loans that violate the Small Loan Act "is unfair and deceptive" per se, and "does not call for individualized proof").  Moreover, Daye can prove a UPA violation using common evidence, because the UPA does not require plaintiffs to show detrimental reliance.  See N.M. Stat. Ann. § 57-12-2(D).  The key questions, therefore, common to resolving the Payday Loans Subclass' claims and the EFTA Subclass' claims are:

1.  Whether Speedy's loans are payday loans under the Small Loan Act;

2.  Whether Speedy's loans complied with the Small Loan Act's requirements for payday loans;

3.  Whether Speedy's loans violated the UPA with regard to their violation of the Small Loan Act;

4.  Whether Speedy's loans are void or it would otherwise be inequitable for Speedy to retain or collect unlawful interest;

5.  Whether Speedy conditioned loans on ACH withdrawals in violation of the EFTA.

Brief at 14.   The Court can answer whether certain contractual language in all contracts violates the Small Loan Act, the UPA, and the EFTA by analyzing certain provisions in one document, because the allegedly illegal language resides in every proposed class member's loan contract. See Tr. at 18:20-24 (Mattison).

The Court's analysis of one loan contract's provisions, which every proposed class member signed, will not only resolve the Payday Loan Subclass' claims, but also the EFTA Subclass' claim that the loans violated the EFTA by requiring an electronic funds transfer. Again, Daye does not allege that individual loan officers created specific situations in which the totality of circumstances made it appear as if Speedy Loan required an electronic funds transfer. See Reply at 8; Tr. at 21:5-11 (Mattison)(stating that Daye does not intend to prove her claims by considering "what was in the minds of the lender and the borrower or what signs may be on the wall," but by considering "the text of this loan contract").   Daye argues that the same contractual language in all loan contracts "conditioned the extension of credit on repayment by means of preauthorized electronic funds transfer," thereby violating the EFTA.   Reply at 8.   Because all loans contracts contain that same language, an answer for Daye will create an answer for all class members.   Speedy Loan admitted at the hearing that under Daye's argument that the loan contract itself requires electronic funds transfer, the Court could certify a class.   See Tr. at 45:17-21 (Kochersberger)("[I]f the plaintiff is defining the class as simply everyone who signed the money document as being required to enter into an electronic funds transfer agreement then that's a class.").   It stated that, as long as Daye did not intend to introduce evidence about verbal

representations in individual loan transactions, the Court could certify that subclass.  See Tr. at 45:17-46:8 (Kochersberger).   Other courts have similarly concluded that: (i) "whether [the defendant's] alleged practice of requiring customers to agree to EFT payments . . . violate[s] the EFTA[] raise[s] issues that are common to all putative class members"; and (ii) "whether [conditioning loans on EFT authorization] constitutes unlawful debt collection methods under the [state unfair practices act] is an issue that is common to the class."  O'Donovan v. CashCall, Inc., 278 F.R.D. 479, 490 (N.D. Cal. 2011)(James, M.J.).

Similarly, the Court can resolve the TILA Subclass' claims and the Deceptive Disclosure Subclass' claims without considering each document or transaction, making the questions at issue common.  The common questions are: (i) whether certain statements in all loan documents under-discloses the Total of Payments and Finance Charges in violation of the TILA and the UPA; and (ii) whether Speedy Loan fails to list the payment schedule fully and accurately, in violation of the TILA.  See Reply at 10.   The Court can answer these questions without considering each loan.  See O'Donovan v. CashCall, Inc., 278 F.R.D. at 490.  Speedy Loan admitted at the hearing that whether certain language in all contracts violates the TILA is a common question among all class members.  See Tr. at 52:2-5 (Court, Kochersberger).

Additionally, the Court can determine whether Speedy Loan violated the TILA and UPA with respect to certain loan customers, because the parties collaboratively created a spreadsheet that determines which loan documents contain the under-disclosures or inaccurate Finance Charges.  See Tr. at 48:23-49:10 (Mattison); id. at 49:1-50:20 (Mattison).  Even though Speedy Loan may have under-disclosed the Total of Payments or Finance Charge to a greater extent in some loans, this fact does not change the common question: whether such under-disclosures violate the TILA and the UPA.  The amount of the alleged under-disclosure goes to damages.

See In re Intelcom Grp. Sec. Litig., 169 F.R.D. at 148 (stating that "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist"); Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification . . . ."); Lopez v. City of Santa Fe, 206 F.R.D. at 289.  Again, Speedy Loan agreed that the questions for these subclasses "would be numerous and common to all of the folks," and that the Court could certify a class.   Tr. at 53:14-21 (Kochersberger).   See id. at 54:15-20 (Kochersberger)(stating that "there probably isn't a great argument for why that isn't one distinct numerous common class"); id. at 55:6-11 ("[T]he way that it's crafted in the reply it seems like a class that we can't really mount any opposition to.").

        This case is unlike Wal-Mart, where the 1.5 million proposed class members alleged that various local supervisors across the county discriminated against them by denying them pay and promotions.  See 131 S. Ct. at 2551-52.  The plaintiffs there did not allege that Wal-Mart's discrimination resulted from a corporate policy or other companywide decision.  See 131 S. Ct. at 2553 (noting that the plaintiffs could not argue that Wal-Mart operated under a general policy of discrimination).   They argued that each individual manager, vested with discretion, discriminated against the plaintiffs.  See 131 S. Ct. at 2553.  The plaintiffs sought to establish their claims through anecdotal evidence, statistics, and sociologist testimony.  See 131 S. Ct. at 2553, 2555.   They did not identify, however, which specific employment practice they challenged.  See 131 S. Ct. at 2555.  The Supreme Court concluded that they had no "'specific employment practice' -- much less one that ties all their 1.5 million claims together."  131 S. Ct. at 2555-56.

This case presents a different situation.  Here, Daye identifies in detail the practices that she alleges violate the law: Speedy Loan's standard contract, whose disputed provisions are in every proposed class member's contract.  See Brief at 4-5; Reply at 9.  She argues that all class members suffered the same types of injuries as a result of the alleged violations: they overpaid their loans without receiving proper disclosures.  See Tr. at 74:24-75:2 (Mattison).  Finally, she can prove her claims through standardized loan contracts and standardized procedures.  See Reply at 9.  In conclusion, Daye alleges more than that the proposed class members all suffered from violations of the same law.  She argues that they suffered injury from the same practices: (i) Speedy Loan's conditioning loans on debit authorizations; and (ii) misrepresentations about the Finance Charge, the Total of Payments, and the schedule of payments.  See Wal-Mart, 131 S. Ct. at 2550-51; Gen. Tel. Co. of the Sw. v. Falcon, 102 S. Ct. at 2364.  Because the proposed class members have materially similar contracts, this common contention is "of such a nature that it is capable of classwide resolution."  Wal-Mart, 131 S. Ct. at 2550-51.  In other words, the Court's determination whether Speedy Loan requires electronic funds transfers through behaviors it uses with all class members "will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart, 131 S. Ct. at 2550-51.[15]

---

[15]Speedy Loan's other objection to class certification is not that the Court cannot certify a class, but that the Court should more narrowly define the class.  See Tr. at 7:23-8:2 (Kochersberger); id. at 9:5-7 (Kochersberger).  Speedy Loan argued at the hearing that the Court should divide the Payday Loan Subclass into two subclasses based on Daye's class definition: one in which Speedy Loan requires electronic fund transfers, and one in which Speedy Loan allows the transfers and the loan had a maturity period of less than 120 days.  See Tr. at 27:18-22 (Kochersberger). Speedy Loan's argument appears to rest on an understandable misinterpretation of Daye's argument.  See Tr. at 33:10-19 (Kochersberger); id. at 34:1-11 (Kochersberger).

Daye clarified that the Payday Loan Subclass' claims rested on proving that borrowers signed the loan contract, which every borrower signed, not an additional page titled the "PPD/ACH Authorization" that was ancillary to the integrated loan contract.  See Tr. at 39:1-12 (Mattison)("[In that integrated two-page contract the requirement for giving debit authorization is right there.  So whether or not an ancillary document was signed really isn't going to come

### C.     DAYE SATISFIES THE TYPICALITY REQUIREMENT.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  Speedy Loan's disputes to rule 23's typicality requirement are similar to its disputes on commonality.  See Response at 12 (arguing that Daye does not meet rule 23's typicality requirement for the same reasons that she does not meet rule 23's commonality requirement).  Before the hearing, Speedy Loan alleged that Daye's claims were not typical of other class members' claims, because Daye's loan contract might contain different types of misrepresentations than those for other borrowers, or because her transaction might have been unconscionable when others members' transactions were not.  See Response at 12-13.  After Daye explained that she sought to prove her claims using only common loan contracts, however, Speedy Loan agreed that her claims were typical of the class' claims.  See Tr. at 52:2-5 (Court, Kochersberger); id. at 45:17-46:8 (Kochersberger); id. at 45:17-46:8 (Kochersberger).

As described above, the problems that Daye asserts are in all proposed class members' loan contracts, thereby not requiring the Court to examine each document or transaction.  An answer whether certain language violates the Small Loan Act, the UPA, the TILA, or the EFTA will resolve all class members' claims.  Furthermore, Daye asserts that her personal loan

into our argument.").  Speedy Loan understood Daye to be arguing that the third page, the PPD/ACH Authorization, which some borrowers might not have signed, required the debit authorization.  See Tr. at 34:1-11 (Kochersberger)(arguing that some borrowers did not sign the additional document authorizing electronic transfers, while agreeing that every borrower signed the loan contract).  Speedy Loan therefore thought that it would have to introduce different evidence to show that it did not require electronic transfers for each group, because some class members signed the third page, while some class members might not have signed it.  See Tr. at 33:14-16 (Kochersberger).  Because all borrowers signed the loan contract, and Daye argues that certain language in that loan contract requires electronic funds transfer, the Court concludes that the Payday Loan Subclass need not be divided into two groups.  The alternate definition of the Payday Loan Subclass as those borrowers for whom electronic transfers were allowed and whose loan's maturity period was less than 120 days is merely another way of identifying the same group of class members.  Additionally, in her review of all the PPD/ACH Authorization forms, Daye has not "seen a single one where that document wasn't signed.  It's in all of them."  Tr. at 38:20-24 (Mattison).

contracts contain each violation that she alleges.  See Reply at 12-13.  That her loans contain each violation she alleges makes her claims typical of the class' claims.  See DG v. Devaughn, 594 F.3d at 1198 (concluding that, when "the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality").

### D.    DAYE SATISFIES THE ADEQUACY REQUIREMENT.

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

Regarding the first requirement, the Court concludes that Daye is a "part of the class and 'possess[es] the same interest and suffer[s] the same injury' as the putative class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Daye's interests are coincident with the Proposed Class members' interests.  She does not seek any separate individual relief. See Brief at 17.  There are no intra-class conflicts, because all class members make the same arguments based on common language in each of their loan contracts.  See Langbecker v. Elec. Data Sys. Corp., 476 F.3d at 315 n.28; Pickett v. Iowa Beef Processors, 209 F.3d at 1280.

Speedy Loan does not dispute that Daye and her counsel will vigorously prosecute the action on the class' behalf.  See Tr. at 36:21-24 (Court, Kochersberger).  Daye's lawyers have the experience to adequately represent the class.  They have extensive experience litigating TILA and UPA cases, and in bringing class actions, including class actions under the TILA and the

UPA, in both state and federal courts.  Richard Feferman's law firm has brought at least twenty-eight consumer class actions, and he has been involved in nearly all of them.  See Brief at 16.  Recently, he was appointed class counsel in another TILA class action, Chester v. Tancorde Finance, Inc., No. CIV 14-0092 JAP/KK (D.N.M.), in which the Honorable Judge Parker, United States District Judge, stated: "Mr. Feferman has been a mainstay in successful consumer class actions in this District, and the Court is confident he will adequately represent the class and vigorously prosecute this case to its conclusion."  Memorandum Opinion and Order, filed January 12, 2015 (Doc. 33).  Daye's other attorneys possess similar experience.  Attorney Charles Delbaum and the National Consumer Law Center also represent Daye.  Mr. Delbaum has forty-three years of litigation experience, which includes litigating "a dozen successful consumer class actions in the past nine years, with another dozen currently pending."  Brief at 17.  Moreover, he co-authored the National Consumer Law Center's Consumer Class Actions manual.  See Brief at 17.  Given this experience, the Court concludes that Daye's counsel will adequately represent the class and that Daye meets all of rule 23(a)'s requirements.

## II.    DAYE SATISFIES RULE 23(b)'S REQUIREMENTS.

Having found that Daye has made a sufficient showing on rule 23(a)'s requirements, she must next demonstrate that the Court can certify the action under rule 23(b).  To satisfy rule 23(b)(3), the Court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Because all of the proposed class members assert the same claims based on the same contractual language, the Court concludes that common issues predominate and that a class action is the superior method for litigating the case.

## A.        DAYE SATISFIES THE PREDOMINANCE REQUIREMENT.

Rule 23(b)(3) first requires that questions common to the class predominate over those that are individualized.  See Fed. R. Civ. P. 23(b)(3).  The Tenth Circuit requires courts to characterize the issues as common or individual, and then to weigh which issues predominate. See CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)("Under the predominance inquiry, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."); Gene and Gene LLC v. BioPay LLC, 541 F.3d 318, 326 (5th Cir. 2008)(observing that, to determine which issues will predominate, courts must identify "the substantive issues that will control the outcome, assessing which issues will predominate").  A question is common when "the same evidence will suffice for each member to make a prima facie showing," whereas a question is individual when "the members of a proposed class will need to present evidence that varies from member to member."  Blades v. Monsanto Co., 400 F.3d at 566.

Here, the common questions are:

1. Whether Speedy's loans are payday loans under the Small Loan Act;

2. Whether Speedy's loans complied with the Small Loan Act's requirements for payday loans;

3. Whether Speedy's loans violated the UPA with regard to their violation of the Small Loan Act;

4. Whether Speedy's loans are void or it would otherwise be inequitable for Speedy to retain or collect unlawful interest;

5. Whether Speedy conditioned loans on ACH withdrawals in violation of the EFTA[;]

6. Whether Speedy under-disclosed the Finance Charge and Total of Payments, in violation of the TILA and the UPA;

> 7.   Whether Speedy failed to list the payment schedule fully and accurately, in violation of the TILA.

Brief at 14.

With respect to Daye's first claim for relief, that the payday loans are void under the Small Loan Act, Daye must show: (i) that certain provisions in all class members' loan contracts makes them payday loans under N.M. Stat. Ann. § 58-15-2; (ii) that those common contract provisions do not comply with the Small Loan Act's requirements; and (iii) that these loans are void under the Small Loan Act.   See White v. Singleton, 1975-NMCA-104, ¶ 8, 539 P.2d 1024 (describing the "general rule [] that transactions in violation of a statute prescribing penalties are void").   Daye can prove liability on these questions, if at all, through the standardized loan forms.

Daye further asserts that, by virtue of violating the Small Loan Act, Speedy Loans also violated the UPA's prohibitions against "unfair or deceptive trade practices," and "unconscionable trade practices."   Brief at 7; Complaint ¶¶ 82-85, at 14.   The UPA defines "unfair or deceptive trade practices" as "a false or misleading oral or written statement . . . knowingly made in connection with the . . . the extension of credit . . . that may, tends to or does deceive or mislead any person."   N.M. Stat. Ann. § 57-12-2(D).   It does not require the plaintiff to show that he or she relied on the statements.   See N.M. Stat. Ann. § 57-12-2(D).   Daye could attempt to establish that certain language, common to all contracts, "tends to or does deceive or mislead any person."   N.M. Stat. Ann. § 57-12-2(D).   Similarly, she can attempt to prove that common language in the loan contracts is substantively unconscionable.   See Brief at 8 (arguing that all class members have the same claim that Speedy Loan's lending practices are substantively unconscionable).   She will not need to use outside evidence, such as the individual circumstances surrounding each individual's loan transaction, to prove this claim.   See State ex

- 60 -

rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-024, ¶ 32, 329 P.3d 658, 679 (stating that "substantive unconscionability can be found by examining the contract terms on their face -- a simple task when, as here, all substantive contract terms were nonnegotiable, and embedded in identical boilerplate language").   Speedy Loan conceded that, if the Court looked only to standardized forms and procedures, the Payday Loan Subclass' claims for relief under the Small Loan Act and the UPA are common and would predominate over individual questions.   See Tr. at 35:18-36:2 (Court, Kochersberger).

The Court must next determine whether these common issues predominate over individual issues.   The Tenth Circuit understands common issues to predominate when they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."   Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (emphasis in original).   See CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88 (adopting the Eleventh Circuit's test for determining predominance).   Predominance requires a qualitative, holistic assessment in which the Court does not merely count the common issues, but analyzes whether, overall, the common issues will predominate.   See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 133 S. Ct. 1184, 1196 (2013); Butler v. Sears, Roebuck & Co., 727 F.3d at 801.   Daye makes this showing, as she argues that every class member's loan was a payday loan that violates the Small Loan Act and the UPA, and that an answer to the common questions will resolve every class member's claim in one step.   These common questions therefore predominate over any individual questions.

Likewise, Daye can establish Speedy Loan's liability under the EFTA by resolving one common question.   Under 15 U.S.C. § 1693k(a), "[n]o person may . . . condition the extension of

credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  Daye argues that the same language in all class members' loan contracts requires electronic funds transfers.  See Brief at 8-9.  Whether this common language requires electronic funds transfers is common to all borrowers, and Speedy Loan has not articulated any individual issues that the Court must address to resolve this claim.  This issue therefore predominates.  See O'Donovan v. CashCall, Inc., 278 F.R.D. at 495.

Finally, whether Speedy Loan's disclosures violate the TILA and UPA also predominates.  The TILA requires lenders to disclose accurately the Finance Charge, the Total of Payments, the payment schedule, and the annual percentage rate.  See 15 U.S.C. §§ 1632(a), 1638(a)(3)-(6).  As stated above, the UPA's prohibition on unfair or deceptive trade practices does not require plaintiffs to prove reliance or make any other individualized showing.  See N.M. Stat. Ann. § 57-12-2(D); Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35, 142, N.M. 437, 444 (stating that the "UPA does not require that the defendant's conduct actually deceive a consumer; it permits recovery even if the conduct only 'tends to deceive,'" and that "a claimant need not prove reliance upon a defendant's deceptive conduct in this context").  Daye plans to use the same loan contract to argue that Speedy Loan's representations on the Total of Payments and Finance Charge violate the TILA and the UPA.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (stating that, if plaintiffs must introduce much more individualized proof after adjudicating the classwide issues, their "claims are not suitable for class certification").  Because all loan documents contain the same relevant disclosures, whether these types of disclosures violate the TILA is common to all, and Speedy Loan has not shown that the Court must resolve individual issues regarding this claim.  Accordingly, Daye "demonstrate[s] that the element of [the legal claim] is capable of proof at

trial through evidence that is common to the class rather than individual to its members."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311.  Common issues therefore predominate in this claim.  "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual," and because Daye intends to use the same evidence to resolve all questions for all proposed class members, the Court concludes that the common issues predominate.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311.

This case is not one in which the proposed class members had material variations in their contracts, which would suggest that individual issues predominate, because the Court would have to evaluate the particular terms of each class member's agreement.  See Moore v. Apple Inc., 309 F.R.D. at 546 (denying class certification, because the proposed class members had materially different contracts that would require the court to devote substantially more time resolving individual contracts' meaning).  The only individual issues will be determining which class members fit into the TILA, EFTA, and Deceptive Disclosure Subclasses, which the Court can determine easily using the parties' spreadsheet.  The spreadsheet shows which class member's loans contained inaccurate Finance Charges and Total of Payments statements, thereby making it unnecessary for the Court to sort through each individual loan document.  See Newberg § 4:50 (stating that common issues predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria -- thus rendering unnecessary an evidentiary hearing on each claim").  Using this spreadsheet, the Court can also quickly resolve the individual damage issues.  The parties agree that the spreadsheet applies the same simple formula to all class members.  This damage calculation is reliable and easy to determine.  See 133 S. Ct. at 1433.  Because it is reliable and the parties agree on its efficacy, neither classwide nor individual damage determinations will preclude predominance.

See 133 S. Ct. at 1433 (stating that, because the proposed damage calculation was inadmissible, damage calculations would defeat predominance); Gold Strike Stamp Co. v. Christensen, 436 F.2d 791, 798 (10th Cir. 1970)(noting that even wide disparity among class members as to damages does not mean that class certification is inappropriate); Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 307 (5th Cir. 2003)(stating that the need to perform individual damages calculations will not overwhelm common liability issues when those calculations are "mathematical and formulaic"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342-43 (4th Cir. 1998)(observing that, where proposed class members' claims are "inherently individualized," not susceptive to mechanical calculation, and would require separate mini-trials, "the need for individual proof of damages" will bar class certification).

As the Supreme Court required in Comcast v. Behrend, Daye presents a damages model capable of reliably and properly calculating classwide (and individual) damages that tracks Daye's liability theory, meaning that the Court need not devote more time to individual questions than to common questions.  See 133 S. Ct. at 1433 (stating that, because the plaintiffs' damages model did not reliably measure classwide damages, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class").  Not only are the parties jointly creating the spreadsheet, see Tr. at 47:22-25, but the calculation is reliable.  Daye explains that the spreadsheet arrives at its calculations for each borrower by comparing the stated amount of each loan payment to the stated total payment, and listing the discrepancy between the two.  See Tr. at 49:11-25 (Mattison).  For example, Daye's loan states that she must make four payments of $154.52, which add up to $618.08.  The loan's stated Total of Payments, however, is $575.39, which Daye alleges understates the true cost of her loan by $42.69.  See Tr. at 49:11-

25 (Mattison).  Using this comparison, the Excel Spreadsheet determines not only which loans contains a discrepancy, but the amount of the discrepancy.

If the Court determines that certain statements constitute misrepresentations under the TILA and UPA, all class members with such misrepresentations will be entitled to relief. Similarly, if the Court determines that these loans violate the Small Loan Act, the UPA, and the EFTA, all class members will be entitled to relief.  The addition or subtraction of various class members will not change the evidence that the Court must consider.  See Klay v. Humana, Inc., 382 F.3d at 1255 (stating that, "if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important"); Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170; Newberg § 4:50 ("In addition, common issues predominate when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced.").  Moreover, the parties dispute the common issues.  Compare Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. at 438-39 (concluding that, because the parties agreed upon the answer to many of the common questions, the Court would devote much more time to resolving individual questions, thereby defeating predominance).  The Court concludes that it will devote more time to resolving the common questions than it will to resolving any individual questions.

## B.    DAYE SATISFIES THE SUPERIORITY REQUIREMENT.

At the outset, the Court notes that Speedy Loan does not contest superiority, agreeing that a class action is the superior method for trying this case.  See Tr. at 36:6-12 (Court, Kochersberger).  The Court agrees that a class action is the best mechanism to try Daye's claims. The amounts of each individual claim are relatively small.  See Brief at 19; Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (stating that the class action mechanism's core policy is "to

overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights").  The four non-exhaustive factors that rule 23(b)(3)(A)-(D) enumerates indicate that the class action is superior to other methods.  The first factor, "the class members' interests in individually controlling the prosecution . . . of separate actions," closely tracks the money value of the individual cases.  Fed. R. Civ. P. 23(b)(3)(A). Here, the proposed class members would not likely pursue relief on their own, because "most class members would likely not even know their rights had been violated and would not be able to afford to retain competent counsel to pursue their rights."  Brief at 19.  See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 722 F.3d 838, 861 (6th Cir. 2013)(stating that "class members are not likely to file individual actions -- the cost of litigation would dwarf any potential recovery"); Wolin v. Jaguar Land Rover N. Am., L.L.C., 617 F.3d 1168, 1176 (9th Cir. 2010)(concluding that individual adjudication under Michigan and Florida consumer protection laws would be inferior when no other actions had been filed, and "the amount of damages suffered by each class member is not large"); Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1165 (7th Cir. 1974); Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. at 464.

The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," also weighs in favor of the class action mechanism.  Fed. R. Civ. P. 23(b)(3)(B).  As no other proposed class members have filed a similar case, it is unlikely that proposed class members have "much interest in individually controlling the prosecution of the action."  Brief at 19.  See Seijas v. Republic of Argentina, 606 F.3d 53, 58 (2d Cir. 2010)(noting that "district court correctly determined that proceeding individually would be prohibitive for class members with small claims").  The Court also observes that the third factor weighs in favor of the class-action mechanism: the forum is

geographically convenient for Daye and other proposed class members, making it particularly desirable.  See Fed. R. Civ. P. 23(b)(3)(C)(directing courts to consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"); Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; Winkler v. DTE, Inc., 205 F.R.D. at 245; Macarz v. Transworld Sys., Inc., 193 F.R.D. at 57.

Finally, the fourth factor's emphasis on manageability demonstrates that the class action method is superior to other methods of trying the case.  See Fed. R. Civ. P. 23(b)(3)(D).  The Court can manage the common issues, all of which arise from Speedy Loan's standard, uniform loan agreements and lending practices.  See Nicodemus v. Union Pacific Corp., 204 F.R.D. 479, 493 (D. Wyo. 2001)(stating that "the superiority requirement is founded on the notions of judicial economy").  As described above, the parties have together created a spreadsheet determining which proposed class members fit into each subclass and the precise amount of damages as to each class member for the UPA claims.  See Tr. at 63:20-25 (Mattison); id. at 47:22-25 (presenting the Court with a copy of "the spreadsheet that Mr. Kochersberger and I have been working on diligently for a long time").[16]  For the EFTA and TILA claims, the statute describes how to calculate statutory damages for class members.  See 15 U.S.C. §§ 1601−1667f; 15 U.S.C. §§ 1693−1693r; Stillmock v. Weis Mkts., Inc., 385 F. App'x 267 (4th Cir. 2010)(concluding that common issues predominate even though statutory damages available to each class member would vary from $100.00 to $1,000.00); Messner v. Northshore Univ. HealthSystem, 669 F.3d 802 (7th Cir. 2012); Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d

---

[16]Daye asserts that, for the Payday Loan Subclass, the spreadsheet will calculate the amount Speedy Loan obtained from each borrower above that borrower's principal loan amount. See Tr. at 63:11-19 (Mattison).  Daye contends that, for the Deceptive Disclosure Subclass, the spreadsheet will calculate the difference between the disclosed Total of Payments and the actual total of payments.  See Tr. at 64:11-18 (Mattison).

1087, 1094 (9th Cir. 2010); <u>Smilow v. Southwestern Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 42-43

(1st Cir. 2003).  Accordingly, Daye demonstrates that the class action mechanism is superior.  In

sum, Daye satisfies all of rule 23's class certification requirements, and the Court therefore

certifies the class action.

**IT IS ORDERED** that Plaintiff's Opposed Motion for Class Certification, filed

November 27, 2015 (Doc. 60), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Charles M. Delbaum
National Consumer Law Center, Inc.
Boston, Massachusetts

-- and --

Richard N. Feferman
Nicholas Mattison
Feferman & Warren
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Donald F. Kochersberger III
Alicia M. LaPado
Business Law Southwest, LLC
Albuquerque, New Mexico

   *Attorneys for the Defendant*