# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CLARA DAYE,
on behalf of herself and all others similar situated,

      Plaintiff,

vs.                                     No. CIV 14-0759 JB/SCY

COMMUNITY FINANCIAL SERVICE CENTERS, LLC,
d/b/a SPEEDY LOAN,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on (i) Plaintiff's Opposed Motion for Summary Judgment, filed on April 5, 2016 (Doc. 89 Sealed Version)(Doc. 97 Public Version)("MSJ"); and (ii) Defendant Speedy Loan's Motion to Extend Deadline to File Its Response to Plaintiff's Motion for Summary Judgment, filed May 13, 2016 (Doc. 101)("Motion to Extend Deadline"). The primary issues are: (i) whether the Court should allow Defendant Community Financial Service Centers, LLC d/b/a Speedy Loan Speedy Loan additional time to conduct discovery before being required to respond to Plaintiff Clara Daye's MSJ pursuant to rule 56(d) of the Federal Rules of Civil Procedure; (ii) whether all loans that Speedy Loans made were payday loans under the New Mexico Small Loan Act, N.M.S.A. 1978 §§ 58-15-2 to -34[1]; (iii) whether

---

[1]New Mexico defines a payday loan as a loan "in which the licensee accepts a personal check or debit authorization tendered by the consumer and agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date agreed to by the licensee and the consumer and:

    (1)  includes any advance of money or arrangement or extension of credit whereby the licensee, for a fee, finance charge or other consideration:

        (a)  accepts a dated personal check or debit authorization from a

every loan in which (a) Speedy Loan accepted preauthorized ACH debit authorization;[2] and (b) the loan was to be repaid in fewer than four payments or the loan period was less than 120 days, was a payday loan; (iv) whether Speedy Loan violated the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693*i*-93r ("EFTA"), by requiring each borrower to preauthorize EFTs as a condition for making a loan; (v) whether Speedy Loan violated the Truth-in-Lending Act, 15 U.S.C. §§ 1601-67f ("TILA"), by misrepresenting finance charges and totals of payments for its loans; (vi) whether Speedy Loan violated the New Mexico Unfair Practices Act, N.M.S.A. 1978 §§ 57-12-1 to -26 ("UPA"), by intentionally reporting different totals of payments in the loans' TILA Box[3]

---

consumer for the specific purpose of repaying a payday loan;

(b)  agrees to hold a dated personal check or debit authorization from a consumer for a period of time prior to negotiating or depositing the personal check or debit authorization; or

(c)  pays to the consumer, credits to the consumer's account or pays another person on behalf of the consumer the amount of an instrument actually paid or to be paid pursuant to the New Mexico Small Loan Act of 1955; but

(2)  does not include:

(a)  an overdraft product or service offered by a banking corporation, savings and loan association or credit union . . . .

N.M.S.A. 1978 § 58-15-2(H).

[2]An ACH is an electronic fund transfer made between banks and credit unions across the Automated Clearing House network.  See Consumer Financial Protection Bureau, What is an ACH?, http://www.consumerfinance.gov/askcfpb/1065/what-is-an-ach.html (last visited Jan. 17, 2017)("CFPB Definition").  ACH is used for many fund transfer transactions, including direct deposit of paychecks and monthly debits for routine payments.  See CFPB Definition at 1. Merchants often enable consumers to pay their bills via ACH by providing a bank routing number and account number.  See CFPB Definition at 1.

[3]Under Regulation Z, 12 C.F.R. § 226.18, in each closed-credit transaction that does not concern a residential mortgage, the creditor must disclose: (i) the creditor's identity; (ii) the amount financed; (iii) itemization of the amount financed; (iv) the finance charge; (v) the annual

and loan's payment schedule; and (vii) whether, if the Court deems Speedy Loan to have violated any of these statutes, the Court should award Daye and respective Subclass members summary judgment and damages.  On the first motion, because (i) Daye did not oppose Speedy Loan's Motion to Extend Deadline at the motion hearing; (ii) the deadline extension will not cause unnecessary delay in the case; and (iii) Speedy Loan provided an affidavit "explain[ing] why facts precluding summary judgment [could not] be presented," Fed. R. Civ. P. 56(d),[4] the Court grants the Motion to Extend Deadline, extending Speedy Loan's deadline to respond to Daye's motion for summary judgment until one week from the date that Speedy Loan receives the deposition transcripts.   On the second motion, the Court (i) grants Daye's motion for summary judgment with respect to liability on her claim under the EFTA, and awards damages to EFTA subclass members in the amount of $12,693.40; (ii) grants Daye's motion for summary judgment with respect to liability on her claim under TILA, and awards damages to TILA subclass members in the amount of $12,693.40; and (iii) grants Daye's motion for summary judgment on her claim under the UPA with respect to liability, but declines to award UPA damages at this time.

---

percentage rate; (vi) any variable rate; (vii) the payment schedule; (viii) the total of payments; (ix) any demand feature; (x) any prepayment penalty; (xi) any late payment penalty; and (xii) any required deposit.  See 12 C.F.R. §226.18(a)-(r).  Regulation Z requires that this information be in the form of a table with no more than five columns, with headings, and with a format substantially similar to one of four model clauses in the case of residential mortgage transactions.  See 12 C.F.R. § 226.18(s)(1).   In contrast, for non-residential-mortgage, closed-credit transactions, the required information can be arranged in any order but must be segregated from all other information by some means.  See 12 C.F.R. § 226.17(a).  Creditors typically group together the required information and segregate it from other information by surrounding the information with a border, producing what creditors refer to as a "TILA Box."

[4]The rule subsection to which the parties refer moved from subsection 56(f) to subsection 56(d) in the 2010 Amendments without any substantial change.  The Court notes here that, accordingly, references to rule 56(f) and rule 56(d) in sections of this Memorandum Order and Opinion related to Speedy Loan's Motion to Extend Deadline refer to the same provision.

## FACTUAL BACKGROUND

"Plaintiff Clara Daye is a 'consumer' as defined by the TILA, 15 U.S.C. § 1602(*i*) and Regulation Z, 12 C.F.R. § 226.2(a)(11)." MSJ ¶ 1, at 4 (stating this fact). See Defendant Speedy Loan's Response to Plaintiff's Opposed Motion for Summary Judgment ¶ 1, at 4, filed July 1, 2016 (Doc. 111)("Response")(not disputing this fact). Clara Daye "is a 'consumer' as defined by the EFTA, 15 U.S.C. § 1693a(6)." MSJ ¶ 1, at 4 (stating this fact). See Response ¶1, at 4 (not disputing this fact). "Defendant Community Financial Service Centers, LLC, d/b/a Speedy Loan . . . is a Delaware LLC with its principal place of business in Wisconsin." MSJ ¶ 2, at 4 (stating this fact). See Response ¶ 1, at 4 (not disputing this fact).

Speedy Loan "operates a payday loan store in Gallup and eleven other locations in New Mexico." MSJ ¶ 2, at 4 (stating this fact). See Response ¶ 2 (not disputing this fact).[5] Speedy Loan "is a 'creditor,' as defined in the TILA, 15 U.S.C. § 1602(g), and Regulation Z, 12 C.F.R. § 226.2(a)(17)." MSJ ¶ 2, at 4 (stating this fact). See Response ¶ 2, at 4 (not disputing this fact). "Speedy has a net worth of [a sum certain][6] as of December 31, 2013, and of [a sum certain] as of December 31, 2014." MSJ ¶ 3, at 4 (stating this fact). See Response ¶ 3, at 4 (not disputing this fact). Speedy Loan "is a profitable business." MSJ ¶ 4, at 4 (stating this fact). See Response ¶ 4, at 4 (not disputing this fact). Speedy Loan's "owners received more than [a sum

---

[5]Daye says that Speedy Loan "operates a payday loan store in Gallup and eleven other locations in New Mexico." MSJ ¶ 2, at 4. Speedy Loan does not dispute the number or location of its stores, nor does it dispute that it is a loan store. See Response ¶ 2. Speedy Loan disputes, however, that it operates a payday loan store. To reflect precisely what is undisputed, the Court elides the word "payday" in the stated fact while retaining the remainder of the stated fact.

[6]In the statement of material facts, both Daye and Speedy Loan have chosen to redact the exact amount.

certain][7] in 2014."  MSJ ¶ 4, at 4 (stating this fact).  See Response ¶ 4, at 4 (not disputing this fact).

"On August 23, 2013, Speedy loaned Ms. Daye $300."  MSJ ¶ 5, at 4 (stating this fact). See Response ¶ 5, at 4 (not disputing this fact).  "As of August 23, 2013, Ms. Daye received monthly direct deposit pension payments and weekly direct deposit wage payments from part-time home health care work."  MSJ ¶ 6, at 5 (stating this fact).  See Response ¶ 6, at 4 (not disputing this fact).  Speedy Loan "was aware of these income sources and amounts."  MSJ ¶ 6, at 5 (stating this fact).  See Response ¶ 6, at 4 (not disputing this fact).  "On October 21, 2013, Speedy loaned Ms. Daye $300 in a renewal of the August loan."  MSJ ¶ 7, at 5 (stating this fact). See Response ¶ 7, at 4 (not disputing this fact).  Daye "paid off the October loan."  MSJ ¶ 8, at 5 (stating this fact).  See Response ¶ 8, at 4 (not disputing this fact).  "On February 15, 2014, the parties entered into a new loan agreement."  MSJ ¶ 9, at 5 (stating this fact).  See Response ¶ 9, at 4 (not disputing this fact).  "On May 23, 2014, Speedy renewed Ms. Daye's February loan." MSJ ¶ 10, at 5 (stating this fact).  See Response ¶ 10, at 4 (not disputing this fact).  Speedy Loan "used the ACH system to withdraw money from Ms. Daye's bank account to pay her loans." MSJ ¶ 11, at 5 (stating this fact).  See Response ¶ 11, at 4 (not disputing this fact).

"Since at least August 22, 2010, Speedy has offered a single loan product, which it calls an 'installment loan.'"  MSJ ¶ 12, at 5 (stating this fact).  See Response ¶ 12, at 4 (not disputing this fact).  Speedy Loan "entered into 31,802 loans in New Mexico between August 22, 2010 and August 22, 2014."  MSJ ¶ 13, at 5 (stating this fact).  See Response ¶ 13, at 4 (not disputing this fact).  "Before New Mexico enacted legislation regulating payday loans, Speedy referred to its loan product as a 'payday loan.'"  MSJ ¶ 14, at 6 (stating this fact).  See Response ¶ 14, at 4 (not

_____

[7]In the statement of material facts, the parties have chosen to redact the exact amount.

disputing this fact).  "As of August, 2014, Speedy's New Mexico website continued to state that 'Speedy Loan is the only place I will go for a Pay-Day Loan.'"  MSJ ¶ 15, at 6 (stating this fact). See Response ¶ 15, at 4 (not disputing this fact).  Speedy Loan's "loans were made in the regular course of its trade or commerce."  MSJ ¶ 16, at 6 (stating this fact).  See Response ¶ 16, at 5 (not disputing this fact).

"In order to qualify for a loan, Speedy required customers to have a bank account from which payments could be withdrawn through electronic fund transfer."  MSJ ¶ 17, at 6 (stating this fact).  See Response ¶ 17, at 5 (not disputing this fact).  "As part of the loan application process, Speedy required customers, including Ms. Daye, to provide the account number and routing number of an account that could be used for electronic fund transfer."  MSJ ¶ 18, at 6 (stating this fact).  See Response ¶ 18, at 5 (not disputing this fact).  "If credit was approved, Speedy required customers to sign a loan contract in order to receive a loan."  MSJ ¶ 19, at 7 (stating this fact).  See Response ¶19, at 5 (not disputing this fact).

Every loan contract entered into between August 21, 2010 and August 21, 2014,

including Ms. Daye's contracts, contained the following terms:

> On or about the day each installment payment becomes due, you authorize us to affect one or more ACH debit entries to your Account at the Bank.
>
> You acknowledge that the account on which the Check/ACH Authorization is drawn is a legitimate, open, an active account.
>
> This document represents the final agreement between the creditor and you and may not be contradicted by evidence of any alleged oral agreement."

MSJ ¶ 20, at 7 (stating this fact).  See Response ¶ 20, at 5 (not disputing this fact).  "After obtaining the customer's signature on the loan contract, Speedy would request each customer's signature on a separate 'PPD/ACH Authorization' form, specifying the schedule of automatic

debits from the customer's bank account."  MSJ ¶ 21, at 7 (stating this fact).  See Response ¶ 21, at 5 (not disputing this fact).  Speedy Loan "used the PPD/ACH Authorization forms in an internal filing system as reminders of the dates upon which employees should use Speedy's computer system to withdraw money from the borrowers' [sic] bank account."  MSJ ¶ 22, at 8 (stating this fact).  See Response ¶ 22, at 5 (not disputing this fact).

"Between August 22, 2010 and August 22, 2014, Speedy entered into 12,189 loans in which the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days."  MSJ ¶ 23, at 8 (stating this fact).  See Response ¶ 23, at 5 (not disputing this fact).  "All of Ms. Daye's contracts were to be repaid in less than 120 days."  MSJ ¶ 23, at 8 (stating this fact).  See Response ¶ 23, at 5 (not disputing this fact).  "Of these 12,189 loans, Speedy attempted to electronically withdraw money from the borrower's bank account in 11,702 loans, including all of Ms. Daye's loans."  MSJ ¶ 24, at 8 (stating this fact).  See Response ¶ 24, at 5 (not disputing this fact).

Speedy Loan "has known of the New Mexico Small Loan Act's provisions governing payday loans since at least August 22, 2010."  MSJ ¶ 25, at 9 (stating this fact).  See Response ¶ 25, at 5 (not disputing this fact).  Speedy Loan "never offered borrowers the right to enter an unsecured payment plan."  MSJ ¶ 26, at 9 (stating this fact).  See Response ¶ 26, at 5 (not disputing this fact).  Speedy Loan "never verified that the proposed loan agreement was permissible using the consumer reporting service certified by the Financial Institutions Division of the New Mexico Regulation and Licensing Department, as required by N.M.S.A. 1978 § 58-15-37 and N.M.A.C. § 12.18.7.14."  MSJ ¶ 27, at 9 (stating this fact).  See Response ¶ 27, at 5 (not disputing this fact).  Speedy Loan "never included the disclosures required by N.M.S.A. 1978 § 58-15-38 in its agreements."  MSJ ¶ 28, at 9 (stating this fact).  See Response ¶ 28, at 5

(not disputing this fact).  Speedy Loan "did not offer its borrowers the right to rescind in any of its loan documents."  MSJ ¶ 29, at 9 (stating this fact).  See Response ¶ 29, at 5 (not disputing this fact).  "All of Speedy's loans had repayment periods exceeding 35 days."  MSJ ¶ 30, at 9 (stating this fact).  See Response ¶ 30, at 5 (not disputing this fact).

"In many cases, Speedy charged interest rates dramatically above the rate permitted by New Mexico law for payday loans."  MSJ ¶ 31, at 9 (stating this fact).  See Response ¶ 31, at 5 (not disputing this fact).  "Between August 22, 2010 and August 22, 2014, 31,074 of Speedy's 31,082 loans charged more than the legal rate for payday loans."  MSJ ¶ 32, at 10 (stating this fact).  See Response ¶ 32, at 5 (not disputing this fact).  "Between August 22, 2010 and August 22, 2014, Speedy collected $7,340,471.14 above the legal rate for payday loans."  MSJ ¶ 33, at 10 (stating this fact).  See Response ¶ 33, at 5 (not disputing this fact).  "With regard to the 11,702 loans in which the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days, and in which Speedy attempted to electronically withdraw money from the borrower's bank account, Speedy charged $1,635,092.05 above the legal rate."  MSJ ¶ 34, at 10 (stating this fact).  See Response ¶ 34, at 5 (not disputing this fact).

Speedy Loan "frequently entered into renewals of its payday loans."  MSJ ¶ 35, at 10 (stating this fact).  See Response ¶ 35, at 5 (not disputing this fact).  "Since at least August 22, 2010, Speedy has been aware of the Truth in Lending Act."  MSJ ¶ 36, at 10 (stating this fact).  See Response ¶ 36, at 5 (not disputing this fact).  "In all of Speedy's loan contracts between August 22, 2013 and August 22, 2014, in the Payment Schedule under the heading 'When Payments Are Due,' the contract stated 'Payments are due on your payday.'"  MSJ ¶ 37, at 11 (stating this fact).  See Response ¶ 37, at 5 (not disputing this fact).  "In addition, in all of Speedy's loan contracts between April 10, 2014 and August 22, 2014, in the Payment Schedule

under the heading 'Number of Payments,' the contract did not state a number, but instead stated an interval such as 'monthly.'"   MSJ ¶ 38, at 11 (stating this fact).  See Response ¶ 38, at 5 (not disputing this fact).  "In all of Speedy's loan contracts between August 22, 2010 and August 22, 2014, the contract stated "PROMISE TO PAY: You promise to pay to Speedy Loan Corp. (Creditor), each installment payment as it becomes due as shown above in the Payment Schedule.'"   MSJ ¶ 39, at 11 (stating this fact).  See Response ¶ 39, at 6 (not disputing this fact). "In each loan, Speedy disclosed the Total of Payments, and represented to the borrower that the Total of Payments was 'the amount you will have paid when you have made all scheduled payments.'"   MSJ ¶ 40, at 11 (stating this fact).  See Response ¶ 40, at 6 (not disputing this fact).

In "25,976 loans . . . between August 22, 2010 and August 22, 2014, of which 5,535 were between August 22, 2013 and August 22, 2014, Speedy disclosed a Total of Payments lower than the sum of the payments disclosed in the Payment Schedule. . . ."   MSJ ¶ 41, at 11-12 (stating this fact).[8]  In all such loans, the Finance Charge was under-disclosed by the same amount as the as the Total of Payments was under-disclosed."   MSJ ¶ 42, at 12 (stating this fact).[9]  "The total

_____

[8]Speedy Loan purports to dispute this fact.  See Response ¶ 41, at 6.  According to Speedy Loan, "[f]or each of the loans identified by Plaintiff, the payment schedule provided by the **PPD/ACH Authorization** provided with the loan by Speedy Loan (see Exhibit 16 to the Motion for Summary Judgment as an example [Doc. 90]) disclosed a sum of payments that exactly matched the Total of Payments disclosed on the loan contract."  Response ¶ 41, at 6 (emphasis added).  The Court notes that Daye and Speedy Loan point to two different and distinct documents.  The exhibit to which Daye refers the Court is the loan contract.  In contrast, Speedy Loan refers the Court to a separate document -- the PPD/ACH Authorization form that accompanies the loan contract.  Nowhere in the Response does Speedy Loan dispute the fact that Daye here asserts.  Because Speedy Loan does not dispute the asserted fact, the Court deems it undisputed.

[9]Speedy Loan purports to dispute this fact.  See Response ¶ 42, at 6.  According to Speedy Loan, "[f]or each of the loans identified by Plaintiff, the payment schedule provided by the **PPD/ACH Authorization** provided with the loan by Speedy Loan . . . disclosed the payment of a F8nance [sic] Charge that exactly matched the Finance Charge disclosed on the loan contract."  The Court notes that Daye and Speedy Loan point to two different and distinct

amount by which the Total of Payments and Finance Charge were under-disclosed in loans between August 22, 2010 and August 22, 2014 was $783,282.50." MSJ ¶ 43 (stating this fact).[10]

"During the time period of August 22, 2010 through August 22, 2014, Plaintiff and at least two other Speedy Loan customers, Luana Lorenzo Gaco and Charles Robert Foster, procured loans from Speedy loans [sic] . . . ." Response ¶ a, at 6 (stating this fact).[11] "At all times relevant to this case, Plaintiff [Daye], Ms. Gaco, and Mr. Foster did not want to take out

_____

documents; Daye points to the loan contract and Speedy Loan points to the PPD/ACH Authorization that accompanies the loan contract. Nowhere in the Response does Speedy Loan dispute the fact that Daye here asserts. Because Speedy Loan does not dispute the asserted fact, the Court deems the fact undisputed. See D.N.M. Local R. Civ. P. 56.1(a).

[10]Speedy Loan purports to dispute this fact. See Response ¶ 43, at 6. According to Speedy Loan, "[b]ecause the Plaintiff erred in its [sic] identification of the Total of Payments and Finance Charge, as reflected in Undisputed Material Fact No. 41 and 42, she has erred in her calculation in this Undisputed Material Fact. In actuality, neither the Total of Payments nor the Finance Charge, is under-disclosed." Response ¶ 43, at 6. The Court's previous conclusion that neither Undisputed Material Fact No. 41 nor Undisputed Material Fact No. 42 is disputed fundamentally undermines Speedy Loan's purported dispute of this fact as well. The Court, therefore, deems the asserted fact undisputed.

[11]The fact as stated in the Response has an additional clause, reading in full: ""During the time period of August 22, 2010 through August 22, 2014, Plaintiff and at least two other Speedy Loan customers, Luana Lorenzo Gaco and Charles Robert Foster, procured loans from Speedy loans [sic] with the intention of taking out installment loans." Response ¶ a, at 6. Daye does not dispute that "Luana Lorenzo Gaco, and Charles Robert Foster took out loans during the time period of August 22, 2010 and August 22, 2014 . . . ." Reply Brief in Support of Plaintiff's Opposed Motion for Summary Judgment ¶ a, at 5, filed August 12, 2016 (Doc. 121)("Reply"). Daye disputes, however, "that these customers had the 'intention of taking out installment loans.'" Reply ¶ a, at 5. According to Daye, "the term 'installment loan' has a precise legal meaning in this matter," and none "of the testimony cited by Speedy demonstrates that its customers had any understanding of this legal terminology." Reply ¶ a, at 5. Daye says that even "if the evidence did support [this asserted fact], the 'intention' of these customers is immaterial. This case concerns Speedy's compliance with state and federal law. None of Plaintiff's legal claims turns on whether Speedy's customers had the 'intention' of taking out an installment loan." Reply ¶ a, at 5. "Moreover," Daye says, "nothing prevented Speedy from making loans to these customers that met their wishes and did not violate the law." Reply ¶ a, at 5. Because Daye and the United States do not dispute the first part of the sentence but do dispute the second part of the sentence, the Court deems only the first part -- as captured in the body text -- to be undisputed.

loans that they were going to have to pay back within thirty-five (35) days."  Response ¶ b, at 7 (stating this fact).[12]  "At all times relevant to this case, Plaintiff [Daye], Ms. Gaco and Mr. Foster wanted to take out loans from Speedy Loan that were paid back in payments over about four months."  Response ¶ c, at 7 (stating this fact).[13]  "At all times relevant to this case, each of the four (4) loans borrowed by Plaintiff [Daye] included a Federal Truth-in-Lending Disclosure Statement ('Disclosure Statement'), which contained a 'TILA Box' stating the Annual Percentage Rate, Finance Charge, Amount Financed, and Total of Payments."  Response ¶ d, at 7 (stating this fact).  See Reply ¶ d, at 5 (not disputing this fact).  "At all times relevant to this case, Plaintiff [Daye], Ms. Gaco and Mr. Foster looked at the Installment Loan Payment Authorization Chart ('Payment Schedule') to determine their payment amounts and the dates on which the payments would be made."  Response ¶ e, at 7 (stating this fact).[14]  "The amount reflected under

---

[12]Daye says that this fact is immaterial, but she does not dispute this fact.  See Reply ¶ b, at 5.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).

[13]Daye says that this fact is immaterial, but she does not dispute this fact.  See Reply ¶ c, at 5.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

[14]Daye says that this fact is immaterial, but she does not dispute this fact.  See Reply ¶ e, at 5.

 TILA claim relating to the disclosure of the Payment Schedule concerns the adequacy of the "segregated" disclosure in the TILA Box on the fact of the contract.  Speedy's A[dditional] F[act] (e), by contrast, concerns the ancillary

the "Total of Payments' on the TILA boxes on Plaintiff [Daye]'s Federal Truth-In-Lending

Disclosure Statements equaled the total amount of the payments listed on the Payment Schedules

for each individual loan." Response ¶ f, at 7 (stating this fact).[15] "With regard to her loans from

Defendant, Plaintiff [Daye] testified that she did not intend to take out loans that required her to

pay a flat fee for a finance charge as opposed to one that would be less if she paid the loan off

---

> PPD/ACH Authorization.  In a deliberate misrepresentation, Speedy's Response renames this form the "Payment Scheduled," in contradiction to the TILA, which specifies that the genuine "Payment Schedule" is the one disclosed in the TILA Box.  Regardless of Speedy's mislabeling, the PPD/ACH Authorization cannot cure the inadequate disclosures in the TILA Box, particularly where the two disclosures contradict each other.

Reply ¶ e, at 5-6 (internal citations omitted).  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion and is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

[15]Daye does not dispute this fact but says that it is immaterial.  See Reply ¶ f, at 6. According to Daye, Daye's TILA claim

> relating to the disclosure of the Total of Payments and Finance Charge concerns whether these amounts accurately reflected the borrower's legal obligation.  It is undisputed that all of Speedy's loans stated that it was the Payment Schedule disclosed in the TILA Box -- not the payments listed in the PPD/ACH Authorization -- that were the basis of the borrower's contractual obligation.  And it is undisputed that the sum of the payments listed in Payment Schedule in the TILA Box of Plaintiff's loans virtually never equaled the amount disclosed as the Total of Payments in the TILA Box.  The PPD/ACH Authorization has no bearing on this claim, and as such, A[dditional] F[act] (e) is immaterial.

Reply ¶ f, at 6 (internal citations omitted).  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

early." Response ¶ g, at (stating this fact).[16] "Ms. Gaco testified that '[I] felt like it was my responsibility to understand, and if I didn't, then it was my fault, not theirs, because I felt like they were real thorough in explaining everything. . . .'" Response ¶ h, at 8 (stating this fact).[17] "Mr. Foster testified that '[I] have never had a problem with them . . . and they've never misled me in any way.'" Response ¶ i, at 8 (stating this fact).[18] "When [Foster] get[s] the loan, they give [him] a printout of how it breaks down on how much [he is] borrowing, what the interest rate's going to be and what it works out to be taken from [his] account every month and for how

_____

[16]Daye does not dispute this fact but says that it is immaterial. See Reply ¶ g, at 6. According to Daye, none of Daye's "legal claims turns on whether Plaintiff [Daye] wanted to take out loans that required her to pay a flat fee or a finance charge, and nothing prevented Speedy from making lawful loans that met this preference." Reply ¶ g, at 6. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See D.N.M.LR-Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

[17]Daye does not dispute this fact but says that it is immaterial. See Reply ¶ h, at 7. According to Daye, whether "Speedy customer Ms. Gaco perceived that she had 'the responsibility to understand' her loans with Speedy has no bearing on Speedy's liability for Plaintiff's legal claims." Reply ¶ h, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See D.N.M.LR-Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

[18]Daye does not dispute this fact but says that it is immaterial. See Reply ¶ i, at 7. According to Daye, whether "Speedy customer Mr. Foster perceived that he 'had a problem' with Speedy has no bearing on Speedy's liability for Plaintiff's legal claims." Reply ¶ i, at 7. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See D.N.M.LR-Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

many months it will be." Response ¶ k, at 8 (stating this fact).  Reply ¶ k, at 7 (not disputing this fact).  "At all times relevant to this case, Plaintiff [Daye], Ms. Gaco and Mr. Foster could change the electronic withdrawal and make their loan payments in cash."  Response ¶ m, at 8 (stating this fact).[19]  "'[Speedy Loan] said if [Foster] want[ed] to switch it over to coming in and making the payment in person at their office, I could do that."  Response ¶ n, at 8 (stating this fact).[20]  "'They give me that option when they're asking me how I want to make payments.  They either ask if I want to come in and make the payments in person or have it automatically withdrawn.'"  Response ¶ o, at 9 (stating this fact).[21]  "Plaintiff testified that she wanted Speedy Loan to take

---

[19]Daye does not dispute this fact, but says that it is immaterial.  See Reply ¶ m, at 7.  According to Daye, Daye's "legal claims concern whether the preauthorized debit authorization was required as a condition of making the loan, not whether it subsequently could be cancelled."  Reply ¶ m, at 7.  Furthermore, Daye argues, the "ability to later cancel the PPD/ACH Authorization is not at issue, and as such, A[dditional] F[act] (m) is immaterial."  Reply ¶ m, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

[20]Daye does not dispute this fact, but asserts that it is immaterial.  See Reply ¶ n, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8

[21]Daye does not dispute this fact, but asserts that it is immaterial.  See Reply ¶ o, at 8.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.

the payments out of her bank account." Response ¶ p, at 9 (stating this fact).[22] "Celicia Linkin,

the manager of the Gallup Speedy Loan store for the past five years, testified that '[i]f a customer

doesn't want to have payment taken out of their account . . . they need to come in a day before

their payment is set up by 1:30.'" Response ¶ q, at 9 (stating this fact).[23] "Ms. Linkin also

testified that Speedy Loans makes '[o]nly installment loans.'" Response ¶ r, at 9 (stating this

fact).[24] "Jessica Hood, a customer service representative for Speedy Loan since 2012, testified

that Speedy Loan makes 'installment loans.'" Response ¶ s, at 9 (stating this fact).[25] "Richard

Barr, the owner of Community Financial Services, testified that Speedy Loan now makes

installment loans which '[gave] the public a better product for less money . . . [it] gives the

customer a longer period to pay them back and it's less pressure on them.'" Response ¶ t, at 9

(stating this fact).[26]

---

[22]Daye disputes this fact. <u>See</u> Reply ¶ p, at 8. According to Daye, she actually testified "'that's the only way they're going to give me the money, and I said, "Okay."'" Reply ¶ p, at 8. "In any case," Daye argues, this fact "is immaterial. Whether [she] wanted Speedy to take payments from her bank account has no bearing on Speedy's liability for Plaintiff [Daye]'s legal claims." Reply ¶ p, at 8.

[23]Daye does not dispute this fact, but says that it is immaterial. <u>See</u> Reply ¶ q, at 8. Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> D.N.M.LR-Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, 2011 WL 1336670, at *4 n.8.

[24]Daye disputes this fact. <u>See</u> Reply ¶ r, at 8. According to Daye, "Speedy made payday loans, not installment loans." Reply ¶ r, at 8. "In any case," Daye continues, this fact "is immaterial . . . ." Reply ¶ r, at 8.

[25]Daye disputes this fact. <u>See</u> Reply ¶ s, at 8. According to Daye, "Speedy made payday loans, not installment loans." Reply ¶ s, at 8. "In any case," Daye continues, this fact "is immaterial . . . ." Reply ¶ s, at 8.

[26]Daye disputes this fact. <u>See</u> Reply ¶ t, at 8. According to Daye, "Speedy made payday

## PROCEDURAL BACKGROUND

In its Memorandum Opinion and Order, filed February 9, 2016 (Doc. 82), the Court

granted Daye's motion to certify a class action under rule 23 of the Federal Rules of Civil

Procedure, and to certify four subclasses: (i) a "Payday Loan Subclass"[27]; (ii) an "EFTA

Subclass"[28]; (iii) a "TILA Subclass"[29]; and (iv) a "Deceptive Disclosure Subclass."[30]

---

loans, not installment loans." Reply ¶ t, at 8. "In any case," Daye continues, this fact "is immaterial . . . ." Reply ¶ t, at 8. Daye asserts "Speedy had options. It could have offered a genuine installment loan product or could have offered lawful, short-term payday loans. Because the temptation of preferential access to its borrowers' bank accounts was so great, Speedy chose to break the law." Reply ¶ t, at 8-9.

[27]The Payday Loan Subclass

consists of all members of the class who entered into a loan with Speedy beginning four years prior to the filing of this action, and EITHER (a) Speedy conditioned the loan upon repayment by means of preauthorized debit authorization OR (b) Speedy accepted preauthorized debit authorization and either the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days. The members of the Payday Loan Subclass assert a right to relief under the UPA and other legal theories for Speedy's illegal payday loans.

Class Certification MOO at 3.

[28]The EFTA Subclass

consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, and whose loan was conditioned upon repayment by means of preauthorized electronic fund transfer. The members of the EFTA Subclass assert a right to relief under the EFTA.

Class Certification MOO at 3.

[29]The TILA Subclass

consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, in which EITHER (a) the loan paperwork disclosed a "Total of Payments" and "Finance Charge" lower than the true amounts, OR (b) the form contract did not state the dates upon which the first payment or any subsequent payments were due, or whether the payments were due weekly, monthly, or otherwise, or the number of payments. The members of

- 16 -

Memorandum Opinion and Order 68, filed February 9, 2016 (Doc. 82)("Class Certification MOO").  On April 5, 2016, Daye and members of the Payday Loan, EFTA, TILA, and Deceptive Disclosure Subclasses moved for summary judgment on the issues of Speedy Loan's liability for alleged EFTA, TILA, and UPA violations.   On May 13, Speedy Loan moved to extend the deadline for it to respond to Daye's MSJ.  Before it addresses the legal questions involved in this case, the Court here recapitulates Daye's and Speedy Loan's arguments as they presented them in case filings and at the motion hearing.  It refers to prior proceedings only insofar as referring to them is directly relevant to the MSJ or to Speedy Loan's Motion to Extend Deadline.

     **1.**     **The MSJ.**

Daye filed the public version of the MSJ on April 28, 2016.  See MSJ at 1.  Daye contends that Speedy Loan flouted federal and state law by knowingly making tens of thousands of illegal payday loans.  See MSJ at 1.  Specifically, Daye alleges that Speedy the EFTA; TILA; the UPA; and the New Mexico Small Loan Act, N.M.S.A. 1978, §§ 58-15-1 to -31 ("Small Loan Act").  See MSJ at 1.  Daye asserts that there is no genuine dispute as to material fact, and asks the Court to hold a Speedy Loan responsible for its actions.  See MSJ at 1.

Daye requests that the Court make seven rulings.  See MSJ at 1-3.  First, Daye contends that, as to the Payday Loan Subclass, the Court should rule that all loans that Speedy Loan made to class members, beginning four years before Daye filed this action, were payday loans under New Mexico law.  See MSJ at 1.  In the alternative, Daye asks the Court to rule that every loan,

─────────────────

the TILA Subclass assert a right to relief under the TILA.

Class Certification MOO at 3.

[30]The "Deceptive Disclosure Subclass" "consists of all members of the class who entered into a loan with Speedy that disclosed a 'Total of Payments' and 'Finance Charge' lower than the true amounts.  The members of the Deceptive Disclosure Subclass assert a right to relief under the UPA."  Class Certification MOO at 3.

beginning four years before Daye filed this action, in which Speedy Loan accepted preauthorized debit authorization, and either the loan was to be repaid in fewer than four payments, or the loan was less than 120 days, was a payday loan.  See MSJ at 2.

Second, Daye contends that, if the Court concludes that Speedy Loan conditioned its loans on borrowers agreeing to ACH withdrawal, then Speedy Loan is liable in the amount of $7,340,471.14 to all Payday Loan Subclass members.  See MSJ at 2.  Daye asks for a ruling that, if the alternative conclusion is made, Speedy Loan is liable in the amount of $1,635,092.05, with additional damages/restitution to be assessed.  See MSJ at 2.  Third, Daye asks the Court to enjoin Speedy Loan from ongoing debt collection above the legal rate, from continuing to violate the Small Loan Act, and from adverse credit reporting.  See MSJ at 2.  Fourth, Daye asks the Court to conclude that Speedy Loan violated the EFTA with regard to every member of the EFTA Subclass, and to make Speedy Loan liable to EFTA Subclass members in a redacted amount.  See MSJ at 2.  Fifth, Daye asks the Court to conclude that Speedy Loan violated the TILA with regard to every member of the TILA Subclass, and to make Speedy Loan liable to the TILA Subclass in a redacted amount.  See MSJ at 2.  Sixth, Daye asks the Court to conclude that Speedy Loan engaged in unfair and deceptive practices in violation of the UPA with regard to all members of the Deceptive Disclosure Subclass, and to make Speedy Loan liable to the Deceptive Disclosure Subclass in the amount of $783,282.50.  See MSJ at 2-3.  Last, Daye asks the Court to award her costs and reasonable attorney fees.  See MSJ at 3.

### 2. __Brief in Support of the MSJ.__

Daye also filed the public version of a separate Brief in Support of Plaintiff's Opposed Motion for Summary Judgment on April 28, 2016.  See Brief in Support of Plaintiff's Opposed Motion for Summary Judgment, filed April 28, 2016 (Doc. 98)("Supportive MSJ Brief").

According to Daye, Speedy Loan's loans were payday loans under New Mexico law.   See Supportive MSJ Brief at 12.   Daye argues that, despite Speedy Loan's "transparent attempt" to disguise its loans as "installment loans," the facts are clear that the loans meet the definition of "payday loan" under New Mexico law.   Supportive MSJ Brief at 12.   Quoting at length from the New Mexico Small Loan Act, Daye asserts that a payday loan

> means a loan in which the licensee accepts a personal check **or debit authorization** tendered by the consumer and agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date agreed to by the licensee and the consumer and:
>
>> (1) includes any advance of money or arrangement or extension of credit whereby the licensee, for a fee, finance charge or other consideration:
>>
>>> (a) accepts a dated personal check or debit authorization from a consumer for the specific purpose of repaying a payday loan; [or]
>>>
>>> (b) agrees to hold a dated personal check or debit authorization from a consumer for a period of time prior to negotiating or depositing the personal check or debit authorization . . .
>>
>> (2) does not include:
>
> . . .
>
>>> (b) installment loans;
>
> E.  "installment loan" means a loan that is to be repaid in a minimum of four successive substantially equal payment amounts to pay off a loan in its entirety with a period of no less than one hundred twenty days to maturity.  "Installment loan" does not mean a loan in which a licensee requires, as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan[.]

Supportive MSJ Brief at 13 (quoting N.M.S.A. 1978 § 58-15-2 (emphasis added in the brief)).

Daye recapitulates the statutory text as "a payday loan is any loan (1) in which a preauthorized debit authorization is a *condition* of the loan, **OR** (2) in which a preauthorized debit

authorization is *accepted* and either the loan is repaid in fewer than four payments, or the term of the loan is less than 120 days." Supportive MSJ Brief at 13 (emphases in the brief).

Daye maintains that every loan contract that Speedy Loan made was conditioned on the borrower providing debit authorization. See Supportive MSJ Brief at 13. Daye says that every customer who received a loan from Speedy Loan was required to provide the account number and routing number for an account from which payments could be withdrawn electronically. See Supportive MSJ Brief at 13-14. According to Daye, Speedy Loan's Policy and Procedure Manual goes into great detail to describe exactly how Speedy obtained and effectuated debit authorizations in all of its loans. See Supportive MSJ Brief at 14.

Daye speculates that Speedy Loan will argue that it only requested -- i.e., did not require -- borrowers to permit repayment by means of preauthorized debt transactions. See Supportive MSJ Brief at 14. Daye further speculates that Speedy Loan will point to a clause hidden in the fine print of a separate document, the "PPD/ACH Authorization," stating that "[t]his authorization is not required as a condition of the loan, I understand that I may cancel this authorization by providing written notice to Speedy Loan at least three (3) business days prior to the payment due date." Supportive MSJ Brief at 14. As Daye sees it, such an argument would be unavailing for two reasons. See Supportive MSJ Brief at 14-15. First, according to Daye, the PPD/ACH Authorization is not a part of the loan contract, nor is it incorporated by reference into the loan contract, meaning that it cannot override unambiguous terms in Speedy Loan's integrated form contracts. See Supportive MSJ Brief at 14. Second, according to Daye, the fact that Speedy Loan allowed borrowers to revoke the debit authorization is irrelevant to whether debit authorization was a requirement of the loan. See Supportive MSJ Brief at 14-15.

Daye then asserts that Speedy Loan failed in its attempt to exempt itself from the Small

Loan Act by disguising its payday loans as "installment loans." See Supportive MSJ Brief at 15. Beneath the mask, Daye says, the loans continued to contain the same abusive terms that the legislature had targeted. See Supportive MSJ Brief at 15. Daye mocks the "ruse" as "particularly shabby" in light of the fact that Speedy Loan's website continued to feature customers bragging that "'Speedy Loan is the only place I will go for a Pay-Day Loan.'" Supportive MSJ Brief at 15.

Daye then hedges with a new line of argument in support of the same point that Speedy Loan's loans were payday loans under New Mexico law. See Supportive MSJ Brief at 15. According to Daye, every loan (i) for which Speedy Loan accepted preauthorized debit authorization; and (ii) either the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days, was a payday loan. See Supportive MSJ Brief at 15. According to Daye, Speedy Loan admits that at least 11,702 of its loans meet these criteria, and that another 487 loans may meet these criteria. See Supportive MSJ Brief at 15. Daye says that the Court, therefore, should conclude that at least this subset of loans was payday loans in the event that Speedy Loan prevails on the remainder of this argument. See Supportive MSJ Brief at 15.

Daye then switches gears, arguing that none of Speedy Loan's loans between August 22, 2010, and August 22, 2014, complied with the Small Loan Act. See Supportive MSJ Brief at 16. Daye says that seven facts support this argument. See Supportive MSJ Brief at 16-17. First, according to Daye, Speedy Loan never offered borrower the right to enter an unsecured payment plan, as N.M.S.A. 1978 § 58-15-35 requires. See Supportive MSJ Brief at 16. Second, according to Daye, Speedy Loan never used the certified consumer reporting service to confirm that its borrowers were eligible to receive payday loans, as N.M.S.A. 1978 § 58-15-37 and N.M.A.C. § 12.18.7.14 require. See Supportive MSJ Brief at 16. Third, according to Daye, in

its loan agreements, Speedy Loan never included the disclosures warning consumers what N.M.S.A. 1978 § 58-15-38 requires.  See Supportive MSJ Brief at 16.  Fourth, according to Daye, Speedy Loan did not offer its borrowers the right to rescind in any of its loan documents, as N.M.S.A. 1978 § 58-15-32(c) requires.  See Supportive MSJ Brief at 16.  Fifth, according to Daye, all of Speedy Loan's loans had repayment periods exceeding thirty-five days, in violation of N.M.S.A. 1978 § 58-15-32(B).  See Supportive MSJ Brief at 16.  Sixth, according to Daye, 99.97% of Speedy Loan's loans charged interest rates above the rate that New Mexico law permits, resulting in the collection of more than seven million dollars above the legal rate set in N.M.S.A. 1978 § 58-15-33(A)-(D).  See Supportive MSJ Brief at 16.  Seventh, according to Daye, Speedy Loan frequently entered into renewals of its payday loans, in violation of N.M.S.A. 1978 § 58-15-34(A).  See Supportive MSJ Brief at 17.

Daye also asserts that damages or restitution in the amount of any amounts Speedy Loan collected above the legal rate is the appropriate remedy.  See Supportive MSJ Brief at 17.  Daye maintains that Speedy Loan's allegedly illegal loans are void under both the Small Loan Act, for the aforementioned reasons, and void under the UPA, because the UPA (i) prohibits economic exploitation of others; (ii) prohibits deceptive trade practices; and (iii) applies to both misrepresentations and material omissions.  See Supportive MSJ Brief at 17.  According to Daye, the UPA provides a non-exhaustive list of unfair or deceptive trade practices, which includes:

(11) making false or misleading statements of fact concerning the price of goods or services . . .

(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

(15) stating that a transaction involves rights, remedies or obligation that it does not involve . . . .

Supportive MSJ Brief at 17-18 (quoting N.M.S.A. 1978 § 57-12-2(D)).  Daye says that Speedy Loan omitted multiple legally required terms in every loan.  See Supportive MSJ Brief at 18. Daye asserts that Speedy Loan routinely represented that it was entitled to charge a rate dramatically above the legal rate, and that, therefore, Speedy Loan's loans were unfair and deceptive.  See Supportive MSJ Brief at 18.  Furthermore, Daye says, the UPA prohibits "unconscionable trade practices," which it defines to include a practice in the extension of credit that "results in a gross disparity between the value received by a person and the price paid." Supportive MSJ Brief (quoting N.M.S.A. 1978 § 57-12-2(E).  As Daye sees it, where Speedy Loan's payday loans each violated the Small Loan Act in multiple ways -- including Finance Charges manifold the legal rate -- the loans are substantively unconscionable in New Mexico. See Supportive MSJ Brief at 18.  Daye asserts that the appropriate remedy for the class is to strike the unconscionable terms from the contracts and "enforce the remainder of the contract without the unconscionable term." Supportive MSJ Brief at 18 (quoting State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 49, 329 P.3d 658).  Daye calculates the resulting refund as $7,340,471.14, an amount equal to any amounts collected above 15.50 per $100.00 loaned, plus fifty cents per loan.  See Supportive MSJ Brief (citing N.M.S.A. 1978 § 58-15-33(A)-(D)).

Daye also asserts that injunctive relief is appropriate, as restitution of illegally collected amounts will not fully remedy Speedy Loan's legal violations.  See Supportive MSJ Brief at 18-19.  Because Speedy Loan's unlawful loans also may have resulted in inaccurate and damaging credit reporting, according to Daye, the UPA provides for injunctive relief "under the principles of equity and on terms that the court considers reasonable."  Supportive MSJ Brief (quoting N.M.S.A. 1978 § 57-12-10).  Daye says that the Court should enjoin Speedy Loan (i) from failing to follow the New Mexico Small Loan Act; (ii) from collecting any amounts from class

members above the legal rate for payday loans; and (iii) from failing to correct any adverse credit reporting relating to payments above the legal rate. See Supportive MSJ Brief at 19.

Moving on to another argument, Daye says that all loans to members of the EFTA Subclass violated the EFTA. See Supportive MSJ Brief at 19. According to Daye, all of Speedy Loan's loans were unlawfully conditioned upon repayment by means of preauthorized electronic fund transfer. See Supportive MSJ Brief at 19. Daye says that Congress enacted the EFTA to protect individual consumer rights in electronic systems to transfer funds. See Supportive MSJ Brief (citing 15 U.S.C. § 1693(b)). As Daye reads the EFTA, it is illegal to condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers. See Supportive MSJ Brief (citing 15 U.S.C. § 1693(k)). Daye states that, for these reasons, Speedy Loan conditioned all its loans between August 22, 2010, and August 22, 2014, on repayment by means of preauthorized electronic fund transfer. See Supportive MSJ Brief at 19.

Daye indicates that Speedy Loan is liable for damages under the EFTA. See Supportive MSJ Brief at 19. Daye asserts that the EFTA provides for statutory damages in class actions, with a maximum of "the lesser of $500,000 or 1 per centum of the net worth of the defendant," based on (i) the frequency, persistence, and nature of noncompliance; (ii) the resources of the defendant; (iii) the number of persons adversely affected; and (iv) the extent to which the noncompliance was intentional. See Supportive MSJ Brief at 19-20 (quoting 15 U.S.C.A. § 1693m). Based on these criteria, Daye says, the Court should award her one percent of Speedy Loan's "mean average" net worth during 2013 and 2014.[31] Supportive MSJ Brief at 20.

---

[31]"Mean" and "average" are synonyms, and "mean average" is not a statistical term. See, e.g., David R. Anderson et al., Statistics for Business & Economics 104-07 (13th ed. 2016). Context suggests that Daye intends to say that she used an average of averages, and the Court

According to Daye, this "modest recovery" would impose no hardship on Speedy Loan. Supportive MSJ Brief at 20.  Moreover, Daye contends that it is necessary to impose the full statutory award, because (i) Speedy Loan violated the EFTA in every loan that it made for at least four years; (ii) Speedy Loan's violations were not technical or de minimis; (iii) Speedy Loan built its entire business model on the illegal loans; and (iv) Speedy Loan violated the EFTA with full knowledge and attempted to camouflage its actions.  See Supportive MSJ Brief at 20.

Daye also asserts that all Speedy Loan's loans to TILA Subclass members violated TILA. See Supportive MSJ Brief at 20.  According to Daye, TILA requires clear, conspicuous, and meaningful disclosures of financial terms, in a precise format.  See Supportive MSJ Brief at 20 (citing 15 U.S.C. § 1632, 1638)).  Daye avers that all persons who borrowed from Speedy Loan between August 22, 2013, and August 22, 2014, entered into contracts that violated TILA in at least two ways.  See Supportive MSJ Brief at 20.  First, TILA requires that a loan's payment schedule be disclosed, including "[t]he number, amount, and due dates or period of payment scheduled to repay the total of payments."  Supportive MSJ Brief at 21 (quoting 15 U.S.C. § 1638(a)(6) and citing 12 C.F.R. § 1026.18(g)).  Daye adduces guidance from the Bureau of Consumer Financial Protection on how to interpret such language:

> Section 1026.18(g) requires creditors to disclose the timing of payments.  To meet this requirement, creditors may list all of the payment due dates.  They also have the option of specifying the "period of payments" scheduled to repay the obligation.  **As a general rule, creditors that choose this option must disclose the payments intervals or frequency, such as "monthly" or "bi-weekly," and the calendar date that the beginning payment is due.**  For example, a creditor may disclose that payments are due "monthly beginning on July 1, 1998."  This information, when combined with the number of payments, is necessary to define the repayment period and enable a consumer to determine all of the payment due dates.

Supportive MSJ Brief at 21-22 (quoting Bureau of Consumer Financial Protection, Official

_____

uses this understanding for its net worth calculations in the analysis section infra.

Interpretations § 1026.18(g)(4)(i))(emphasis added in the Supportive MSJ Brief).  According to Daye, court decisions from other circuits also require the creditor to list the first payment's calendar date and the frequency of payments.  See Supportive MSJ Brief at 22 (citing Hamm v. Ameriquest Mortgage Co., 506 F.3d 525 (7th Cir. 2007); LeFoll v. Key Hyundai of Manchester LLC, 829 F. Supp. 2d 44 (D. Conn. 2011)).  Daye says that whether the payment schedule complies with TILA is an objective test, the measure of which is whether the borrower must make assumptions to determine the precise payment schedule.  See Supportive MSJ Brief at 22 (citing Hamm v. Ameriquest Mortgage Co., 506 F.3d at 529).

Daye asserts that all of Speedy Loan's loans between August 22, 2013, and August 22, 2014, failed to state the first payment date or the payment interval.  See Supportive MSJ Brief at 22.  According to Daye, all Speedy Loan contracts instead ambiguously stated that "payments are due on your payday."  Supportive MSJ Brief at 22.  After April 10, 2014, Daye contends, Speedy Loan exacerbated its TILA violation when it stopped disclosing the number of payments due on loans as well.  See Supportive MSJ Brief at 23.

Daye further asserts that many of the loans to TILA Subclass members also stated an inaccurate finance charge and total of payments, meaning that the loans violated TILA in yet another way.  See Supportive MSJ Brief at 23.  According to Daye, Speedy Loan disclosed a total of payments lower than the sum of the payments disclosed in the payment schedule on 5,535 loans between August 22, 2013, and August 22, 2014.  See Supportive MSJ Brief at 24.  Daye sees this as a ham-handed attempt at subterfuge, meant to try to make loans appear less expensive than they actually were.  See Supportive MSJ Brief at 24.  Because the total payment amount decomposes into principal and finance charge -- and because the principal on these loans was accurate -- it follows, Daye asserts, that Speedy Loan also under-disclosed the loans' finance

charge.  See Supportive MSJ Brief at 24.

Daye argues that TILA's formula for statutory damages has a maximum limit of the lesser one million dollars or one percent of a creditor's net worth.  See Supportive MSH Brief at 24 (citing 15 U.S.C. § 1640).  Daye urges the Court to award her a full one percent Speedy Loan's net worth, because (i) Speedy Loan's TILA violations were widespread; (ii) Speedy Loan knowing violated the law; and (iii) Speedy Loan would not suffer any hardship from the award. See Supportive MSJ Brief at 24-25.

Moving to her last set of arguments, Daye avers that all loans Speedy Loan made to Deceptive Disclosure Subclass members violated the UPA.  See Supportive MSJ Brief at 25. Daye says that the UPA prohibits unfair or deceptive practices, including "making false or misleading statements of fact concerning the price of goods or services."  Supportive MSJ Brief at 25 (quoting N.M.S.A. 1978 § 57-12-2(D)).  According to Daye, the UPA has no requirement for detrimental reliance  or deception; the plaintiff need only show that an action tends to deceive and has caused economic loss.  See Supportive MSJ Brief at 25.  Referring to a case out of the United States District Court for the District of New Mexico, Daye says that in "most cases, this showing is fairly simple  -- **the product was not what it was represented to be and, instead, was a product of lesser economic value**."  Supportive MSJ Brief at 25 (quoting Mulford v. Altria Group, Inc., 242 F.R.D. 615, 626 (D.N.M. 2007)(Vazquez, J.)(emphasis added in Supportive MSJ Brief).

Unpacking this line of argument, Daye avers that Speedy Loan made unfair or deceptive statements in loans that disclosed a total of payments and finance charge lower than the true amount.  See Supportive MSJ Brief at 25.  Because the statute for limitations is four years for the UPA -- as opposed to only one year for TILA -- Daye identifies a much larger subclass of loans

that Daye says violate the UPA:  25,976 loans in total between August 22, 2010, and August 22, 2014.  See Supportive MSJ Brief at 26.  Daye contends that, in each of these loans, the borrower was contractually obligated to pay an amount higher than what Speedy Loan represented to be the amount the borrower would have to pay over the lifetime of the loan.  See Supportive MSJ Brief at 26.  Because each loan appeared to be less expensive than it actually was, each loan, Daye argues, "was not what it was represented to be and, instead, was a product of lesser economic value."  Supportive MSJ Brief at 26 (quoting Mulford v. Altria Group, Inc. at 626).  Daye maintains that the appropriate remedy for UPA violations is the difference between (i) the disclosed total of payments and finance charge; and (ii) the true total of payments and finance charge.  See Supportive MSJ Brief at 26.

Wrapping up, Daye asserts that she is entitled to reasonable attorney fees and costs under N.M.S.A. 1978 § 57-12-10(c) and under 15 U.S.C. § 1640(a)(3) -- TILA -- and 15 U.S.C. § 1693m(a)(3) -- EFTA.  See Supportive MSJ Brief at 27.  She alleges that Speedy Loan reaped windfall profits for years by willfully violating state and federal law in providing predatory loans to some of the most vulnerable members of society.  See Supportive MSJ Brief at 27.  Daye therefore requests that the Court enter summary judgment in her favor.  See Supportive MSJ Brief at 27.

### 3.    Speedy Loan's Motion to Extend Deadline.

Speedy Loan filed its Motion to Extend Deadline on May 13, 2016.  After quickly summarizing the case's claims, Speedy notes that Daye filed her MSJ on the claims on April 5, 2016.  See Motion to Extend Deadline at 2.  Speedy Loan also notes that three depositions took place after April 27, 2016, and that one additional witnessed scheduled for a deposition on May 6, 2016, needed to be rescheduled on account of illness.  See Motion to Extend Deadline at 2.

Speedy Loan says that, because the discovery deadline was to be May 2, 2016, it asked Daye's counsel for an extension of time to file its Response.  <u>See</u> Motion to Extend Deadline at 2. According to Speedy Loan, Daye's counsel agreed to extend the deadline only to May 12, 2016. <u>See</u> Motion to Extend Deadline at 2.  Speedy Loan asserts that May 12, 2016, precedes both the date when the rescheduled deposition is scheduled to take place and the date when the deposition transcripts will become available from the court reporter.  <u>See</u> Motion to Extend Deadline at 2. In what simultaneously is an implicit call for fair play and an assertion that the deadline extension would not introduce unnecessary delay, Speedy Loan then observes that it recently had given its approval on Daye's motion to continue the trial for ninety days.  <u>See</u> Motion to Extend Deadline at 2.

Speedy Loan argues that the Court should afford it the opportunity to rely on the class representative's deposition as well as its own customers' depositions before it has to respond to an MSJ that would essentially be dispositive of the case.  <u>See</u> Motion to Extend Deadline at 2. Speedy Loan then emphasizes that the required extension will not cause any prejudice to Daye or create any unnecessary delay in the case.  <u>See</u> Motion to Extend Deadline at 2.

**4.     <u>Daye's Response to the Motion to Extend Deadline</u>.**

Daye filed the Plaintiff's Response Brief in Opposition to Defendant's Motion to Extend Deadline to File Its Response to Plaintiff's Motion for Summary Judgment and Request for Ruling on May 27, 2016 (Doc. 105)("Response to the Motion to Extend Deadline").  Daye requests that the Court deny Speedy Loan's Motion to Extend Deadline, insisting that Speedy Loan's failure to file and serve a response in opposition to the MSJ within the prescribed time for doing so constitutes consent to grant the MSJ.  <u>See</u> Response to the Motion to Extend Deadline at 1.  Daye notes that fifty-two days have passed since she filed the MSJ, bringing the total time

since the case began to more than six hundred days.  See Response to the Motion to Extend Deadline at 1-2.  According to Daye, Speedy Loan has presented no reason why it could not have deposed Daye at some point during the preceding two years and adds that Speedy Loan did not even notify Daye of its intent to depose her until after Daye had followed the MSJ.  See Response to the Motion to Extend Deadline at 2.  Daye sees this combination of facts as proof that Speedy Loan seeks to delay the case for strategic reasons.  See Response to the Motion to Extend Deadline at 2.  Daye also asserts that Speedy Loan provides no explanation why it could not have obtained Gaco's and Foster's affidavits before the response deadline.  See Response to the Motion to Extend Deadline at 2.

Daye maintains that she has been accommodating of Speedy Loan's previous requests for extensions of time.  See Response to the Motion to Extend Deadline at 2.  This time is different, Daye asserts; discovery is closed and the case is rapidly moving toward trial, and she cannot agree to a delay of the magnitude that Speedy Loan seeks.  See Response to the Motion to Extend Deadline at 2-3.  Daye closes by insisting that the Court is entitled to enforce its deadlines to promote this matter's efficient resolution.  See Response to the Motion to Extend Deadline at 3.

**5.      Speedy Loan's Reply to the Response to the Motion to Extend Deadline.**

Speedy Loan filed Defendant Speedy Loan's Reply in Support of Motion to Extend Deadline to File Its Response to Plaintiff's Motion for Summary Judgment on June 10, 2016 (Doc. 107)("Motion to Extend Deadline Reply").  After presenting some case background, Speedy Loan asserts that Daye makes several arguments in her Response to the Motion to Extend Deadline which contradict her recent position in the parties' Joint Motion to Continue Trial Setting.  See Motion to Extend Deadline Reply at 2.  According to Speedy Loan, Daye

seeks to deny Speedy Loan the opportunity to include evidence from the testimony of the class representative and two Speedy Loan customers even though Daye agreed in the Joint Motion to Continue Trial Setting that the parties need time to "wrap up" discovery matters.  Motion to Extend Deadline Reply at 2.  Speedy Loan rejects Daye's assertion that it is trying to delay the case, noting that both parties have agreed to request a continuance of the trial.  See Motion to Extend Deadline Reply at 2.  Speedy Loan asserts that Daye's contention that Speedy Loan's failure to respond to the MSJ before the deadline amounts to consent to grant the MSJ is "disingenuous at best" and that Daye cites no case law to support the contention.  Motion to Extend Deadline Reply at 3.

Speedy Loan divulges that its counsel obtained the court reporter's transcripts on the Friday before it began a two-week federal trial in Santa Fe.  See Motion to Extend Deadline Reply at 3.  Accordingly, even though a good portion of its MSJ Response is completed, Speedy Loan avers that it "will not have an opportunity to incorporate the needed evidence from the recently-obtained deposition transcripts and to finalize the Response before the end of [the Santa Fe] trial."  Motion to Extend Deadline Reply at 3.  Speedy Loan therefore resubmits its request for a deadline extension that, according to Speedy Loan, will cause neither prejudice to Daye nor any unnecessary delay in the case.  See Motion to Extend Deadline Reply at 3-4.

### 6.    The MSJ Response.

Speedy Loan filed Defendant Speedy Loan's Response to Plaintiff's Opposed Motion for Summary Judgment on July 1, 2016.  See Defendant Speedy Loan's Response to Plaintiff's Opposed Motion for Summary Judgment, filed July 1, 2016 (Doc. 111)("Response").  Speedy Loan offers significant amounts of background at the start of the Response.  See Response at 1-3.  After summarizing its take on Daye's Supportive MSJ Brief, Speedy Loan stated that it offers

"*unsecured* installment loans" to its customers.  Response at 2.  Speedy Loan explains that an installment loan permits someone to borrow money and repay it over time in fixed payments, without penalty for prepayment.  <u>See</u> Response at 2 (emphasis in original).  In exchange, Speedy Loan says, the borrower is expected to repay the original amount plus interest.  <u>See</u> Response at 2.  According to Speedy Loan, interest is not pre-computed, and the loans may be repaid at any time to avoid all or part of the interest charges.  <u>See</u> Response at 2.  Speedy Loan maintains that the absence of collateral and the absence of any upfront fees, in addition to per-loan overhead costs and the lack of pre-payment penalties, makes Speedy Loan's loan products risky.  <u>See</u> Response at 2.  Speedy Loan contends that it assumes the risk that the borrower will repay the loan before Speedy Loan recoups its costs, much less make a profit.  <u>See</u> Response at 2.[32]

Speedy Loan suggests that Daye's claims rest solely on three innocent circumstances that Daye has wrongly inflated into allegations of nefarious, intentional conduct by Speedy Loan to cheat its customers.  <u>See</u> Response at 2.  First, for the convenience of its customers and itself, Speedy Loan wanted its customers to have the opportunity to make periodic payments by electronic funds transfer.  <u>See</u> Response at 2.  Because most people choose this option, Speedy Loan says, it made electronic funds transfer the default method of payment.  <u>See</u> Response at 2.  Speedy Loan asserts that customers are allowed to opt-out of electronic payments if they choose

---

[32]Speedy Loan seems to be arguing the opposite of what this sentence, as Speedy Loan wrote it, says; namely, that "Speedy Loan assumes the risk that the borrower will <u>not</u> repay the loan before Speedy recoups its costs, much less make a profit." (emphasized word added). Without the added word, the following sentence in the Response is incongruous with this sentence: "Furthermore, Defendants assume the risk that the borrower will default on the loan." Response at 2.  As originally written, the sentence also is at loggerheads with risk allocation when an institution makes a loan.  The risk inheres in the recipient of a loan not repaying it, a.k.a. "credit risk."  Shelagh Heffernan, <u>Modern Banking</u> 104 (1st ed. 2005).  It does not inhere in the recipient of the loan repaying it.  <u>See</u> Shelagh Heffernan, <u>Modern Banking</u> at 104-105. Nevertheless, having made this note, the Court retains the language as Speedy Loan put it in the Response.

not to use them.  See Response at 2.  Second, the loan form that Speedy Loan used contained an erroneous statement that (i) none of the deposed customers even saw; and (ii) that may make the loans appear more -- not less -- expensive than they actually were.  See Response at 2.  This occurs on the form, Speedy Loan says, because the erroneous statement appears to indicate that all loan payments were for the same amount when, in fact, the first and last payment was almost always less (and never more) than the payment amount indicated.  See Response at 2.  According to Speedy Loan, loan customers barely noticed the erroneous statement --if they noticed it at all -- because Speedy Loan disclosed a full page containing the precise accurate payment schedule complete with dates and amounts.  See Response at 2-3.  Third, Speedy Loan says, all of Speedy Loan's customers were aware of the fact that they were taking out installment loans to be paid back in a number of payments over approximately four months.  See Response at 3.  Owing to a then-unknown glitch in its calendaring software, Speedy Loan asserts, a number of its loans came out days short of the 120 days that the Small Loan Act identifies for the definition of an installment loan, because the last payment often occurred before the last month has entirely lapsed.  See Response at 3.

Given the reasons above, Speedy Loan says, the Court must deny Daye's request for summary judgment on the issue she raised in her MSJ and Supportive MSJ Brief.  See Response at 3.  Furthermore, Speedy Loan argues, genuine issues of material fact exist as to whether Speedy Loan offered payday loans during the relevant time period.  See Response at 11.  As Speedy Loan reports the law, New Mexico amended the Small Loan Act in 2007 with regard to one-payment payday loans, which limited loan terms to between fourteen and thirty-five days, precluded renewals or rollovers, and placed fee restrictions.  See Response at 11.  Speedy Loan purports that the amendments specifically excluded installment loans from the class of loans it

defined as "payday" loans.  Response at 11 (quoting N.M.S.A. 1978 § 58-15-2(H)(2)("a payday

loan does not include . . . installment loans.")).  According to Speedy Loan, N.M.S.A. 1978 § 58-

15-2(E) instead defines installment loans differently, as

> a loan that is to be repaid in a minimum of four successive substantially equal payment amounts to pay off a loan in its entirety with a period of no less than one hundred and twenty days to maturity.  "Installment loan" does not means a loan in which a licensee requires, as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan.

Response at 3 (quoting N.M.S.A. 1978 § 58-15-2(E)).  Speedy Loan accuses Daye of blurring

the definitions of "installment loan" and "payday loan" when she says that, "[i]n short, payday

loan is any loan (1) in which a preauthorized debit authorization is a *condition* of the loan, **OR**

(2) in which a preauthorized debit authorization is *accepted* and either the loan is repaid in fewer

than four payments, or the term of the loan is less than 120 days."  Response at 12 (quoting Brief

in Support of Plaintiff's Opposed Motion for Summary Judgment at 13)(emphases added in the

Response).  According to Speedy Loan, Daye's overgeneralization of the definition of a payday

loan neglects scenarios in which loans are clearly installment loans pursuant to the Small Loan

Act, but would be deemed payday loans under Daye's short definition.  See Response at 12.

Speedy Loan says that one example is an installment loan that is paid off early, i.e. in fewer than

four months or in a period shorter than 120 days, by a consumer's choice via preauthorized debit

transaction.  See Response at 12.  Speedy Loan states that, under Daye's definition, this would

default to a payday loan even though it commenced as an installment loan solely because a

preauthorized debit authorization is accepted and the loan is repaid in fewer than four payments,

or the term of the loan is less than 120 days.  See Response at 12.

     Moreover, Speedy Loan says that, contrary to what Daye asserts, all class members'

loans did not require debit authorization.  See Response at 12.  According to Speedy Loan, the

disclosure statements that Daye signed included language regarding Daye's right to cancel the authorization for electronic debit: "You may revoke this authorization at any time up to 3 business days prior to the due date." Response at 12. The payment schedule that Daye signed, Speedy says, contained the following language: "I understand that I may cancel this authorization by providing written notice to Speedy Loan at least (3) business days prior to the payment due date." Response at 13. Furthermore, Speedy Loan says, Daye testified that she wanted Speedy Loan to take payments out of her bank account. See Response at 13. Speedy Loan argues that other loan recipients have testified that Speedy Loan gave them an option to come into a Speedy Loan office and pay their loan payment in person. See Response at 13.

Turning to tackle another of Daye's arguments, Speedy Loan asserts that every loan in which Speedy Loan accepted preauthorized debit authorization, and either the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days, was not a payday loan. See Response at 13. A borrower receiving a payday loan, Speedy Loan says, intend to repay the loan in one payment, usually on his or her next payday. See Response at 14. In contrast, Speedy Loan notes, Daye and fellow class members intended to have the loans repaid in several payments. See Response at 14.

Speedy Loan goes on to say that, because its loans were not payday loans, Speedy Loan was not required to comply with the Small Loan Act's provisions related to payday loans. See Response at 14. Consequently, Speedy Loan argues, a damages award or restitution is not appropriate until the Court determines liability. See Response at 15. Even if the Court decides to consider damages at this time, Speedy Loan suggests, the remedies that Daye seeks are wrong. See Response at 15. Speedy Loan says that Daye provides no analysis for her positions that

Speedy Loan engaged in unconscionable trade practices, even neglecting to discuss what evidence is needed to support such a position.  See Response at 15.

Speedy Loan purports to pick up the slack, telling the Court that the unconscionable trade practices allegation must show (i) the value each borrower received; (ii) the price each borrower paid; (iii) that there was a gross disparity between the value received and the price paid; and (iv) that the loan worked to the borrower's detriment.  See Response at 15-16 (citing N.M.S.A. 1978 § 57-12-2(E)(2)).  Speedy Loan contends that Daye has not provided any evidence for any of these elements.  See Response at 16.  First, Speedy Loan says, the "value" of any item or service depends on individualized preferences and circumstance.  See Response at 16.  Second, Speedy Loan continues, in the context of an unsecured loan, the price paid must mean the amount the borrower already has paid, e.g., the price a borrower pays is $97 if he or she repays $397 on a $300 loan.  See Response at 16.

Third, Speedy Loan asserts that Daye has not presented any evidence as to how the disparity inherent in an interest-bearing loan transaction becomes so great that it reaches the level of "gross" disparity.  Response at 16.  According to Speedy Loan, New Mexico abolished the usury rate in the state, leaving rate-setting to the market.  See Response at 16.  Speedy Loan needs to set high interest rates for its installment loans, Speedy Loan argues, given the combination of the small amounts being lent, the overhead costs associated with making the loans, the unsecured nature of the transactions, and high risk of borrower default, and the lack of collectability in the event of a default.  See Response at 16.  Fourth, Speedy Loan contends, when determining whether a consumer received a benefit from -- or conversely suffered a detriment from -- a particular transaction is a question of fact.  See Response at 16.  Because there exist genuine issues of material fact, Speedy Loan maintains, the Court should deny

- 36 -

summary judgment on these claims.  See Response at 16.  Despite Daye's assertions, Speedy Loan says, there is no evidence that any of Speedy Loan's loans were void.  See Response at 17. If the Court determines that Speedy Loan and its borrowers made a mutual mistake regarding repayment timelines, Speedy Loan asks the Court to permit the parties to move the final payments to 121 days to comply with the parties' intentions to have installment loan contracts. See Response at 17.

Speedy Loan then turns to Daye's restitution argument.  See Response at 17.  According to Speedy Loan, Daye assumes in the MSJ and Supportive MSJ Brief that all the loans at issue are payday loans.  See Response at 17.  Speedy Loan takes issue with Daye's calculation of damages, arguing that it completely disregards restitution's purpose and Daye fails to set forth a legal analysis for her request.  See Response at 17.  According to Speedy Loan, a party is entitled to restitution "only to the extent that he has conferred a benefit on the other party by way of part performance or reliance."  Response at 18 (quoting Restatement (Second) of Contracts § 344(c)). At the same time, Speedy Loan continues, restitution also means that the party seeking "restitution of a benefit that he conferred on the other party is expected to return what he has received from the other party."  Response at 18 (quoting Restatement (Second) of Contracts § 344 cmt. (a))(emphasis added in the Response).  Furthermore, Speedy Loan asserts, New Mexico has a longstanding general rule that money awards must be established with reasonable certainty. See Response at 18 (citing Herbenstreet v. Atchison, Topeka & Santa Fe Railway Co., 306 P.2d 1057, 1061 (1959)).  As Speedy Loan reads the rule, reasonable certainty means that a plaintiff must produce evidence beyond conjecture or speculation to establish both (i) that damages occurred; and (ii) the amount of those damages.  See Response at 18. According to Speedy Loan, Daye has failed to produce evidence, aside from her recitation of a statute, that she or any fellow

class members are entitled to restitution.   See Response at 18.   Because genuine issues of material fact consequently still exist concerning the basis for Daye's restitution request, Speedy Loan asserts, the Court should deny summary judgment on this issue and deny Daye's request for damages.   See Response at 18.   For the same reason, Speedy Loan concludes, the Court also should deny Daye's request for an injunction until it settles the issue of liability.   See Response at 18.

Turning its attention to Daye's allegations regarding Speedy Loan's purported EFTA violations, Speedy Loan says that Daye has not presented any evidence that Speedy Loan's loans were conditioned upon her repayment via preauthorized electronic fund transfers.   See Response at 19.   Speedy Loan says that the reality is the just the opposite.   See Response at 19.   Once again marshaling various borrowers' deposition testimony, Speedy Loan argues that Daye hoists herself on her own petard by even raising this argument, as the testimony leaves no doubt that none of Speedy Loan's loans were conditioned on a borrower's repayment via preauthorized electronic funds transfer.   See Response at 19.   To the contrary, Speedy Loan asserts, the testimony and other discovery documents firmly establish that electronic fund transfer payments were optional.   See Response at 19-20.

Even if the Court concludes that there are no issues of material fact as to whether Speedy Loan violated the EFTA, Speedy Loan argues, Daye has failed to set forth adequate support for her request for the maximum statutory damages of one percent of Speedy Loan's net worth.   See Response at 20.   Restated another way, Speedy Loan asserts that Daye has failed to support her conclusory allegations that (i) Speedy Loan's EFTA violations were not technical or de minimus; or (ii) that Speedy Loan  intentionally violated the EFTA and attempted to camouflage its actions.   See Response at 20.   Furthermore, Speedy Loan objects to the bookend dates that Daye

chooses to calculate EFTA damages, noting that the EFTA is silent as to the date upon which net worth should be measured. See Response at 20.

Moving on to address Daye's TILA allegations, Speedy Loan asserts that loan agreements to members of the TILA subclass contained adequate payment scheduled. See Response at 21. According to Speedy Loan, 12 C.F.R. § 1026.18(g) offers lender an option to specify a payment period on a loan -- it does not mandate that lender specify a payment period. See Response at 21. Speedy Loan indicates that, on its payment schedule, it lists all payment due dates and the amount due on each date. See Response at 21. Speedy Loan contends that each customer, including Daye and all members of the TILA subclass, sign the payment schedule and receive a copy of it. See Response at 21. According to Speedy Loan, Daye and two other Speedy Loan customers testified that they had looked to the payment schedule to determine their payment amounts and dates, and none of them testified to having any confusion or difficulty understanding when their payments were due or the amount due. See Response at 21.

Daye's assertions notwithstanding, Speedy Loan argues that it was not obliged to disclose payment intervals as it listed the payment due dates. See Response at 21. Speedy Loan dismisses Daye's invocation of 12 C.F.R. § 1026.18(g) as irrelevant to the case, because Speedy Loan listed payment dates on its payment schedules. See Response at 21. Speedy Loan likewise rejects Daye's references to Hamm v. Ameriquest Mortgage Co., saying that whether a payment schedule complies with TILA is an objective test, and that the proper benchmark for that test is whether a borrower must make assumptions to determine the precise payment schedule. See Response at 21. According to Speedy Loan, no Speedy Loan customer has testified to having to make assumptions regarding their payment dates and amounts. See Response at 21-22. Based on customer testimony so far in the case, Speedy Loan says, a genuine issue of material fact

- 39 -

exists regarding the sufficiency of the payment schedule that Speedy Loan provided to the TILA Subclass.  See Response at 22.

Moreover, Speedy Loan asserts, loans to the TILA Subclass members contained accurate finance charges in the TILA Box, and the total payment in the TILA Box accurately reflected the total of payments listed on the payment schedule.  See Response at 22.  Speedy Loan states that each of its customers received and signed a Federal Truth-In-Lending Disclosure Statement.  See Response at 22.  The TILA Box on the disclosure statement, Speedy Loan maintains, contained the annual percentage rate, finance charge, amount financed, and payment total in the largest boxes at the top of the page.  See Response at 22.  According to Speedy Loan, the disclosure agreement even conveniently broke down the payment total into principal and finance charges.  See Response at 22.  Speedy Loan argues that such plentiful numbers conspicuously displayed undermine Daye's contention that Speedy Loan's loans appeared less expensive than they were.  See Response at 22.  Speedy Loan admits that the fine print listing payment amount and payment due dates may have been inaccurate, but it insists that customers only paid the amounts that the payment schedule lists.  See Response at 22.  Accordingly, Speedy Loan contends, a genuine issue of material fact exists regarding the sufficiency of the payment schedules that Speedy Loan supplied to the TILA Subclass.  See Response at 22.  Unless and until the Court establishes liability, Speedy Loan asserts, any award of TILA-related damages is premature.  See Response at 23.  Even if and when the Court determines that Speedy Loan is liable, Speedy Loan insists, Speedy Loan reserves the right to dispute Daye's damage assessment and valuation.  See Response at 23.

Turning the Court's attention to Daye's allegations under the UPA, Speedy Loan then argues that genuine issues of material fact exist as to whether Speedy Loan made unfair or

deceptive statements to Daye during the relevant time period.  See Response at 23.  According to

Speedy Loan, Daye's MSJ and Supportive MSJ Brief fail to list all the elements the UPA

requires a plaintiff to show to state a claim.  See Response at 23.  Speedy Loan says that there are

four required elements that the plaintiff must show, not three, and that these are as follows:

> (1) defendant made an oral or written statement that was either false or
> misleading; (2) the false or misleading representation was either *knowingly* made
> in connection with the sale of goods or services; (3) the conduct complained of
> occurred in the regular course of defendant's business; and (4) the representation
> may, tends to, or does deceive or mislead any person.

Response at 23 (quoting Brooks v. Norwest Corp., 103 P.3d 39, 51 (2004))(emphasis added in

the Response).  Speedy Loan asserts that Daye skips the knowledge requirement in the MSJ, and

that she does not prove anywhere in the MSJ or attendant Supportive MSJ Brief that Speedy

Loan knowingly made unfair or deceptive statements concerning the total number of loan

payments or loan finance charges.  See Response at 24.

Furthermore, Speedy Loan says, the UPA provides for the recovery of actual damages.

See Response at 24.  According to Speedy Loan, Daye has not set forth sufficient evidence of

liability for the Court even to consider such a damages award at this time.  See Response at 24.

Speedy Loan argues that, moreover, any damages calculation under the UPA requires

individualized determinations of damages for each purported class member.  See Response at 24

(citing Mulford v. Atria Group, Inc., 242 F.R.D. at 629).  Speedy Loan suggests that these

individualized damages have not yet been computed, and reserves the right to dispute the sums if

and when the Court determines that Speedy Loan is liable for damages under the UPA.  See

Response at 24.

Addressing Daye's request for reasonable attorney fees and costs very briefly at the end

of the Response, Speedy Loan insists that an award of attorney fees is premature, as the Court

has not yet decided the issue of liability.  See Response at 25.  If and when the Court decides that

Speedy Loan is liable for the other claims in the case, Speedy Loan argues that it reserves the

right to dispute Daye's fee and cost calculations.  See Response at 25.  In the meantime, Speedy

Loan asks the Court to deny Daye's MSJ on all counts, bind over the matter for trial, and order

any and all other relief that the Court deems just and proper.  See Response at 25.

### 7.    The MSJ Reply.

Daye filed the Reply Brief in Support of Plaintiff's Opposed Motion for Summary

Judgment on August 12, 2016.  See Reply Brief in Support of Plaintiff's Opposed Motion for

Summary Judgment, field August 12, 2016 (Doc. 121)("Reply").  Daye instantly throws down

the gauntlet, averring that Speedy Loan admits in the Response that, in all of its more than

30,000 loans to class members, the borrower was required to authorize Speedy Loan to debit his

or her bank account for loan payments.  See Reply at 1.  Daye asserts that every one of Speedy

Loan's loans between August 22, 2010, and August 22, 2014, met the definition of "payday

loan" in New Mexico's Small Loans Act.  Reply at 9 (quoting N.M.S.A. 1978 § 58-15-2(E),

(H)).   Under New Mexico law, Daye says, a payday loan is any loan "(1) in which a

preauthorized debit authorization is a *condition* of the loan, **OR** (2) in which a preauthorized

debit authorization is *accepted* and either the loan is to be repaid in fewer than four payments, or

the term of the loan is less than 120 days."  Reply at 9.  According to Daye, Speedy Loan unfurls

a "tortured, illogical argument" that it did not require preauthorized debit authorization as a

condition of extending its loans, because borrowers later could cancel the authorization they

were required to give at the time of the loan.  Reply at 10-11.  Daye insists, however, that the

ability to opt out is irrelevant to whether a loan qualifies as a payday loan under the Small Loan

Act; what matters is whether debit authorization must be provided ab initio as a condition of

making the loan.  See Reply at 11.  Had New Mexico meant for the protections of the Small Loan Act to apply only to payday loans that did not permit opt out, Daye maintains, it could have said so.  See Reply at 11.  According to Daye, however, New Mexico recognized that "inertia is a powerful force," and therefore did not provide that the ability to opt out -- which borrowers might not descry in a thicket of contract text -- was sufficient to nullify the debit authorization requirement.  Reply at 11.

Daye introduces more out-of-circuit cases interpreting the EFTA to support its position. See Reply at 11.  Not only that, Daye says, but federal law always grants borrowers the right to opt out of a preauthorized electronic fund transfer.  See Reply at 12 (citing 15 U.S.C. § 1693e(a)).  Daye therefore asserts that, if "the right to opt out meant that preauthorized debit authorization was not a condition of the loan, then no loans would ever be conditioned on preauthorized debit authorization."  Reply at 12.  In other words, according to Daye, the Small Loan Act's payday loan provisions would be meaningless.  See Reply at 12.

As in her MSJ and attendant Supportive MSJ Brief, Daye hedges her bets at this point, asserting that at least 11,702 of Speedy Loan's loans were payday loans even if the Court determines that Speedy Loan's loans did not require preauthorized debit authorization, because a loan is a payday loan if (i) a preauthorized debit authorization was accepted; and (ii) either the loan was to be repaid in fewer than four payments, or the term of the loan was for less than 120 days.  See Reply at 12.  Moreover, Daye asserts, damages and restitution in the amount of any amounts collected above the legal rate is the appropriate remedy.  See Reply at 13.

Daye then engages in a rapid-fire reply to scattered assertions that Speedy Loan made in its Response.  See Reply at 14.  Daye rejects Speedy Loan's assertion that it is relevant that no usury limit applies to Speedy Loan's loans and that the price of its loans is reasonable relative to

the risks of lending.  See Reply at 14.  Referring the Court to a case that the New Mexico Supreme Court decided in 2014, Daye states that loans can be found to be substantively unconscionable even if it was not specifically prohibited by law.  See Reply at 14 (citing State ex rel. King v. B & B Inv. Grp., Inc., 329 P.3d at 670).  Quoting directly from the case, Daye maintains that "[s]ubstantive unconscionability is found **where the contract terms themselves are illegal**, contrary to public policy, or grossly unfair."  Reply at 15 (quoting State ex rel. King v. B & B Inv. Grp., Inc., 329 P.3d at 670)(emphasis added in the Reply).  According to Daye, the New Mexico Supreme Court also held that individual analysis of loan transactions is unnecessary, as "substantive unconscionability can be found by examining the contract terms on their face -- a simple task when . . . all substantive contract terms were nonnegotiable, and embedded in identical boilerplate language."  Reply at 15 (quoting State ex rel. King v. B & B Inv. Grp., Inc., 329 P.3d at 670).  Daye says that, because Speedy Loan's loans violated the Small Loan Act in multiple ways -- with illegal interest rates, unlawful renewals, none of the required underwriting, and none of the protective terms that the Small Loan Act requires, required -- New Mexico dictates a finding of unconscionability.  See Reply at 15.

Again invoking State ex rel. King v. B & B Investment Group, Inc., Daye says that the appropriate remedy for Speedy Loan's unlawful conduct is to refund any amounts collected in excess of the legal rate for payday loans.  See Reply at 15 (citing State ex rel. King v. B & B Inv. Grp., Inc., 329 P.3d at 675-76).  Mocking Speedy Loan's proposal that the offending loans be reformed to have final payments 121 days after execution, Daye says that such a request is nonsensical for two reasons.  See Reply at 16.  First, reforming the loans in this way would not correct their illegality, because Speedy Loan conditions its loans on repayment by means of preauthorized debit authorizations and the loans, therefore, would qualify as payday loans

regardless whether they are repaid in 120 days or less.  See Reply at 16.  Second, Daye asserts, Speedy Loan did not seek reformation by way of a counterclaim.  See Reply at 16.  Last, Daye argues that Speedy has not offered an argument in opposition to Daye's request for injunctive relief and cannot, as it purports to do, "reserve the right" to address the matter at a later time. Reply at 16.  Daye states that Speedy Loan, therefore, has waived the right to address the matter and that the Court should take the lack of opposition as consent to grant the MSJ under local rules 7.1(b) and 7.2(a).  See Reply at 16.

Moving onto the EFTA, Daye repeats that all of Speedy Loan's loans were unlawfully conditioned upon repayment by means of preauthorized electronic funds transfer.  See Reply at 16.  Reiterating a point she brought up earlier, Daye says that all of Speedy Loan's loans were "condition[ed on] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  Reply at 16-17 (quoting 15 U.S.C. § 1693k). Accordingly, Daye maintains, all loans within the EFTA's one-year statute of limitations violated the EFTA.  See Reply at 17.

Daye calculates the EFTA damages to equal $12,693.40.[33]  See Reply at 17.  Contrary to what Speedy Loan contends, Daye says, even technical and de minimis violations of the EFTA are actionable.  See Reply at 17.  Moreover, Daye asserts, it is not her burden to demonstrate that Speedy Loan's EFTA violation was intentional.   See Reply at 17 (citing 15 U.S.C. § 1693(m)(a)).  Daye notes that Speedy Loan objects to the timeline for calculating Speedy Loan's net worth.  See Reply at 17 (citing Response at 20).  At the same time, Daye continues,

---

[33]Based off the EFTA damages ratio, Daye here calculates Speedy Loan's net worth to be $1,269,340.  This amount may seem low for a lender that "operates a payday loan store in Gallup and eleven other locations in New Mexico."  MSJ ¶ 2, at 4.  The Court notes, however, that Speedy Loan is a limited liability corporation and concludes that the calculated net worth is plausible if profits are passed through to the owners.

Speedy Loan has proposed no alternative measure of net worth.  See Reply at 17-18.  Daye insists that her proposed measure is the most accurate and appropriate under the circumstances. See Reply at 18.

Moving on to her TILA argument, Daye asserts that all of the loan agreements with TILA Subclass members contained an inadequate payment schedule.  See Reply at 18.  Daye says that Speedy Loan attempts legerdemain when it argues that the payment schedule listed all of the payment due dates as well as the amount due, and was signed by each customer.  See Reply at 18.  According to Daye, Speedy Loan uses the term "payment schedule" to refer to a separate, ancillary document -- the PPD/ACH Authorization -- instead of the payment schedule in the TILA Box on the face of Speedy Loan's loan contracts.  See Reply at 18.  Daye asserts that statements hidden in ancillary documents cannot satisfy TILA's requirements for segregated disclosures in the TILA Box.  See Reply at 18.  As Daye sees it, even if Speedy Loan's only disclosure of the payment schedule has been an accurate disclosure in the PPD/ACH Authorization, such a disclosure would fail to satisfy TILA.  See Reply at 18.  Daye contends that Speedy Loan's situation is worse than this, though.  See Reply at 18.  According to Daye, Speedy Loan's paperwork contained two inconsistent statements of the payment schedule, one in the TILA Box, and the other in the PPD/ACH Authorization.  See Reply at 18.  In the former, Daye says, Speedy Loan disclosed the payment schedule that plainly failed to satisfy TILA.  See Reply at 18-19.  In the latter, Daye continues, Speedy Loan made an inconsistent disclosure of payment due dates in the PPD/ACH Authorization.  See Reply at 19.  Daye asserts that Speedy Loan admits that the payment schedule in its contracts "appears to indicate that all loan payment [sic] were for the same amount when, in fact, the first and last payment was almost *always less* (and never more) than the payment amount indicated."  Reply at 19 (quoting Response at

2)(emphasis in the Response)(grammatical error/misquote in the Reply).   According to Daye, Speedy Loan attempts to minimize this contradiction by arguing that the TILA Box disclosure was erroneous and that the PPD/ACH Authorization was the real disclosure.   See Reply at 19. Daye asserts that that argument not only ignores the borrower's right to cancel authorization at any time, thus rendering the payment dates in the Authorization meaningless, but that it also is incorrect as a matter of law.   See Reply at 19.   As Daye sees it, this latter point is true for two reasons.   See Reply at 19.   First, TILA specifies that the real disclosure is in the TILA Box.   See Reply at 19.   Second, all of Speedy Loan's integrated loan contracts referred to the payment schedule in the TILA Box as the basis for the borrower's contractual obligation.   See Reply at 19.

Continuing to hammer on this point, Daye maintains that Speedy Loan has admitted that its loan forms contained an "erroneous statement."   Reply at 19 (quoting Response at 2). Nevertheless, Daye says, Speedy Loan tries to sugarcoat this admission by indicating that the error made loans more -- not less -- expensive than they were and that no borrower noticed the error anyway.   See Reply at 19-20.   Daye contends that neither of these considerations matters. See Reply at 20.   Because (i) the TILA disclosures must reflect the terms of the legal obligation between the creditor and the consumer; and (ii) the stated Total of Payments and stated Finance Charge in the TILA Box in tens of thousands of loans, Daye says, Speedy Loan under-disclosed the true cost of borrowing, making its loans appear less expensive than they were.   See Reply at 20.   According to Daye, this is precisely the unfair advantage that Congress sought to prevent when it passed the TILA.   See Reply at 20.   Finally, Daye calculates TILA damages in this case to amount to $12,693.40.   See Reply at 20.

Moving onto her final UPA argument, Daye states that all of Speedy Loan's loans to

Deceptive Disclosure Subclass members violated the UPA.  See Reply at 21.  Daye asserts that Speedy Loan made unfair or deceptive statements in loans that disclosed a total of payments and a finance charge lower than the true amount.   See Reply at 21.  As Daye reads the law, misrepresentation of a good or service's price, including misrepresentation in the extension of credit, is one of the UPA's primary targets.  See Reply at 21.  Because Speedy Loan's loans were a product of lesser economic value than represented, Daye contends, they violate the UPA.  See Reply at 22.  Furthermore, and in closing, Daye says that Speedy Loan chooses not to argue against Daye's proposed UPA damages measure at this time.  See Reply at 22-23.  Seeing as Speedy Loan cannot, despite its attempt, reserve a right to make this oppositional argument later, Daye asks the Court to grant that part of the MSJ as unopposed.  See Reply at 23.  Tacking one sentence onto the end of the Reply, Daye also asks the Court for reasonable attorney's fees and costs pursuant to the UPA, EFTA, and TILA.  See Reply at 23.

**8.** **The Hearing.**

The Court held a hearing on both the Motion to Extend Deadline and on the MSJ on September 6, 2016.  See Draft Transcript of Hearing (taken September 6, 2016)("Tr.").[34]  The portion of the hearing relating to the two motions was relatively short, and the parties largely stuck to their briefing.  The parties raised a few new issues, however.

**a.** **Motion to Extend Deadline.**

At the start of the hearing, the Court proposed to the parties that they first discuss Speedy Loan's Motion to Extend Deadline, indicating that it was inclined to grant the motion.  See Tr. at 2:17-3:8 (Court).  Speedy Loan took the microphone and explained that its counsel had moved

---

[34]The Court's citation to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

for an extension when a month-long criminal trial proved to monopolize the counsel's time over the preceding month.  See Tr. at 3:14-21 (Kochersberger).  Speedy Loan's counsel noted that he had hired a contract lawyer to help him assemble the Response, because, when coupled with the trial, the work had been overwhelming.  See Tr. at 3:3:24-4:4 (Kochersberger).  Speedy Loan indicated that it understood Daye's desire not to delay the case unnecessarily before "throwing [it]self on the Court's mercy . . . ."  Tr. at 4:4-5 (Kochersberger).

Daye asserted that she had some specific concerns about the trial setting at the time that she filed the MSJ, principally a concern about being able to timely complete her own discovery needs that might arise from Speedy Loan's Response if the Court were to grant Speedy Loan a deadline extension.  See Tr. at 4:8-13 (Mattison).  Daye noted that the Court had partially assuaged these concerns when it had pushed back the trial date.  See Tr. at 4:13-15 (Mattison).  Although Daye highlighted Speedy Loan's technical noncompliance with the rules, she conceded that she understood the Court's inclination to grant the Motion to Extend Deadline.  See Tr. at 4:15-18 (Mattison).

  **b.**    **MSJ.**

    **i.**    **Daye.**

Daye started the hearing by asserting that no facts in the case are disputed.  See Tr. at 8:14-9:4 (Mattison).  Accordingly, Daye launched directly into her legal argument.  See Tr. at 9:11 (Mattison).  Daye first recapitulated the New Mexico Small Loan Act's history.  See Tr. at 9:11-10:12 (Mattison).  She recounted how the state legislature first had enacted the Small Loan Act in 1955 and that a general usury rate had existed in New Mexico until 1981.  See Tr. at 9:15-19 (Mattison).  After the New Mexico legislature abolished the usury rate in 1981, Daye said, the annual percentage rate took wing and soared to over 800%.  See Tr. at 9:22-10:4 (Mattison).  In

- 49 -

an attempt to lasso this interest rate Icarus, Daye contended, the New Mexico legislature began to more strictly regulate, in various ways, payday lenders' ability to dip directly into borrowers' bank accounts via preauthorized debit authorizations or postdated checks.  See Tr. at 10:4-11:7 (Mattison).

First, according to Daye, the legislature limited payday loan's finance charge to $15.50 per hundred dollars of the loan, plus fifty cents.  See Tr. at 11:8-10 (Mattison).  Second, according to Daye, the legislature forbade payday loan providers from renewing loans or reassessing the finance charge; if a borrower does not repay the loan, the payday lender must provide the borrower with an opportunity to enter into an unsecured repayment plan that bears no interest at all.  See Tr. at 11:10-18 (Mattison).  Third, according to Daye, the legislature mandated short repayment periods.  See Tr. at 11:19 (Mattison).  Fourth, according to Daye, the legislature gave borrowers a right to rescind.  See Tr. at 11:20 (Mattison).  Fifth, according to Daye, the legislature required payday lenders to verify that a loan repayment will not take up "too much" of the borrower's disposable income.  Tr. at 11:21-12:3 (Mattison).  Sixth, according to Daye, the legislature required payday lenders to disclose to borrowers that (i) the payday loan is a high-cost loan; (ii) lower-cost loans might be available to them; and (iii) they have the right to enter into an unsecured repayment plan with no interest.  See Tr. at 12:3-11 (Mattison).  Daye alleges that Speedy Loan knew about -- and chose to ignore -- all these regulatory requirements for the entirety of the four years at issue in the case, with the aim of obtaining a competitive advantage over other payday lenders.  See Tr. at 12:13-13:8 (Mattison).

Casting her central claim in simple relief, Daye said that she asks the Court to refund money that Speedy Loan collected from borrowers which was above the maximum legal rate for payday loans.  See Tr. at 13:8-15 (Mattison).  Daye asserted that her MSJ demonstrates that all

- 50 -

Speedy Loan's loans over the four-year period relevant to the case fall under the Small Loan Act's definition of "payday loan," because Speedy Loan required borrowers to provide a debit authorization as a condition of making the loan.  Tr. at 14:11-15:2 (Mattison).  Even if borrowers technically could cancel the debit authorization after contracting the loan -- which "fine print" in a separate document notified them they could do, Daye says, the initial debit authorization requirement immutably made the loans payday loans.  See Tr. at 15:3-23 (Mattison).

Daye admitted that no previous case has construed this part of the Small Loan Act, but suggested that analogical reasoning proved that its position is correct.  See Tr. at 15:24-16:8 (Mattison).  Referring to cases she had cited in the MSJ, Daye argued that, under the EFTA, lenders are prohibited from conditioning the extension of credit on repayment by electronic funds transfer, and other courts have held that a post facto cancelation option does not erase the violation.  See Tr. at 16: 2-8 (Mattison).  Daye saw a parallel here between the EFTA prohibition and the Small Loan Act prohibition, and she therefore believes that a post facto cancelation option does as little to erase a violation under the Small Loans Act as it does under the EFTA. See Tr. at 16:1-18 (Mattison).

Suddenly springing into a different argument, Daye then took issue with Speedy Loan's frequent invocation of borrowers' intent in its Response.  See Tr. at 16:19-25 (Mattison). According to Daye, borrower intent is irrelevant; the question at issue here is whether Speedy Loan violated the law.  See Tr. at 16:22-25 (Mattison).  Even if Speedy Loan borrowers battering down its doors in search of "installment loans" that required debit authorizations, Daye declared, Speedy Loan had a legal obligation to resist.  See Tr. at 17:1-16 (Mattison).  In the alternative, Daye asserted, Speedy Loan could have persuaded borrowers to take out legal loans instead.  See Tr. at 17:9-13 (Mattison).

Daye then shifted to discussing her UPA claim.  See Tr. at 18:21 (Mattison).  Daye insisted that Speedy Loan's alleged Small Loan Act violation automatically begot a UPA violation, and that restitution is the proper remedy for the latter violation.  See Tr. at 18:21-19:2 (Mattison).  Daye calculated the appropriate amount of restitution to be seven million dollars, which it computed as the amount that Speedy Loan charged its customers above the legal interest rate for payday loans.  See Tr. at 19:1-19 (Mattison).  According to Daye, such a restitution approach mirrors the approach that the New Mexico Supreme Court recently adopted in State of New Mexico ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, 329 P.3d 658.  See Tr. at 19:19-24 (Mattison).  Beyond restitution, Daye also asked the Court to grant an injunction that would enjoin Speedy Loan, going forward, from (i) collecting any amount above the legal limit for payday loans; (ii) submitting false credit reports. i.e. reporting to credit bureaus that Speedy Loan customers have negative payment histories based on a repayment amount that Speedy Loan never legally was allowed to collect; and (iii) continuing to violate the Small Loan Act.  See Tr. at 19:25-21:1 (Mattison).

After briefly recapitulating her arguments up to that point, Daye sought an assurance from the Court that all discussion of Speedy Loan's finances would remain under seal.  See Tr. at 20:21-22:12 (Mattison).  The Court responded that sealing the transcript was a possibility, but that it would like to hear from Speedy Loan on that issue before deciding it definitively.  See Tr. at 22:7-9 (Court).  With that in mind, Daye began to discuss her calculation of damages without using any numbers, see Tr. at 22:15-18 (Mattison), specifying only that she seeks one percent of Speedy Loan's net worth, see Tr. at 22:19-23:1 (Mattison).  Daye conceded that this amount is the maximum amount of damages available under law, but she insisted that such a damages award is "pretty modest" and that it "is not a large number."  Tr. at 23:1-3 (Mattison).  Daye then

detailed how she had computed Speedy Loan's net worth: take the average of Speedy Loan's net worth from the two financial statements that fall within the one-year of statute of limitations for the EFTA and TILA.  See Tr. at 23:10-16 (Mattison).  According to Daye, Speedy Loan neither made an alternate calculation nor contested Daye's methodology in the Response.  See Tr. at 23:7-10 (Mattison); id. at 23:18-22 (Mattison).

Daye then turned to a discussion of the TILA Subclass.  See Tr. at 23:23-24:2 (Mattison).  After Daye's counsel handed the Court a copy of one of her loans, Daye explained that her first TILA claim is that the loan's payment schedule is inadequately disclosed, insofar as it fails to disclose either specific payment dates or specific payment intervals  See Tr. at 24:2-23 (Mattison).  Daye contended that the phrase "payments are due on your payday" does not satisfy TILA's disclosure requirements, especially given that Daye has five different paydays a month.  See Tr. at 24:24-25:4 (Mattison).  As Daye told it, Speedy Loan -- via the separate PPD/ACH authorization -- goes back to the contract after the fact and modifies payment dates to coincide with one of a borrower's paydays each month.  See Tr. at 25:15-26:10 (Mattison).  Daye asserted that such identification of specific payment dates on the PPD/ACH authorization form is legally faulty, as the form is neither a novation of the loan contract nor a new contract.  See Tr. at 26:12-27:2 (Mattison).  Under TILA, Daye maintained, the payment schedule disclosure must be in the TILA Box on the loan contract's face.  See Tr. at 27:3-6 (Mattison).  Furthermore, Daye said, the payment schedules listed in the TILA Box and on the PPD/ACH authorization are inconsistent, listing different repayment amounts.  See Tr. at 27:13-28:1 (Mattison).

Daye argued that even this first TILA violation, in isolation, would expose Speedy Loan to liability under TILA.  See Tr. at 28:1-15 (Mattison).  Upping the ante nevertheless, Daye argued that Speedy Loan committed a second TILA violation: under-disclosing the total of

payments and the finance charge in the loan contract.  See Tr. at 28:15-22 (Mattison).  Daye provided a concrete example from her own loan contract.  See Tr. at 29:1-7 (Mattison).  On the contract's face, Daye said, the payment schedule indicated that Daye is obligated to render four payments of $108.11 unto Speedy Loan to satisfy her debt, a total of $432.44.  See Tr. at 29:1-6 (Mattison).  On the PPD/ACH authorization, in contrast, Daye contended, the payment schedule lists a total payment of $397.94.  See Tr. at 29:6-7 (Mattison).  Daye then argued that, if the total of payments is under-disclosed, then the finance charge ipso facto also must be under-disclosed, as (i) the total of payments equals principal plus interest; and (ii) the principal is the same on both the loan contract's face and the PPD/ACH authorization.  See Tr. at 29:11-21 (Mattison).

Daye insisted that restitution in the amount of one percent of Speedy Loan's net worth is the proper remedy for Speedy Loan's alleged TILA violation.  See Tr. at 31:21-32:4 (Mattison).  Daye computed the TILA restitution amount employing the same algorithm she had employed for computing the EFTA restitution earlier in the hearing.  See Tr. at 32:5-9 (Mattison).  Daye also argued that she should receive this maximum one percent of Speedy Loan's net worth permitted under law and that such an award "is not a large amount of money."  Tr. at 32:12-16 (Mattison).

Moving then to amplify the UPA argument upon which she briefly earlier touched in the hearing, Daye insisted that the same under-disclosure that violated TILA also violated the UPA.  See Tr. at 32:22-33:2 (Mattison).  Daye said that the UPA meant to ensure that products are worth as much as they purport to be worth.  See Tr. at 33:2-8 (Mattison).  According to Daye, Speedy Loan's loans are worth less than Speedy Loan represented them to be.  See Tr. at 33:8-9 (Mattison).  Daye unpacked how she came to this conclusion by implicitly again directing the Court's attention to the discrepant total of payments amounts in her loan contract and in her

PPD/ACH authorization.  See Tr. at 33:10-16 (Mattison).  Daye averred that, if one form indicates that she owes $432.44 and the other form indicates -- in a large font right at the top of the loan -- that she owes $397.94, borrowers will think that it will cost them less to repay the loan than what they legally are obligated to pay.  See Tr. at 33:10-34:3 (Mattison).  According to Daye, this under-disclosure infects 25,976 loans that Speedy Loan contracted during the relevant time period for this case.  See Tr. at 34:14-15 (Mattison).  Slowly walking through a spreadsheet that compiled all these loans, Daye computed the total amount of money that Speedy Loan under-disclosed to be $783,282.50.  See Tr. at 36:19-38:5 (Mattison).  Daye asked the Court for UPA damages in this amount, as that is the standard in New Mexico for misrepresentation cases. See Tr. at 38:22-39:5 (Mattison).  In closing, she also asked the Court for attorney fees and costs under TILA, EFTA, and the UPA.  See Tr. at 40:5-13 (Mattison).

## ii.   Speedy Loan.

The Court asked Speedy Loan to start its argument by identifying any factual dispute that would keep the Court from being able to decide the legal issues in the case.  See Tr. at 41:4-8 (Court).  Speedy Loan focused on the dispute whether Speedy Loan required borrowers to preauthorize electronic fund transfers, see Tr. at 41:9-11 (Kochersberger), and then added that the Court also would need to decide (i) whether Speedy Loan had deceived borrowers or had the potential to deceive borrowers; and (ii) whether the class members were damaged,  see Tr. at 41:13-19 (Kochersberger).  Attempting to persuade the Court to adopt Speedy Loan's position on the deception issue, Speedy Loan asserted that any deception claim is "really nonsense" and averred that "nobody was ever deceived."  Tr. at 42:4-6 (Kochersberger).  Because no one was deceived, Speedy Loan continues, no one suffered damages.  See Tr. at 42:8-9 (Kochersberger). Speedy Loan then conceded that "[t]he only one that [sic] can recover under the UPA statutory

damages is the named plaintiff, Ms. Daye, of $100." Tr. at 42:9-11 (Kochersberger).   Speedy

Loan also insisted that, in each of the contested loans, the borrower got a TILA Box that told him

or her how much he or she is borrowing, what the finance charge is, and what the exact payment

schedule is.   See Tr. at 43:10-17 (Kochersberger).   According to Speedy Loan, it never took

payments in any way that diverged from the payment schedule in the TILA disclosure.   See Tr.

at 43:17-20 (Kochersberger).   Furthermore, Speedy Loan maintained, no borrower with whom it

spoke ever even saw the erroneous payment amounts.   See Tr. at 44:2-8 (Kochersberger).

Speedy Loan argued that, contrary to Daye's assertion, what bound the borrowers was the

information in the TILA Box and that the figures in the TILA Box perfectly mirror the payment

schedule.   See Tr. at 44:16-20 (Kochersberger).

Delving into more detail, Speedy Loan asserted that district courts repeatedly --and with

only one exception -- have held that merely having someone execute a form that permits a lender

to withdraw payments via electronic fund transfer does not mean that a lender is treating

payment via electronic fund transfer as mandatory, provided that the borrowers retain an option

to rescind.   See Tr. at 45:7-23 (Kochersberger).   According to Speedy Loan, the EFTA limits

damages if a lender makes a mistake, and TILA requires proof of deception that Daye has been

unable to produce.   See Tr. at 45:24-46:18 (Kochersberger).   Because there was no deception,

Speedy Loan argued, it was incumbent upon Daye to show that there are damages.   See Tr. at

46:18-25 (Kochersberger).   According to Speedy Loan, such a showing is impossible, as (i)

damages would be the difference between the represented loan value and the actual loan value;

and (ii) "there is no difference between the two." Tr. at 47:18-48:3 (Kochersberger).

The Court asked Speedy Loan, in light of Speedy Loan's presented argument, (i) whether

there were any factual determinations that it could decide at this stage to simplify the case for the

parties; or (ii) whether it could grant summary judgment on any issues other than those that Speedy Loan had raised as disputes up to that point during the hearing.  See Tr. at 49:14-50:13 (Court).   Speedy Loan argued in the negative to both questions.   See Tr. at 49:20-50:51:6 (Kochersberger).  Backtracking slightly, Speedy Loan then said that it could stipulate that the loan payment spreadsheet is an accurate representation of how some of the spreadsheet fields were completed on the form documents.  See Tr. at 51:10-18 (Kochersberger).

### iii.   Daye.

After a short recess, the Court gave Daye the last word on her motion.  See Tr. at 52:10-12 (Court).   Seeking to ground what she asserted had become an ethereal discussion, Daye maintained that the objective fact of the matter is that Daye patronized Speedy Loan to get a loan.  See Tr. at 52:15-18 (Mattison).  Daye contended that Speedy Loan charged Daye an APR far higher than that rate which state law permits, and that the difference between the charged rate and the legal maximum rate constitutes damages.   See Tr. at 52:19-53:4 (Mattison).   The difference, when summed across all borrowers, Daye asserts, amounts to over seven million dollars.  See Tr. at 53:12-16 (Mattison).

In marked contrast to Speedy Loan's reluctance to stipulate to any facts, Daye maintained that numerous facts are undisputed and could be taken off the table.  See Tr. at 54:3-8 (Mattison). First, according to Daye, Speedy Loan required an electronic fund transfer agreement before a borrower could enter into a loan.  See Tr. at 54:8-13 (Mattison).  Second, according to Daye, every borrower had to sign an integrated contract that indicated the exact or approximate day that each installment payment became due and that authorized Speedy Loan to make an ECF debit of the borrower's bank account.  See Tr. at 54:14-18 (Mattison).  Third, according to Daye, every borrower also provided Speedy Loan with his or her account number, and his or her routing

number, and signed the separate authorization form.  See Tr. at 54:19-22 (Mattison).  Fourth, according to Daye, borrowers had a right to cancel their automatic debit authorization.  See Tr. at 54:25-55:5 (Mattison).  Fifth, according to Daye, Speedy Loan charged borrowers significantly more than the legal loan rate.  See Tr. at 56:21-57:7 (Mattison).  Sixth, according to Daye, Speedy Loan misrepresented the total of payments on each of the loans at issue.  See Tr. at 57:8-15 (Mattison).  Seventh, Daye argues that Speedy Loan failed to dispute facts 41-43 in the MSJ, and that the Court therefore should deem them as undisputed.  See Tr. at 57:16-20 (Mattison).  Eighth, according to Daye, no dispute exists regarding the amounts of total payments on the aforementioned spreadsheet.  See Tr. at 57:24-58:7 (Mattison).

Sliding without segue into a repetition of her arguments earlier in the hearing, Daye then dismissed Speedy Loan's assertion that the B&B Investment Group is inapposite.  See Tr. at 58:8-15 (Mattison).  To the contrary, Daye said, the B&B Investment Group is very apt and relevant.  See Tr. at 58:15-25 (Mattison).  As Daye reported the case, the New Mexico Supreme Court reviewed a district court's holding that the district court could not decide issues of unconscionability without individualized testimony from all the borrowers.  See Tr. at 58:11-15 (Mattison).  According to Daye, the Supreme Court of New Mexico held that the district court needed to look only at the disputed contract to determine whether it is unconscionable.  See Tr. 58:17-59:4 (Mattison).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"   Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party
> must satisfy its burden of production in one of two ways: by putting evidence into the
> record that affirmatively disproves an element of the nonmoving party's case, or by
> directing the court's attention to the fact that the non-moving party lacks evidence on an
> element of its claim, "since a complete failure of proof concerning an essential element of
> the nonmoving party's case necessarily renders all other facts immaterial."   Celotex, 477
> U.S. at 323-25.   On those issues for which it bears the burden of proof at trial, the
> nonmovant "must go beyond the pleadings and designate specific facts to make a
> showing sufficient to establish the existence of an element essential to his case in order to
> survive summary judgment."   Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)

(emphasis added).   "If the *moving* party will bear the burden of persuasion at trial, that party

must support its motion with credible evidence -- using any of the materials specified in Rule

56(c) -- that would entitle it to a directed verdict if not controverted at trial."   Celotex Corp. v.

Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[35]   Once the movant

meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that

there is a genuine issue for trial.   See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

---

[35]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is
widely understood to be an accurate statement of the law.   See 10A Charles Allen Wright &
Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the
Court issued a five-to-four decision, the majority and dissent both agreed as to how the
summary-judgment burden of proof operates; they disagreed as to how the standard was applied
to the facts of the case.").

1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[36]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to

---

[36]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

support a claim of violation of clearly established law under <u>Graham v. Connor</u>, 490 U.S. 386, 395-96 (1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 F. App'x at 291-92 (internal quotation marks omitted).  <u>See</u> <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1249-50 (quoting <u>Rhoads v. Miller</u>, 352 F. App'x at 291-92). In a concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## RELEVANT TEXT OF RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE

(d) **When Facts Are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

## LAW REGARDING MOTIONS TO STRIKE

Rule 12(f) of the Federal Rules of Civil Procedures provides:

> (f)     **Motion to Strike.**  The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> > (1)     on its own; or
> >
> > (2)     on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f).  Professors Charles Wright and Arthur Miller have recognized, however, that such motions are not favored and, generally, should be denied:

> The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter. However, because federal judges have made it clear, in numerous opinions they have rendered in many substantive contexts, that Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or "time wasters," there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy . . . .

5C C. Wright & A. Miller, Federal Practice & Procedure § 1382, at 433-36 (3d. ed. 2004)(footnotes omitted).  Accord Burget v. Capital W. Sec., Inc., 2009 WL 4807619, at *1 (W.D. Okla. December 8, 2009)(Miles-LaGrange, C.J.)(citing Scherer v. U.S. Dep't of Educ., 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished))("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court.").


"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy."  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5 (N.D. Okla. January 8, 2010)(Egan, J.).  "The Court must be convinced that there are no questions of fact, that any questions of law

are clear and not in dispute, and that under no set of circumstances could the defenses succeed." Friends of Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(quoting Carter-Wallace, Inc. v. Riverton Lab., Inc., 47 F.R.D. 366, 368 (S.D.N.Y. 1969))(internal quotation marks omitted).   Professors Wright and Miller have also commented on what constitutes "immaterial" matter in the context of a motion to strike. "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material."   5C Wright & Miller, supra, § 1382, at 458-60 (footnotes omitted).

Moreover, "[o]nly material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.   Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." Dubrovin v. Ball Corp. Consol. Welfare Ben. Plan for Emps., 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Wiley, J.).   Accord Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning,  J.)(citing Searcy v. Soc. Sec. Admin., 956 F.2d 278, 1992 WL 43490, at *1, *4 (10th Cir. 1998)(unpublished table decision))("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike.").   "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'"   Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are

disfavored." <u>Estate of Gonzales v. AAA Life Ins. Co.</u>, 2012 WL 1684599, at *5 (quoting <u>Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc.</u>, 2010 WL 132414, at *5)(internal quotation marks omitted)).  "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a surreply filed without leave of court.'" <u>Ysais v. N.M. Judicial Standard Comm'n</u>, 616 F. Supp. 2d at 1184 (citing <u>In re Hopkins</u>, 162 F.3d 1173, 1998 WL 704710, at *3 n.6 (10th Cir. 1998)(unpublished table decision)).

For example, in <u>Skyline Potato, Co., Inc. v. Hi-Land Potato, Co., Inc.</u>, 2012 WL 6846386 (D.N.M. December 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading and did not pertain to either party's legal defenses or arguments -- the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial.  <u>See</u> 2012 WL 6846386, at *6.  Similarly, in <u>Great Am. Ins. Co. v. Crabtree</u>, 2012 WL 3656500 (D.N.M. August 23, 2012)(Browning, J.), the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant.  <u>See</u> 2012 WL 3656500, at *18.  In <u>Applied Capital, Inc. v. Gibson</u>, the Court refused the plaintiff's request to strike a motion to dismiss because rule 12(f) applies only to pleadings, and not to a motion to dismiss.  <u>See</u> 2007 WL 5685131, at *18.  In <u>Estate of Anderson v. Denny's, Inc.</u>, No. CIV 12-0605 JB/GBW, 2013 WL 690809 (D.N.M. February 7, 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons.  <u>See</u> 2013 WL 690809, at *12.

## RELEVANT STATUTORY TEXT FROM THE NEW MEXICO UPA

D.  "unfair or deceptive trade practice" means an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made

- 67 -

in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes:

(1)  representing goods or services as those of another when the goods or services are not the goods or services of another;

(2)  causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3)  causing confusion or misunderstanding as to affiliation, connection or association with or certification by another;

(4)  using deceptive representations or designations of geographic origin in connection with goods or services;

(5)  representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have;

(6)  representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(7)  representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

(8)  disparaging the goods, services or business of another by false or misleading representations;

(9)  offering goods or services with intent not to supply them in the quantity requested by the prospective buyer to the extent of the stock available, unless the purchaser is purchasing for resale;

(10)  offering goods or services with intent not to supply reasonable expectable public demand;

(11)  making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction;

(12)  making false or misleading statements of fact for the purpose

of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services;

(13) packaging goods for sale in a container that bears a trademark or trade name identified with goods formerly packaged in the container, without authorization, unless the container is labeled or marked to disclaim a connection between the contents and the trademark or trade name;

(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

(15) stating that a transaction involves rights, remedies or obligations that it does not involve;

(16) stating that services, replacements or repairs are needed if they are not needed;

(17) failing to deliver the quality or quantity of goods or services contracted for; or

(18) violating the Tobacco Escrow Fund Act [6-14-4 NMSA 1978]; and

E. "unconscionable trade practice" means an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment:

(1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2) results in a gross disparity between the value received by a person and the price paid.

N.M.S.A. 1978 § 57-12-2

## **RELEVANT LAW REGARDING THE NEW MEXICO UNFAIR PRACTICES ACT**

"The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins. Co., at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 22, 227

P.3d 73, 80)).  "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096.  To state a claim under the UPA, a complaint must allege:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 5, 166 P.3d at 1093 (citing N.M.S.A. § 57-12-12(D); Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311)).  "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338.

### RELEVANT STATUTORY TEXT FROM THE FEDERAL TILA

(a) Required disclosures by creditor

For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:

> (1) The identity of the creditor required to make disclosure.

> (2)
>> (A) The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1):

>>> (i) take the principal amount of the loan or the cash price less down payment and trade-in;

- 70 -

(ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and

(iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.

(B) In conjunction with the disclosure of the amount financed, a creditor shall provide a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed. The statement shall include spaces for a "yes" and "no" indication to be initialed by the consumer to indicate whether the consumer wants a written itemization of the amount financed. Upon receiving an affirmative indication, the creditor shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed. For the purposes of this subparagraph, "itemization of the amount financed" means a disclosure of the following items, to the extent applicable:

(i) the amount that is or will be paid directly to the consumer;

(ii) the amount that is or will be credited to the consumer's account to discharge obligations owed to the creditor;

(iii) each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference

to the third person; and

(iv) the total amount of any charges described in the preceding subparagraph (A)(iii).

(3) The "finance charge", not itemized, using that term.

(4) The finance charge expressed as an "annual percentage rate", using that term. This shall not be required if the amount financed does not exceed $75 and the finance charge does not exceed $5, or if the amount financed exceeds $75 and the finance charge does not exceed $7.50.

(5) The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

(6) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

(7) In a sale of property or services in which the seller is the creditor required to disclose pursuant to section 1631(b) of this title, the "total sale price", using that term, which shall be the total of the cash price of the property or services, additional charges, and the finance charge.

(8) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate", "total of payments", and "total sale price" as specified by the Bureau. The descriptive explanation of "total sale price" shall include reference to the amount of the down payment.

(9) Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type.

(10) Any dollar charge or percentage amount which may be imposed by a creditor solely on account of a late payment, other than a deferral or extension charge.

(11) A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same

circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

(12) A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties.

(13) In any residential mortgage transaction, a statement indicating whether a subsequent purchaser or assignee of the consumer may assume the debt obligation on its original terms and conditions.

. . . .

(a) Individual or class action for damages; amount of award; factors determining amount of award

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, subsection (f) or (g) of section 1641 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of --

(1) any actual damage sustained by such person as a result of the failure;

(2)

(A)

(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction,

(ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $200 nor greater than $2,000, (iii) in the case of an individual action relating to an open end consumer credit plan that is not secured by real property or a dwelling, twice the

- 73 -

amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in the case of an established pattern or practice of such failures; [1] or (iv) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4,000; or

(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor;

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 or 1638(e)(7) of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court; and

(4) in the case of a failure to comply with any requirement under section 1639 of this title, paragraph (1) or (2) of section 1639b(c) of this title, or section 1639c(a) of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional. In connection with the disclosures referred to in subsections (a) and (b) of section 1637 of this title, a creditor shall have a liability determined under paragraph (2) only for failing to comply with the requirements of section 1635 of this title, 1637(a) [2] of this title, or any of paragraphs (4) through (13) of section 1637(b) of this title, or for failing to comply with disclosure requirements under State law for

any term or item that the Bureau has determined to be substantially the same in meaning under section 1610(a)(2) of this title as any of the terms or items referred to in section 1637(a) of this title, or any of paragraphs (4) through (13) of section 1637(b) of this title. In connection with the disclosures referred to in subsection (c) or (d) of section 1637 of this title, a card issuer shall have a liability under this section only to a cardholder who pays a fee described in section 1637(c)(1)(A)(ii)(I) or section 1637(c)(4)(A)(i) of this title or who uses the credit card or charge card. In connection with the disclosures referred to in section 1638 of this title, a creditor shall have a liability determined under paragraph (2) only for failing to comply with the requirements of section 1635 of this title, of paragraph (2) (insofar as it requires a disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of section 1638(a) of this title, or section 1638(b)(2)(C)(ii) of this title, of subparagraphs (A), (B), (D), (F), or (J) of section 1638(e)(2) of this title (for purposes of paragraph (2) or (4) of section 1638(e) of this title), or paragraph (4)(C), (6), (7), or (8) of section 1638(e) of this title, or for failing to comply with disclosure requirements under State law for any term which the Bureau has determined to be substantially the same in meaning under section 1610(a)(2) of this title as any of the terms referred to in any of those paragraphs of section 1638(a) of this title or section 1638(b)(2)(C)(ii) of this title. With respect to any failure to make disclosures required under this part or part D or E of this subchapter, liability shall be imposed only upon the creditor required to make disclosure, except as provided in section 1641 of this title.

(b) Correction of errors

A creditor or assignee has no liability under this section or section 1607 of this title or section 1611 of this title for any failure to comply with any requirement imposed under this part or part E, if within sixty days after discovering an error, whether pursuant to a final written examination report or notice issued under section 1607(e)(1) of this title or through the creditor's or assignee's own procedures, and prior to the institution of an action under this section or the receipt of written notice of the error from the obligor, the creditor or assignee notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed, or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower.

(c) Unintentional violations; bona fide errors

A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor

or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error.

(d) Liability in transaction or lease involving multiple obligors

When there are multiple obligors in a consumer credit transaction or consumer lease, there shall be no more than one recovery of damages under subsection (a)(2) for a violation of this subchapter.

(e) Jurisdiction of courts; limitations on actions; State attorney general enforcement

Except as provided in the subsequent sentence, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation or, in the case of a violation involving a private education loan (as that term is defined in section 1650(a) of this title), 1 year from the date on which the first regular payment of principal is due under the loan. Any action under this section with respect to any violation of section 1639, 1639b, or 1639c of this title may be brought in any United States district court, or in any other court of competent jurisdiction, before the end of the 3-year period beginning on the date of the occurrence of the violation. This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law. An action to enforce a violation of section 1639, 1639b, 1639c, 1639d, 1639e, 1639f, 1639g, or 1639h of this title may also be brought by the appropriate State attorney general in any appropriate United States district court, or any other court of competent jurisdiction, not later than 3 years after the date on which the violation occurs. The State attorney general shall provide prior written notice of any such civil action to the Federal agency responsible for enforcement under section 1607 of this title and shall provide the agency with a copy of the complaint. If prior notice is not feasible, the State attorney general shall provide notice to such agency immediately upon instituting the action. The Federal agency may --

    (1) intervene in the action;

    (2) upon intervening --

        (A) remove the action to the appropriate United

States district court, if it was not originally brought there; and
    (B) be heard on all matters arising in the action; and

    (3) file a petition for appeal.

. . . .

    (*l*) Exemption from liability and rescission in case of borrower fraud or deception

    In addition to any other remedy available by law or contract, no creditor or assignee shall be liable to an obligor under this section, if such obligor, or co-obligor has been convicted of obtaining by actual fraud such residential mortgage loan.

15 U.S.C. § 1638-40.

## LEGISLATIVE AND REGULATORY HISTORY REGARDING TILA

    State usury laws,[37] commercial banks' conservative lending policies,[38] and a residually

Puritanical social norm to "neither a borrower nor a lender be"[39] combined to keep installment

---

[37]State usury laws put a ceiling on the interest rates that banks could charge on loans. See, e.g., Benjamin S. Horack, A Survey of the General Usury Laws, 8 Law & Contemp. Prob. 36, 48-53 (1941)(citing state statutes and cases then in effect). These rates discouraged lending to individual borrowers in general. See Lendol Calder, Financing the American Dream 115 (1999). Short-term borrowers seeking installment loans were at an especial disadvantage, as they -- then as now -- tended to be poor and presented a high risk of not repaying the loan. Compare Lendol Calder, Financing the American Dream at 120, with Pew Charitable Trusts, Payday Lending in America: Who Borrows, Where They Borrow, and Why 10 (2012). Furthermore, administering a small loan at the time was proportionally much more expensive than administering a larger loan, as both incurred approximately the same amount of paperwork, investigation, payment tracking, and general office work. See Joseph Budnowitz, Pawnbroking: A Treatise On The History, Regulation Legal Decisions And A Comparison With Other Small Loan Agencies (thesis, Columbia University 1931), on file with the Library of Congress, box 123, Russell Sage Foundation Papers.

[38] See generally Howard Bodenhorn, State Banking in Early America, A New Economic History (2002)(surveying antebellum American banking practice); 1 Allan H. Meltzer, A History of the Federal Reserve 19-64 (2003).

[39]William Shakespeare, Hamlet act 1, sc. 3, l. 75 (John Jowett et al., eds., Oxford University Press 2005)(1604). For the prevalence and import of this norm among early Americans, and for its roots in Puritan theology, see James Calvin Davis & Charles Mathewes,

loans rare and on the shadowy margins of American society until after World War I.  See Louis

Roland Hyman, Debtor Nation: How Consumer Credit Built Postwar America (June

2007)(unpublished Ph.D. dissertation, Harvard University)(on file with Harvard University

Archives)("Debtor Nation").  In the rare instances when an individual sought an installment loan,

furtiveness and the dignity concerns that afflicted borrowers in hoc to a loan shark oftentimes left

borrowers without much effective legal recourse if a shark shackled a borrower to contract terms

that he or she did not understand.  See Rolf Nugent and Leon Henderson, Installment Selling and

the Consumer: A Brief for Regulation, 173 Annals of the American Academy of Political and

Social Science 93, 102 (1934).  This helplessness was especially acute in those states where

entering into installment loans itself was a violation of state law.  See Debtor Nation at 7.  True

to their name, loan sharks menaced borrowers, charging annual interest rates of up to 480% on

illegal loans; loading contracts with recondite language, byzantine repayment provisions, and

sundry add-on rates and fees; and then bringing muscle to enforce repayment if a borrower

defaulted.  See Library of Congress at 34.

　　　Religious organizations and social activists inveighed against such exploitation already in

the 1800s.  See Lendol Calder, Financing the American Dream 120 (1999).  It was not until the

dawn of mass production and the modern consumption economy in the 1920s -- when

installment loans drifted from social oxbows to the mainstream -- that state governments

earnestly began to enforce existing regulations on installment loans and to enact new borrower

---

Saving Grace and Moral Striving: Thrift in Puritan Theology, in Thrift and Thriving in America:
Capitalism and Moral Order from the Puritans to the Present 88-116 (Joshua J. Yates and James
Davison Hunter, eds., 2011).  For the continuing adherence of this thriftiness into at least the
1950s, see, for instance, Joseph O'Mahoney, Do Installments Peril the Economy?, N.Y. Times
(May 4, 1958)(last visited January 16, 2017).  These norms started to shift rapidly at the end of
the 1950s.  Compare University of Michigan, 1958 Survey of Consumer Finance, with
University of Michigan, 1961 Survey of Consumer Finance (raw data on file in ASCII format
with the Harvard-MIT data center).

protections.  Congress did not significantly join this regulatory effort on a federal level[40] until severe installment loan contracting and repayment practices in lower-income neighborhoods in Washington, D.C., helped ignite riots in the spring of 1968.[41]  See Williard Clopton, 11,500 Troops Confront Rioters; Three Day Arrest Total at 2686, Wash. Post, Apr. 7, 1968.

One of the most important new borrower protections was incipient regulation to ensure truthfulness in lending.  Senator Paul Douglas of Illinois had begun to push Congress in this direction for much of the preceding decade, but his efforts had gained little traction.  See, e.g., S. 2755, 86th Cong. (1960).  Looters burning credit books within sight of the Capitol Building helped hold Congress' feet a little closer to the fire.  See Rampage & Restraint, Time Magazine, April 19, 1968.  Congress began to consider legislation in 1968 that would make all loans express their interest rates and charges in a uniform manner as a way to empower borrowers in their credit choices.  See Paul H. Douglas, In the Fullness of Time: The Memoirs of Paul H.

---

[40]The Federal Reserve promulgated Regulation W in 1941 as an anti-inflationary measure as war raged in Europe.  Regulation W specified the minimum down payment and maximum contract length for a wide range of consumer goods bought on installment contracts but did not apply to installment loans as they currently are understood, see 1 Allan H. Meltzer, A History of the Federal Reserve at 557-58, and did not regulate truth in lending, see Debtor Nation at 210. Even within its narrow scope, Regulation W was easy to circumvent because of the Federal Reserve's limited oversight capability.  See Debtor Nation at 207-210.  After World War II ended, public support for Regulation W cratered so much that even Federal Reserve Board members spoke out publicly against it.  See Reserve Board to "Re-examine" Enforcement of Credit Curb Because of Bank Protests, N.Y. Times, Jan. 5, 1952.  Regulation W was eliminated in May, 1952.  See Alfred Zipser, Easing of Installment-Buying Curb Sets Off Battle Among Merchants, N.Y. Times, May 11, 1952.

[41]A Federal Trade Commission report from 1968 shows that the price of credit in Washington, D.C. neighborhoods was inversely correlated to neighborhood income.  See Federal Trade Commission, Economic Report on Installment Credit and Retail Sales Practices of District of Columbia Retailers (1968)(on file with Harvard Business School).  Given D.C. "ghetto" residents' "low, irregular, and unreliable" income, defaults on installment loans was much more frequent than in other parts of the country and led to repossession rates approximately one hundred times higher than the rates in the rest of the consumer market.  United States Senate, Committee on Banking and Currency, Consumer Credit and the Poor (90th Cong., 2d Sess.)(April 19, 1968).

Douglas 523-35 (1972).

The bill that would become the federal TILA drew heavily on United States Department of Defense requirements that creditors make detailed disclosures of cost and rate data on credits extended to servicemen and servicewomen.  See Library of Congress, Consumer Credit Finance Charge and Rate Disclosures: "Truth in Lending": Legislative Background, Computational Procedures and Economic Impact 3 (May 12, 1967)("1967 Library of Congress").  An even greater font of legislative wisdom proved to be state truth-in-lending laws -- particularly those from Massachusetts and Washington.  See 1967 Library of Congress at 3.  States' law varied, but nearly universally they required creditors to disclose a loan's principal, finance charge, and schedule of payments, as well as specifying that repayment must be made in regular and substantially equal payments.  See 1967 Library of Congress at 3-4 & 28-31.  Importantly, state laws required the disclosures to be clear and straightforward; no longer could creditors screen terms in a thicket of confusing jargon.  See 1967 Library of Congress at 28-31.

Enacted as title I of the Consumer Credit Protection Act of 1968, Pub L. No. 90-321 ("Consumer Act"), the original TILA provided for the disclosure, in advance and under uniform methods of computation, of the price that a consumer would pay for credit.  See Consumer Act, Pub. L. No. 90-321, §§ 106-07 & 128.  Creditors needed to disclose the price as both an annual percentage rate and as a dollars-and-cents figure.  See Consumer Act, Pub. L. No. 90-321, §§ 106-07 & 128.  The Consumer Act provided both civil and criminal penalties for non-compliance, see Consumer Act, Pub. L. No. 90-321, § 112 & 130. although Congress envisioned that civil suits would compel most compliance, see Congressional Research Service at 3.  It also distinguished between two major consumer credit categories, demarcating for the first time in federal law between "open-end credit," such as credit cards and other revolving charge accounts,

and "closed-end credit," such as installment loans that are extended once in a specific amount, and that repaid in one or more subsequent payments.  See Congressional Research Service, Truth-in-Lending Simplification Issues Brief No. IB79086, at 2 (August 7, 1979)("1979 Library of Congress").  In 1974, Congress amended TILA to distinguish for the first time between individual suits and class actions, leaving the penalties for individual non-compliance as they had been previously but limiting the maximum recovery in class actions to the lesser of $100,000.00 or one percent of the creditor's net worth.  See Congressional Research Service at 4.

During the decade after TILA's passage, TILA seemed to achieve remarkable success vis-à-vis its central objective of increasing borrower awareness of credit rates; Federal Reserve Board data indicated that such awareness had shot up from fifteen percent of borrowers to nearly fifty-five percent by 1977.  See 1979 Library of Congress at 4.  Academics and legislators nevertheless questioned whether the act still could be substantially improved.  See 1979 Library of Congress at 4.  Major concerns particularly regarded: (i) whether the mandated disclosures' emphasis and scope provided the most important information to borrowers in a way that they readily could comprehend and use; and (ii) whether civil liability provisions in TILA effectively were achieving their intended objective of compelling creditor compliance.  See 1979 Library of Congress at 3-4.  A general consensus arose that disclosure forms were too lengthy and impenetrable, and -- just as troublingly -- that creditors struggled so much to stay current with a steady stream of administrative interpretations and highly-technical judicial decisions that even sincere creditors sometimes ran afoul of the law and found themselves subject to litigation.  See 1979 Library of Congress at 4.

After a false start to amend TILA in 1977, see S. 1312, 95th Cong. (1977), Congress aggressively took up another bill to amend in 1979, see H.R. 4986, 96th Cong. (1979).  The

ensuing legislation's central goal, in the Senate Committee Report's words, was to "streamline federal disclosure requirements for credit transactions" to "make required disclosures of the actual cost of goods purchased on credit more understandable to consumers, less difficult for creditors to apply, and easier for federal agencies to supervise."  S. Rep. No. 96-73 (1979).  The bill coursed quickly through the Senate.  The Senate Committee on Banking, Housing and Urban Affairs reported the bill on April 24, 1979, and it passed the Senate by voice vote the following week.  See 1979 Library of Congress 8 (reproducing bill chronology).  Because the House of Representatives did not immediately act on the Senate TILA amendments, the Senate incorporated its bill into an existing House bill as title V to the Depository Institutions Deregulation Act of 1980.  See H.R. 4986 (1979).  The final bill, the Truth in Lending Simplification and Reform Act, Pub. L. No. 96-221, §§ 601-25 (1980)("Truth in Lending Simplification Act"), contained two amendments that are relevant to this case.  First, the bill simplified disclosures' format and language.  See Truth in Lending Simplification Act § 614.  Second, the bill drastically limited civil creditors' liability for TILA violations when the violations were unwitting or technical.  See Truth in Lending Simplification Act §§ 615-16.

The second amendment sketched out what a creditor must prove to be able to take advantage of the new civil liability exception.  In the bill's words

> [a] creditor or assignee may not be held liable in any action brought under this section . . . for a violation of this title if the creditor or assignee shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  Examples of bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this title is not a bona fide error.

Truth in Lending Simplification Act § 615(c).  Congress did not fill in this sketch, though, even for key terms such as "intentional" and "bona fide error."  As early as the Senate committee

markup session for the bill's 1977 Senate predecessor, the Senate signaled a preference for

leaving precise definitions under this section to the Federal Reserve, because committee senators

could not find compromise language.  See Markup Session on S. 1312, S. 1501, S. 1653, S. 1846

-- Truth-in-Lending Simplification Legislation Before the S. Comm. on Banking, Housing, and

Urban Affairs, 95th Cong. 66-71 (statements of Senators Robert Burren Morgan; Harrison

Schmitt; Donald W. Riegle, Jr.; Edward Brooke; and William Proxmire, Members, S. Comm. on

Banking, Housing, and Urban Affairs).  In the intervening decades -- and in marked contrast to

its minute regulation of other TILA provisions through Regulation Z, 12 C.F.R. § 226.1 -- the

Federal Reserve has declined to define "intentional" or "bona fide error" with any greater

specificity. Nor has it detailed what "procedures reasonably adapted to avoid any such error"

might be or what it means to "maintain" such procedures.

## RELEVANT EFTA STATUTORY TEXT

> (a) A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made. A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. The financial institution may require written confirmation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

> (b) In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution or designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with regulations of the Bureau, of the amount to be transferred and the scheduled date of the transfer.

15 U.S.C. § 1693e.

> No person may --

> (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers; or

(2) require a consumer to establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of employment or receipt of a government benefit.

15 U.S.C. § 1693k.

## RELEVANT "REGULATION Z" TEXT

§226.1   Authority, purpose, coverage, organization, enforcement, and liability.

. . . .

(b) Purpose. The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and cost. The regulation also includes substantive protections. It gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling, regulates certain credit card practices, and provides a means for fair and timely resolution of credit billing disputes. The regulation does not generally govern charges for consumer credit, except that several provisions in Subpart G set forth special rules addressing certain charges applicable to credit card accounts under an open-end (not home-secured) consumer credit plan. . . .

12 C.F.R. § 226.1(b).

(10) *Closed-end credit* means consumer credit other than "open-end credit" as defined in this section.

(11) *Consumer* means a cardholder or natural person to whom consumer credit is offered or extended. However, for purposes of rescission under §§226.15 and 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership interest in the dwelling is or will be subject to the security interest.

. . . .

(17) *Creditor* means:

(i) A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

. . . .

(20) *Open-end credit* means consumer credit extended by a creditor under a plan in which:

> (i) The creditor reasonably contemplates repeated transactions;

> (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

> (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

12 C.F.R. § 226.2(a)(10)-(11) & (20).

§226.14   Determination of annual percentage rate.

(a) General rule. The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate. An annual percentage rate shall be considered accurate if it is not more than 1/8 th of 1 percentage point above or below the annual percentage rate determined in accordance with this section.  An error in disclosure of the annual percentage rate or finance charge shall not, in itself, be considered a violation of this regulation if:

> (1) The error resulted from a corresponding error in a calculation tool used in good faith by the creditor; and

> (2) Upon discovery of the error, the creditor promptly discontinues use of that calculation tool for disclosure purposes, and notifies the Board in writing of the error in the calculation tool.

12 C.F.R. § 226.14.

## RELEVANT STATUTORY TEXT FROM THE NEW MEXICO SMALL LOAN ACT

58-15-2. Definitions.

The following words and terms when used in the New Mexico Small Loan Act of 1955 [58-15-31 NMSA 1978] have the following meanings unless the context clearly requires a different meaning.  The meaning ascribed to the singular form applies also to the plural:

> A.   "consumer" means a person who enters into a loan agreement and receives the loan proceeds in New Mexico;

- 85 -

B. "debit authorization" means an authorization signed by a consumer to electronically transfer or withdraw funds from the consumer's account for the specific purpose of repaying a loan;

. . . .

E. "installment loan" means a loan that is to be repaid in a minimum of four successive substantially equal payment amounts to pay off a loan in its entirety with a period of no less than one hundred twenty days to maturity. "Installment loan" does not mean a loan in which a licensee requires, as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan;

. . . .

H. "payday loan" means a loan in which the licensee accepts a personal check or debit authorization tendered by the consumer and agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date agreed to by the licensee and the consumer and:

(1)  includes any advance of money or arrangement or extension of credit whereby the licensee, for a fee, finance charge or other consideration:

(a)  accepts a dated personal check or debit authorization from a consumer for the specific purpose of repaying a payday loan;

(b)  agrees to hold a dated personal check or debit authorization from a consumer for a period of time prior to negotiating or depositing the personal check or debit authorization; or

(c)  pays to the consumer, credits to the consumer's account or pays another person on behalf of the consumer the amount of an instrument actually paid or to be paid pursuant to the New Mexico Small Loan Act of 1955; but

(2)   does not include:

(a)   an overdraft product or service offered by a banking corporation, savings and loan association or credit union; and

(b)   installment loans;

I.   "payday loan product" means a payday loan or a payment plan pursuant to Section 58-15-35 NMSA 1978;

J.   "person" includes an individual, copartner, association, trust, corporation and any other legal entity;

K.   "renewed payday loan" means a loan in which a consumer pays in cash the administrative fee payable under a payday loan agreement and refinances all or part of the unpaid principal balance of an existing payday loan with a new payday loan from the same licensee.  A "renewed payday loan" includes a transaction in which a consumer pays off all or part of an existing payday loan with the proceeds of a payday loan from the same licensee; and

L.   "simple interest" means a method of calculating interest in which the amount of interest is calculated based on the annual interest rate disclosed in the loan agreement and is computed only on the outstanding principal balance of the loan.

. . . .

58-15-17. Requirements for making and paying of loans; incomplete instruments; limitations on charges after judgment and interest.

A.   Every licensee shall:

(1)   at the time a loan is made within the provisions of the New Mexico Small Loan Act of 1955 [58-15-31 NMSA 1978], deliver to the borrower or, if there are two or more borrowers on the same obligation, to one of them, a statement in English or Spanish as requested by the borrower, on which shall be printed a copy of Section 58-15-14.1 NMSA 1978 and that discloses in clear and distinct terms:

(a)   the amount of the loan;

(b)   the date the loan was made;

(c)   a schedule or a description of the payments;

(d)   the type of the security, if any, for the loan;

(e)   the name and address of the licensed office;

(f)   the name of the person primarily obligated for the loan;

(g)   the amount of principal;

(h)   the agreed rate of charge stated on a percent per year basis and the amount in dollars and cents;

(i)   all other disclosures required pursuant to state and federal law; and

(j)   other items allowable pursuant to that act, so stated as to clearly show the allocation of each item included;

. . . .

58-15-32. Requirements for payday loans.

A.   No licensee shall make a payday loan to a consumer if the total principal amount of the loan and fees, when combined with the principal amount and fees of all of the consumer's other outstanding payday loan products, exceeds twenty-five percent of the consumer's gross monthly income.

B.   Without affecting the rights of a consumer to prepay a payday loan product at any time without additional cost or penalty:

(1)   no payday loan shall have a stated maturity greater than thirty-five days;

(2) no payday loan shall have a stated minimum term less than fourteen days unless agreed to in writing by the consumer; and

(3) there shall be a scheduled pay date for the consumer within the term of the payday loan.

C.   A payday loan agreement shall include a provision granting the consumer the right to rescind the transaction by returning in cash, or through certified funds, one hundred percent of the amount advanced by a licensee for a payday loan no later than 5:00 p.m. on the first day of business conducted by the licensee following the execution of the payday loan agreement.  If a consumer exercises the right of rescission pursuant to this subsection, no fee for the rescinded transaction shall be charged to the consumer and the licensee shall not charge or impose on the consumer a fee for exercising the right of rescission pursuant to this subsection.  If this subsection is applicable, any fee collected by a licensee shall be returned in full to the consumer.

D.   A consumer shall be permitted to make payments in any amount on a payday loan product at any time before maturity without additional fees.  A payment received by a licensee shall first be applied to administrative fees owed with any remaining amount to be applied to principal.

E.   After each payment is made, in full or in part, on a payday loan product, the licensee shall give to the person making the payment a signed, dated receipt showing the amount paid; the amount credited toward administrative fees and principal; and the balance due on the loan.

F.   A check written by a consumer for a payday loan product shall be payable to the order of the licensee.

G.   Prior to the consummation of a payday loan, the licensee shall provide the consumer, or each consumer if there is more than one, with copies of the payday loan product agreement in English, Spanish or other language as determined by the director.  Consumers shall have the option to decide which language version of the agreement they wish to receive.

H.   Licensees making payday loans shall provide the consumer with an information brochure in English, Spanish or other language as determined by the director.  Consumers shall have the option to

decide which language version of the brochure they wish to receive.

I. The disclosure of the credit terms of a payday loan product shall be according to and governed by the requirements of 12 CFR 226, known as "Regulation Z". The definitions and requirements of that regulation and commentary shall apply to payday loan products as if those provisions are fully set out in this section.

J. A licensee shall collect on payday loan products in default in a professional, fair and lawful manner. A licensee that complies with the requirements and prohibitions set forth in 15 U.S.C. 1692c-1692f of the federal Fair Debt Collection Practices Act shall be deemed to have operated in a professional, fair and lawful manner.

58-15-33. Payday loan products; permitted charges.

The following provisions apply only to payday loan products:

A. a licensee shall not charge or receive from a consumer, directly or indirectly, fees or charges except as provided in this section;

B. upon the execution of a new payday loan, the licensee may impose an administrative fee of not more than fifteen dollars fifty cents ($15.50) per one hundred dollars ($100) of principal, which fee is fully earned and nonrefundable at the time a payday loan agreement is executed and payable in full at the end of the term of the payday loan or upon prepayment of the payday loan unless a payday loan is rescinded pursuant to Subsection C of Section 58-15-32 NMSA 1978;

C. upon the execution of a new payday loan agreement, the licensee may impose an additional administrative fee of not more than fifty cents ($.50) per executed new payday loan agreement as necessary to cover the cost to the licensee of verification pursuant to Section 58-15-37 NMSA 1978, which fee is fully earned and nonrefundable at the time a payday loan agreement is executed and payable in full at the end of the term of the payday loan or upon prepayment of the payday loan unless a payday loan is rescinded pursuant to Subsection C of Section 58-15-32 NMSA 1978;

D. a licensee shall not charge a consumer interest on the outstanding principal owed on a payday loan product; and

E.  if there are insufficient funds to pay a check or other type of debit on the date of presentment by the licensee, a licensee may charge a consumer a fee not to exceed fifteen dollars ($15.00).  Only one fee may be collected by a licensee on a check or debit authorization.  A check or debit authorization request shall not be presented to a financial institution by a licensee for payment more than one time unless the consumer agrees in writing, after a check or other type of debit has been dishonored, to one additional presentment or deposit.

58-15-34. Payday loan products; prohibited acts.

A licensee shall not:

A.  enter into an agreement for a renewed payday loan or otherwise refinance or extend the term of a payday loan;

B.  enter into an agreement for a payday loan with a consumer who is participating in a payment plan pursuant to Section 58-15-35 NMSA 1978;

C.  threaten or intimidate a consumer or threaten to use or request the use of criminal process in this or another state to collect on a payday loan product;

D.  use a device or agreement that would have the effect of charging or collecting more fees, charges or interest than that allowed by law by entering into a different type of transaction with the consumer that has that effect;

E.  require a consumer to enter into a new payday loan to pay an existing payday loan in whole or in part when the existing loan is eligible for a payment plan pursuant to Section 58-15-35 NMSA 1978;

F.  charge a fee to cash a check representing the proceeds of a payday loan product;

G.  charge a late fee or delinquency charge if a consumer fails to repay a payday loan product on time;

H.  assign or attempt to assign a consumer's personal check to a third party unless for collection purposes;

I.  use or attempt to use the check written by the consumer for a payday loan product as collateral for purposes other than repaying

that payday loan product;

J.   require a consumer to provide multiple checks or multiple debt authorizations;

K.   accept collateral for a payday loan product other than the consumer's check or debit authorization or require a consumer to provide a guaranty from another person for a payday loan product;

L.   include any of the following provisions in a payday loan product agreement:

> (1)   a hold harmless clause;
>
> (2)   a confession of judgment clause or power of attorney;
>
> (3)   an assignment of or order for payment of wages or other compensation for services;
>
> (4)   a waiver of claims for punitive damages;
>
> (5)   a provision in which the consumer agrees not to assert a claim or defense arising out of the contract;
>
> (6)   a waiver of a provision of the New Mexico Small Loan Act of 1955 [58-15-31 NMSA 1978];
>
> (7)   a waiver of the right to enter into a payment plan pursuant to Section 58-15-35 NMSA 1978; or
>
> (8)   a waiver of any rights secured by New Mexico law;

M.   make a payday loan product contingent on the purchase of insurance or other goods or services;

N.   take a check, instrument or form in which blanks are left to be filled in after execution of the check, instrument or form;

O.   offer, arrange, act as an agent for or assist a third party in any way in the making of a payday loan product unless the third party complies with all applicable federal and state laws and regulations;

P.  knowingly enter into a payday loan product with a consumer who lacks the capacity to consent; or

Q.  use an agency agreement or partnership agreement as a scheme or contrivance to circumvent the application of the provisions of the New Mexico Small Loan Act of 1955 to a consumer's payday loan product.  For the purposes of this subsection:

> (1)  "agency agreement" means any agreement between in-state entities and a banking corporation, savings and loan association or credit union operating under the laws of the United States or of any state whereby the in-state agent holds a predominant economic interest in the revenues generated by a payday loan made to New Mexico residents; and

> (2)  "partnership agreement" means any agreement between in-state entities and a banking corporation, savings and loan association or credit union operating under the laws of the United States or of any state whereby the in-state partner holds a predominant economic interest in the revenues generated by a payday loan made to New Mexico residents.

58-15-35. Payday loans; payment plans.

A.  At the time a consumer enters into a payday loan agreement, the licensee shall offer the consumer the opportunity to enter into an unsecured payment plan for any unpaid administrative fees and principal balance of the payday loan.  The consumer may elect, and a licensee shall permit, entry into a payment plan for any unpaid administrative fees and principal balance of the payday loan.

B.  No fees, charges or interest may be charged for a payment plan.

C.  A payment plan shall provide for:

> (1)  a minimum of one hundred thirty days for the repayment of the unpaid principal balance of a payday loan; and

(2) relatively equal installment payments based upon the consumer's schedule of pay periods.

D.   A payment plan entered into pursuant to the provisions of this section shall not be considered an installment loan.

E.   A licensee that fails to offer a consumer the opportunity to enter into a payment plan for a payday loan pursuant to Subsection A of this section shall not commence a legal proceeding against a

consumer to collect on that payday loan if it has not been fully repaid.

N.M.S.A. 1978 §§ 58-15.

## RELEVANT STATUTORY TEXT FROM THE NEW MEXICO INSTALLMENT LOAN ACT

58-7-3. Loans covered by act.

The New Mexico Bank Installment Loan Act of 1959 [58-7-1 NMSA 1978] applies to a loan that is a precomputed loan repayable in installments or that is clearly identified on the loan documents as being made under that act.

58-7-3.1. Precomputed loan.

If the loan is a precomputed loan transaction, the interest charge may be calculated on the assumption that all scheduled payments will be made when due, and the effect of prepayment is governed by the provisions of rebate upon prepayment in Section 58-7-5 NMSA 1978.

58-7-3.2. Extension agreement.

In precomputed loan transactions where the borrower and lender execute an extension agreement for the deferral of an installment payment, the lender may make an interest charge on the monthly installment that is deferred at a rate not exceeding that on the original loan for each month or portion of a month that the payment has been deferred.

58-7-5. Prepayment; precomputed loan transactions.

If the entire unpaid balance outstanding on a precomputed loan transaction is paid by cash, renewal or otherwise, at any time prior to maturity, the lender shall give a refund or credit of the unearned portion of such charge, according to the rule commonly known as "the rule of 78th" ["the rule of 78's"], which refund or credit shall represent at least as great a portion of the original charge as the sum of the

consecutive monthly balances of the contract scheduled to be outstanding after the date of prepayment bears to the sum of all the consecutive monthly balances of the contract scheduled to be outstanding under the schedule of payments in the original instrument or instruments evidencing the loan; provided however, that if the contract is prepaid in cash rather than renewed or refinanced, the lender shall not be required to make a refund or credit, if the amount, computed as herein set forth, would be less than one dollar ($1.00) for each loan paid prior to the maturity.

58-7-6. Additional charges.

No additional amount shall be charged or contracted for, directly or indirectly, on, or in connection with, any such installment loan except as follows:

A. delinquency charges not to exceed five cents ($.05) for each one dollar ($1.00) of each installment more than ten days in arrears, provided that the total of delinquency charges on any such installment shall not exceed ten dollars ($10.00) and that only one delinquency charge shall be made on any one installment regardless of the period during which the installment remains unpaid;

B. the lender may charge for only the actual cost of any insurance; provided, however, all insurance shall be written by a company or companies licensed to operate within the state and at rates no higher than those approved by the superintendent of insurance; and provided further that the lender must not require any insurance to be written or provided by or through any particular agent, broker or insurer as a condition to making the loan but must, at the borrower's option, permit the same to be procured from any reputable insurer or through any reputable agent authorized by law to provide it;

C. in the event that a borrower fails to maintain in effect any insurance required in connection with a loan transaction, the lender may purchase the required insurance or lender's single interest insurance covering the lender's interest in the property, and the cost of such insurance shall be added to the loan and may accrue interest as provided for herein;

D. such amounts as are necessary to reimburse the lender for fees paid to a public officer for filing, recording or releasing any instrument or lien;

E. if a loan under the New Mexico Bank Installment Loan Act of 1959 [58-7-1 NMSA 1978] is secured and if the borrower fails to

pay any governmental or other levy arising after the date of the loan which would create a lien superior to the lien of the lender on the property standing as security, the lender, at the lender's option, may pay such levy and add the amount so paid to the balance due from the borrower;

F. the actual expenditures, including reasonable attorneys' fees, for legal process or proceedings to collect any such installment loan; provided, however, that no attorneys' fees are permitted where the loan is referred for collection to an attorney who is a salaried employee of the holder of the contract;

G. the actual cost of charges incurred in making a real estate loan secured by a mortgage on real estate, including but not limited to the charges for an abstract of title, title examination, title insurance premiums, property survey, appraisal fees, notary fees, preparation of deeds, mortgages or other documents, escrow charges, credit reports and filing and recording fees; and

H. a one-time charge of an amount not to exceed twenty-five dollars ($25.00) in an installment loan repayable in two or more installments when the loan is made to a natural person primarily for personal, family or household purposes to help defray the actual costs of preparing truth-in-lending disclosure statements, equal credit opportunity disclosure statements and other disclosures required by federal law.

The charges permitted under this section may be added to the balance due from the borrower.

No lender shall make a loan under the New Mexico Bank Installment Loan Act of 1959 [58-7-1 NMSA 1978] to a borrower who is also indebted to such lender under the New Mexico Small Loan Act of 1955 [Chapter 58, Article 15 NMSA 1978] unless the loan made under the Small Loan Act of 1955 is paid and released at the time the loan is made.

58-7-8. Penalties and forfeitures.

A. Any person, corporation or association willfully violating any of the provisions of the New Mexico Bank Installment Loan Act of 1959 [58-7-1 NMSA 1978] shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than one hundred dollars ($100) or more than five thousand dollars ($5,000), or imprisoned for not more than six months, or both, such fine and imprisonment in the discretion of the court.

B. The taking, receiving or reserving of a rate of charge, discount or advantage greater than allowed by the New Mexico Bank Installment Loan Act of 1959, when knowingly done, shall be deemed a forfeiture of the entire amount of such rate of charge or advantage which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of charge has been paid, the person by whom it has been paid, or his legal representatives, may recover back by civil action twice the amount of the rate of charge thus paid from the person, corporation or association taking or receiving the same, provided that such action is commenced within two years from the time the transaction occurred.

58-7-9. Construction.

A. None of the provisions of the New Mexico Small Loan Act of 1955 [Chapter 58, Article 15 NMSA 1978] are amended or repealed by the New Mexico Bank Installment Loan Act of 1959 [58-7-1 NMSA 1978].

B. With the exception of precomputed loan transactions, a lender is not bound by the provisions of the New Mexico Bank Installment Loan Act of 1959 in making loans where the loan is made in accordance with the provisions of Sections 56-8-9 through 56-8-14 NMSA 1978.

C. None of the provisions of the New Mexico Bank Installment Loan Act of 1959 apply to the assignment or purchase of retail installment contracts originated under the provisions of Sections 58-19-1 through 58-19-14 NMSA 1978 or originated under the provisions of Sections 56-1-1 through 56-1-15 NMSA 1978.

D. In the event of a conflict between a requirement of the New Mexico Bank Installment Loan Act of 1959 and a requirement of the Home Loan Protection Act [58-21A-1 NMSA 1978], the requirement of the Home Loan Protection Act shall control.

## **ANALYSIS**

On Speedy Loan's Motion to Extend Deadlines, because (i) Daye did not oppose Speedy Loan's Motion to Extend Deadline at the motion hearing; (ii) the deadline extension will not cause unnecessary delay in the case; and (iii) Speedy Loan provided an affidavit "explain[ing] why facts precluding summary judgment [could not] be presented," Fed. R. Civ. P. 56(d), the

Court grants the Motion to Extend Deadline, extending Speedy Loan's deadline to respond to Daye's motion for summary judgment until one week from the date that Speedy Loan receives the deposition transcripts.  On Daye's MSJ, the Court concludes that Speedy Loan's loans at issue in this case are payday loans even though Speedy Loan sometimes characterizes them as installment loans.  Because the Court also concludes that there are no genuine disputes as to material fact, the Court grants Daye's motion for summary judgment with respect to liability on her EFTA, TILA, and UPA claims.  The Court awards Daye and respective subclass members EFTA and TILA damages.  The Court declines, however, to award UPA damages at this time.

**I.      EXTENDING SPEEDY LOAN'S DEADLINE TO SUBMIT A RESPONSE TO THE MSJ WILL NOT CAUSE UNNECESSARY DELAY IN THE CASE, AND SPEEDY LOAN HAS PRESENTED THE COURT WITH AN AFFIDAVIT EXPLAINING WHY FACTS PRECLUDING SUMMARY JUDGMENT COULD NOT BE PRESENTED, IN ACCORD WITH RULE 56(D) OF THE FEDERAL RULES OF CIVIL PROCEDURE.**

Daye correctly notes in her Response to Motion to Extend Deadline that the Court is entitled to enforce its deadlines to promote the efficient resolution of this matter.  Nevertheless, the Court also is aware that the Tenth Circuit has cautioned district courts to be chary not granting deadline extensions in motions for summary judgment when there is good cause to grant one.  See, e.g., Rachel v. Troutt, 820 F.3d 390, 394 (10th Cir. 2016)(indicating that the rule to grant deadline extensions for good cause "should be liberally construed to advance the goal of trying each case on the merits").  See also 4B Charles Alan Wright et al., Federal Practice and Procedure § 1165, at 605-08 (2015)(noting that district courts normally should grant extension requests, made before the deadline, in the absence of bad faith to the requesting party or prejudice to another party).  The Court concludes that there exists no sound reason to override this presumptive caution for three reasons.

First, the extension for time does not introduce unnecessary delay into the case proceedings.  On the same day that Speedy Loan filed its Motion to Extend Deadline, Daye and Speedy Loan jointly moved the Court to grant a continuance of the trial for ninety days so that both parties could complete discovery.  Compare Joint Motion to Continue Trial Setting 1-2, filed May 13, 2016 (Doc. 99), with Motion to Extend Deadline at 1.  The Court therefore does not delay the case proceedings if it grants Speedy Loan a one-week deadline extension to file its MSJ Response.  At the motion hearing, Daye conceded that, now that the trial date has been postponed, its concerns about the delay mostly are assuaged.  See Tr. at 4:8-15 (Mattison).  The Court sees no sound reason to disagree.  Second, Speedy Loan satisfies rule 56(d)'s requirement that it submit an affidavit explaining why it could not present facts precluding summary judgment by the deadline.  See Fed. R. Civ. P. 56(d); Decl. of Donald F. Kochersberger III ¶¶ 2-6, at 1-2, filed May 13, 2016 (Doc. 101-1)("Kochersberger Declaration").[42]  Third, Speedy Loan has demonstrated good cause for a deadline extension and has not evinced bad faith.  Because a failure to respond to the MSJ would be dispositive in this case, the Court therefore, at it has done in the past in similar situations, heeds the Tenth Circuit's cautionary advice and grants Speedy Loan's Motion to Extend Deadline.  See, e.g., Estate of Anderson v. Denny's Inc., 291 F.R.D. 622, 633 (D.N.M. 2013)(Browning, J.); Tapia v. City of Albuquerque, 10 F. Supp. 3d 1323, 1350 (D.N.M. 2014)(Browning, J.).

---

[42]Speedy Loan's counsel Kochersberger attests that Speedy Loan had not yet received the transcript of Daye's, Foster's, or Gaco's depositions from the court reporter.  See Kochersberger Declaration ¶¶ 2-3, at 1.  Speedy Loan avers that with the information from these deposition transcripts, Speedy Loan is "unable to present all facts necessary to justify its opposition to" Daye's MSJ.  Kochersberger Declaration ¶ 6, at 2.

## II.   **NO GENUINE DISPUTE EXISTS AS TO ANY MATERIAL FACT.**

As the movant, who is also the party who will bear the burden of persuasion at trial, Daye

bears the burden of showing that no genuine dispute exists as to any material fact related to her

EFTA, TILA, or UPA claim.  See Celotex Corp. v. Catrett, 477 U.S. at 331.  Daye, in her MSJ,

lays out eleven statements of fact that are related to the EFTA claim that Speedy Loan does not

dispute in its Response.  See MSJ ¶¶ 12-22, at 5-8; Response ¶¶ 12-22, at 4-5.  Speedy Loan

asserts five additional facts related to the EFTA claim in its Response that Daye says are

immaterial.  See Response ¶¶ m-q, at 8-9.  Contending that a fact is immaterial is not disputing a

fact, nor is it specifically controverting a fact by directing the Court with particularity to the

record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed

fact at summary judgment is immaterial to the Court's disposition of the summary judgment

motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts

and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011

WL 1336670, at *4 n.8.  Daye, in her MSJ, further lays out eight statements of fact that are

related to the TILA claim that Speedy Loan does not dispute in its Response.  See MSJ ¶¶ 36-43,

at 10-12; Response ¶¶ 36-43, at 5-6.  Speedy Loan asserts three additional facts related to the

TILA claim in its Response that Daye does not dispute.  See Response ¶¶ d-f, at 7; Reply ¶¶ d-f,

at 5-6. Daye, in her MSJ, lastly presents five statements of fact related to her UPA claim that

Speedy Loan does not dispute in its Response.  See MSJ ¶¶ 39-43, at 11-12; Response ¶¶ 39-43.

## III.   **SPEEDY LOAN'S LOANS AT ISSUE IN THIS CASE ARE PAYDAY LOANS EVEN THOUGH SPEEDY LOAN SOMETIMES CHARACTERIZES THEM AS INSTALLMENT LOANS.**

Daye insists that the loans in question are "payday loans," e.g., MSJ ¶ 2, at 4, whereas

Speedy Loan insists that these loans are "installment loans," e.g., Response ¶ 2, at 4.   The

difference between a payday loan and an installment loan is not scholastic.  According to the New Mexico Small Loan Act, a "payday loan" is any loan in which the "licensee accepts a personal check or debit authorization tendered by the consumer and agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date agreed to by the licensee and the consumer . . . ."  N.M.S.A. 1978 § 58-15-2(H).  In contrast, the New Mexico Small Loan Act defines an installment loan as "a loan that is to be repaid in a minimum of four successive substantially equal payment amounts to pay off a loan in its entirety with a period of no less than one hundred twenty days to maturity."  N.M.S.A. 1978 § 58-15-2(E).  Then, clearly distinguishing installment loans from payday loans, the New Mexico Small Loan Act advises that "'[i]nstallment loan' does not mean a loan in which a licensee requires, as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan."  N.M.S.A. 1978 § 58-15-2(E).  More fully sketching out the contours of installment loans four years later in the New Mexico Bank Installment Loan Act of 1959, the state Legislature defines "installment loan" as "a loan that is a pre-computed loan repayable in installments or that is clearly identified on the loan documents as being made under that act [the New Mexico Bank Installment Loan Act of 1959]."  N.M.S.A. 1978 § 58-7-3.[43]

---

[43]The New Mexico Bank Installment Loan Act authorizes the Director of the Financial Institutions Division of the Regulation and Licensing Department to issue and file as law requires interpretive regulations to effectuate its purposes.  See N.M.S.A. 1978 § 58-7-9.  The director has issued numerous regulations under this authority, see, e.g., NMAC §§ 12.18.7.1.-.16, but the Court has found none that interprets the term "installment loan," or neatly demarcates the boundaries between payday loans and installment loans.  That absence or gap notwithstanding, the Financial Institutions Division defines installment loans in its 2015 New Mexico Installment Loan Product Annual Report, a required official publication under N.M.S.A. 1978 § 58-15-39.  See New Mexico Regulation and Licensing Department, Financial Institutions Division, 2015 New Mexico Installment Loan Product Annual Report 8, available at http://www.rld.state.nm.us/uploads/files/FID%202015%20SL%20Annual%20Report(1).pdf (last visited Jan. 17, 2017)("Installment Loan Annual Report").  According to the Financial Institutions Division, an installment loan is "a loan that is to be repaid in a minimum of four

These textual provisions' plain meaning shows that Speedy Loan's loans are not "installment loans" under New Mexico law for at least two reasons. First, installment loans cannot mature in less than 120 days. See N.M.S.A. 1978 § 58-15-2(E). Daye's first payday loan, transacted on August 23, 2013, had a final withdrawal date of December 2, 2013 -- just 101 days after she entered into the loan. See PPD/ACH Authorization 1, filed April 28, 2016 (Doc. 98-7). This length was not an aberration; between August 22, 2010, and August 22, 2014, Speedy Loan entered into 12,189 loans in which the loan was to be repaid in fewer than four payments or the loan's term was less than 120 days. See MSJ ¶ 23, at 8 (stating this fact); Response ¶ 23, at 5 (not disputing this fact). Second, installment loans must be repaid in "substantially equal payment amounts." N.M.S.A. 1978 § 58-15-2(E). Daye's first payment on her initial loan was $73.63, whereas her second, third, and fourth payments were $108.11, $108.11, and $108.08, respectively. See PPD/ACH Authorization at 1.

That Speedy Loan's loans are not installment loans under New Mexico law does not automatically mean, however, that they are payday loans. They could be in a third loan category. The New Mexico Small Loan Act's plain meaning leaves little doubt, however, that the loans in question are payday loans for two reasons. First, the New Mexico Small Loan Act identifies payday loans as loans in which the repayment schedule is tied to the borrower's payday. See N.M.S.A. 1978 § 58-15-2(H). Speedy Loan scheduled loan repayments for Daye's paydays. See New Mexico Installment Loan Contract 1, filed April 28, 2016 (Doc. 98-1)("Payments are due on your payday."); New Mexico Installment Loan Contract 1, filed April 28, 2016 (Doc. 98-2)(same); New Mexico Installment Loan Contract 1, filed April 28, 2016 (Doc. 98-3)(same).

successive substantially equal payment amounts to pay off a loan in its entirety with a period of no less than one hundred twenty days to maturity," and there is "no collateral associated with this loan product." Installment Loan Annual Report at 8.

Second, the New Mexico Small Loan Act indicates that a second hallmark of payday loans is that the lender "accepts a personal check or debit authorization" that the borrower tenders but that the lender does not present to the borrower's bank for payment until the borrower's payday. See N.M.S.A. 1978 § 58-15-2(H). Even though Daye and Speedy Loan dispute whether Speedy Loan mandated preauthorized debit authorizations, neither party disputes that Speedy Loan "accepts" such a form of payment and presents the authorization to borrowers' banks on borrowers' paydays. For all the aforementioned reasons, the Court concludes that Speedy Loan's loans at issue in this case were payday loans.

## IV.  SPEEDY LOAN VIOLATED THE EFTA WHEN IT REQUIRED EACH BORROWER TO PREAUTHORIZE EFTs AS A CONDITION FOR MAKING A LOAN.

The EFTA explicitly proscribes lenders from requiring borrowers to preauthorize EFTs as a precondition for a loan. See 15 U.S.C. § 1693k. Speedy Loan nevertheless required all borrowers to preauthorize just such EFTs. To qualify for a loan, Speedy Loan required customers to have a bank account from which it could withdraw loan payments via EFT. See MSJ ¶ 17, at 6 (stating this fact); Response ¶ 17, at 5 (not disputing this fact). In Speedy Loan's Policy and Procedure Manual, Speedy Loan instructed its loan officers that "for our everyday Installment Loans . . . [t]here are seven basic requirements for giving someone a loan . . . Make sure the customer has an open bank account from which to get payment." Speedy Loan Policy and Procedure Manual 14.11, filed April 28, 2016 (Doc. 98-5)("Speedy Loan Manual"). Clarifying and reemphasizing this requirement, the Speedy Loan Manual later indicates that "acceptable bank accounts" are "open and active, ach-able checking account[s]." Speedy Loan Manual at 14.14. Deposition testimony confirmed that this policy is operationalized at Speedy

Loan branches: "[W]e are instructing them to make sure the customer has an open and active ACH-able account." Dep. at 93:18-20; see id. at 87:19-24.

## V.    SPEEDY LOAN VIOLATED TILA WHEN IT MISREPRESENTED FINANCE CHARGES AND TOTALS OF PAYMENTS FOR ITS LOANS.

As one species of closed loan, a payday loan is subject to both TILA and related Regulation Z.  See 15 U.S.C. § 1638; 12 C.F.R. § 226.1.  Whenever a lender extends credit to a borrower, TILA requires uniformity and accuracy in the terms of credit.  These terms must state the amount financed, see 15 U.S.C. § 1638(a)(2)(A), the finance charge, see 15 U.S.C. § 1638(a)(3), and the total of payments, i.e. "[t]he sum of the amount financed and the finance charge," 15 U.S.C. § 1638(a)(5).  In the case of payday loans -- with (i) short repayment deadlines; and (ii) a prohibition in New Mexico against compounding payday loan interest -- these calculations are elementary.  As Daye noted at the motion hearing, all that Speedy Loan needed to do in its loan contract with Daye was multiply one pair of numbers that were adjacent to each other on the contract form -- the number of payments and the amount of payments -- to arrive at the total of payments.  See Tr. at 39:12-25; Tr. at 37:15-20 (Mattison).  Despite using a spreadsheet that easily could automate this calculation, Speedy Loan reported two different amounts for the total of payments in the payment schedule and in the TILA Box, e.g., $432.44 and $397.94, respectively, on Daye's first loan.  See New Mexico Installment Loan Contract at 1 (Doc. 98-1).

Speedy Loan does not dispute the mismatch between the calculated total of payments on the payment schedule and the total of payments that it reports in the TILA Box.  Speedy Loan emphasized at the motion hearing, however, that this mismatch (i) was unintentional; and (ii) that the total in the TILA Box is the amount that borrowers paid.    See Tr. at 43:1-44:13 (Kochersberger).  Speedy Loan also correctly noted that the total of payment it reported in the

TILA Box (i) exactly matched the total of payments itemized on each borrower's payment schedule; and (ii) was less than the amount borrowers would calculate if they were to multiply the number of payments by the reported amount of each payment.  See Tr. at 43:10-44:20 (Kochersberger).  Nevertheless, the inaccurate report of the loan terms in the loan contract violates TILA's clear and plain language.  See 15 U.S.C. § 1638(a).  The Court, therefore, concludes that Speedy Loan violated TILA when it misrepresented finance charges and totals of payments for its loans.

## VI.    FOR UPA PURPOSES, SPEEDY LOAN INTENTIONALLY REPORTED DIFFERENT TOTALS OF PAYMENTS IN THE TILA BOX AND PAYMENT SCHEDULE FOR DAYE'S LOANS.

Under the UPA, an "unfair or deceptive trade practice" includes

a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . .

NMSA 1978 § 57-12-2(D).  One example that the statute proffers as an unfair or deceptive trade practice is "making false or misleading statements of fact concerning the price of goods or services . . . ."  N.M.S.A. 1978 § 57-12-2(D)(11).  As the Court of Appeals for New Mexico indicated on a previous occasion, to state a claim under the UPA, a complaint must allege:

(1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 5, 166 P.3d at 1093 (citing N.M.S.A. § 57-12-12(D).  See Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311)).

- 105 -

Neither Daye nor Speedy Loan disputes that the mismatch between the total of payments in Daye's TILA Box and her payment schedule satisfies the first criterion that the Court of Appeals of New Mexico enunciated in Lohman v. Daimler-Chrysler Corp.  In the loan contract, Speedy Loan made two written statements about the total of payments on Daye's loan.  The reported total payment amounts differ in the two statements, and therefore one of the two ipso facto is false.  It is unclear, however, whether the second criterion -- related to knowledge and intent -- is satisfied; Speedy Loan asserts that the variation between the TILA Box and the payment schedule was a "mistake,"[44] Tr. at 43:23 (Kochersberger), whereas Daye sees shadowy machinations behind it, see Tr. at 34:7-36:17 (Mattison).

Although Speedy Loan did not use the specific term of art "bona fide error" to describe its defense, instead using the word "mistake," the Court concludes that Speedy Loan's argument's structure strongly suggests it intended to invoke TILA's civil liability exception for bona fide error.  As the Court noted in its recapitulation of TILA's legislative and regulatory history in pages 77 to 83 supra, the 1980 TILA Amendments provide that

> [a] creditor or assignee may not be held liable in any action brought under this section . . . for a violation of this title if the creditor or assignee shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  Examples of bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this title is not a bona fide error.

Truth in Lending Simplification Act § 615(c).  As the Court also noted when recounting the same history, neither Congress nor the Federal Reserve yet has defined the terms "intentional,"

---

[44]The Court has searched the Response and motion hearing transcript diligently but has found no explanation from Speedy Loan concerning how this "mistake" allegedly occurred.

"bona fide error," nor has either specified what TILA means by "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

If possible, the Court interprets statutes according to the statutory text's plain meaning and structure. When the text's meaning and structure leave ambiguities, however, even the ardent textualist "routinely takes purpose into account, but in its concrete manifestations as deduced from close reading of the text." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012). Spiraling one loop downward in the interpretive funnel of abstraction[45] into TILA's legislative history, the Court uncovers significant evidence that Congress intended for courts to construe the terms "unintentional" and "bona fide error" narrowly. TILA, as Congress originally enacted it in 1968, imposed strict liability on creditors who violated any of its terms. See Pub. L. No. 90-321, §§ 112 & 130 (1968). Even in the face of hydra-headed regulations quickly overwhelming many small lenders in the 1970s, see 1979 Library of Congress at 4, Congress budged only slightly on such strict liability in the 1980 TILA amendments, dredging up a safe harbor from a tempest of civil suits only for those lenders whose mistakes were "unwitting" and "technical," S. Rep. No. 95-720, at 6-7 (1978). Lenders shifted from adding machines, rate tables, and computer punch cards to reliable accounting software and macros over the ensuing three decades, making such unwitting technical errors much rarer, and Congress commensurately narrowed the civil liability exception to errors that arose "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1693m(c).

TILA's evolution -- alongside the original statute's purpose in attempting to eradicate the evil of obfuscating loan contract terms -- suggests to the Court that Congress intended the civil

---

[45] See William N. Eskridge, Jr. & Philip P. Frickey, Statutory Interpretation as Practical Reasoning, 42 Stan. L. Rev. 321, 353-59 (1990).

liability exception for unintentional and bona fide errors to be construed narrowly.   The United States Court of Appeals for the Tenth Circuit and sister federal district courts within the Tenth Circuit have driven sufficient stakes into the ground in their own attempts to survey the limits of the exception that, the Court concludes, they have mapped Congress' intent correctly.   These courts generally recognize that a creditor needs to prove four different elements to the level of preponderance of the evidence to fall within the exception's scope.   First, the creditor must prove that the violation was unintentional.   Second, the creditor must prove that the violation arose out of a bona fide error.   Third, the creditor must prove that it had adopted reasonable preventive measures to avoid the violation before the violation occurred.   Fourth, the creditor must prove that it "maintained," i.e. employed, those preventive measures in the specific case before the court.   Absent even one of these elements, the creditor does not fall within the scope of the civil liability exception.   See 153 A.L.R. Fed. 193 (1999)(citing cases).

The first element, that the violation was "unintentional," is much less indulgent than some might at first suppose.   A layperson oftentimes might describe a violation of the law as being unintentional if the end result was not intended.   For instance, a motorist pulled over for speeding might tell the highway patrolman that he did not "intend" to exceed the posted speed limit and thereby break the law.   For TILA's purposes, the courts generally have held that "intent" is much less teleological.   Rather than focusing on the intended end product of an action, federal courts have focused on the intent to commit the underlying act at all.   See, e.g.,Cole v. Lovett, 833 F.2d 1008 (5th Cir. 1987); Mirabel v. General Motors Acceptance Corp., 576 F.2d 729 (7th Cir. 1978).   Revisiting the quotidian example above, courts analogically generally have held that what matters is whether the speeding motorist meant to depress the accelerator too far, and not whether he or she intended to exceed the speed limit.

Courts also have forced TILA civil liability exceptions to pass through a needle's eye on the second element of "bona fide error" even before Congress narrowed the definition in the 1980 TILA amendments.  In Hinkle v. Rock Springs National Bank, 538 F.2d 295 (10th Cir. 1976), in an opinion that Judge Seth authored and Judges Hill and Doyle joined, the Tenth Circuit held that the only errors that a creditor could shoehorn into the civil liability exception were strictly clerical errors.  See 538 F. 2d at 296-97.  A decade later, after intervening TILA amendments had loosened the exception requirements ever so slightly, the Tenth Circuit reconfirmed that the exception's continued scope is limited to clerical errors in an opinion that Judge Breitenstein wrote and Judge Seth joined.  See Hernandez v. O'Neal Motors, Inc., 638 F.2d 153, 155 (10th Cir. 1981), cert denied sub. nom. James v. Ford Motor Credit Co., 453 U.S. 901 (1981).  Five years later, after lenders had begun to shift in earnest from manual credit entries to computer systems, a third Tenth Circuit panel again tightly cabined TILA's civil liability in Herrera v. First Northern Savings and Loan Association, 805 F.2d 896 (10th Cir. 1986), an opinion that then-Chief Judge Holloway penned and Judges McKay and Kane (sitting by designation) joined.  In that case, the Tenth Circuit held that unintentional errors encompassed errors arising only from clerical, calculation, computer malfunction and programming, and printing errors.  See 805 F.2d at 900-01.  This consistent Tenth Circuit position mirrors that position that the United States Courts of Appeals for the First, Second, Third, Fourth, Fifth, Seventh, and Ninth Circuits have taken as well.  See Bizier v. Globe Financial Services, Inc., 654 F.2d 1, 3 (1st Cir. 1981)("Bizier");  Ives v. W.T. Grant Co., 522 F.2d 749, 758 (2d Cir. 1975)("Ives");  Thomka v. A.Z. Chevrolet, Inc., 619 F.2d 246, 251 (3d Cir. 1980)("Thomka");  Powers v. Sims and Levin Realtors, 542 F.2d 1216, 1218-25 (4th Cir. 1976)("Powers");  McGowan v. King, Inc., 661 F.2d 48 (5th Cir. 1981)("McGowan");  Haynes v. Logan Furniture

Mart, Inc., 503 F.2d 1161, 1167 (7th Cir. 1974)("Haynes"); Palmer v. Wilson, 502 F.2d 860, 861 (9th Cir. 1974)("Palmer").

The third element, that which requires a creditor to have procedures reasonably adapted to avoid any bona fide error, theoretically could open a floodgate for exceptions. Overwhelming, however, courts have turned it into a sluice instead. The Tenth Circuit, in Gallegos v. Stokes, 593 F.2d 372 (10th Cir. 1979), was one of the first Courts of Appeals to grapple with the issue after the 1980 TILA amendments had added it. In an opinion that Judge Logan wrote, and Judges Holloway and Barrett joined, the Tenth Circuit considered whether a used truck dealer had taken sufficient preventive measures to avoid bona fide error when it calculated payment amounts and the annual percentage rate only once. See Gallegos v. Stokes, 593 F.2d at 376. The Tenth Circuit deemed that the dealer's failure to double check the calculations made the procedure insufficient for the civil liability exception to apply. See Gallegos v. Stokes, 593 F.2d at 376.

The Tenth Circuit has not yet specified what a sufficiency threshold might be. Decisions from three other Courts of Appeals give some guidance, however, as they peg certain amounts of prevention that, at least in those Circuits, are sufficiently preventative for TILA's civil liability exception to apply. See Brown v. National Permanent Federal Savings and Loan Association, 683 F.2d 444 (D.C. Cir. 1982); Hutchings v. Beneficial Finance Co. of Oregon, 646 F.2d 389 (9th Cir. 1981); Teel v. Thorp Credit Inc. of Illinois, 609 F.2d 1268 (7th Cir. 1979). In Brown v. National Permanent Federal Savings and Loan Association, 683 F.2d 444 (D.C. Cir. 1982), the United States Court of Appeals for the District of Columbia Circuit held that a lender's use of a standard loan format based off of a manual and guide that a nationwide savings and loan association had published, and a supervisor's double-checking of all figures allowed the lender to

satisfy this third element.  See Brown v. National Permanent Fed. Sav. & Loan Assoc., 683 F.2d at 444-49.  In Teel v. Thorp Credit Inc. of Illinois, 609 F.2d 1268 (7th Cir. 1979), the United States Court of Appeals for the Seventh Circuit held that a lender satisfies the third element when it have a manager double-check loan figures and then subsequently has a secretary check them once more.  See Teel v. Thorp Credit Inc. of Illinois, 609 F.2d at 1268.  The United States Court of Appeals for the Ninth Circuit, in Hutchings v. Beneficial Finance Co. of Oregon, 646 F.2d (9th Cir. 1981), took a similar stance.  See 646 F.2d at 392.  In that case a retail installment contract misstated the deferred payment price, stating that it was $859.66 when it was $859.76, a difference of ten cents.  See 646 F.2d at 390.  Had the retailer computed the amount only once, the Ninth Circuit said, its procedures to avoid error would have been insufficient.  See 646 F.2d at 391.  The case turned on a dime, however, when the retailer proved that it had taken extensive preventive measures to avoid the error: quadruple-checking amounts, including once with an adding machine and once with a computer.  See 646 F.2d at 390.

The fourth element, that which requires a creditor to "maintain" its sufficiently preventive procedures, has received less judicial attention than the other three elements.  The Court cannot find any appellate case in the Tenth Circuit that is on point, but it finds persuasive authority in the Third, Fifth, and Ninth Circuits.  Each of these courts commonsensically has decided that a procedure is "maintained" if it is applied when the specific loan contract being contested was entered into.  See Thomka v. A.Z. Chevrolet, Inc., 619 F.2d 246, 251 (3d Cir. 1980); Turner v. Firestone Tire & Rubber Co., 537 F.2d 1296, 1298 (5th Cir. 1976); Palmer v. Wilson, 502 F.2d 860, 861 (9th Cir. 1974).

In  this case, Speedy Loan claims that it made a "mistake" when calculating payments in the TILA Box.  Tr. at 43:23 (Kochersberger).  Speedy Loan offers, however, no evidence that its

action was unintentional, i.e. that it did not intend to print the erroneous payment amount in the TILA Box.  Speedy Loan offers no specific evidence that the "mistake" was a bona fide error as the federal courts have understood the term.  Speedy Loan offers no evidence that it had put into place sufficient -- or any -- procedures reasonably adapted to avoid any bona fide error.  Last, Speedy Loan offers no evidence that it maintained any procedure to avoid bona fide error, or that it followed such a procedure when processing Daye's of subclass members' loans.  Because Speedy Loan therefore has failed to prove not just one but all four of the elements necessary for it to avoid civil liability under 15 U.S.C. § 1693m(c), the Court concludes that Speedy Loan may not avoid civil liability on account of its alleged "mistake."

Scaffolding back up to the third UPA criterion, the Court concludes that Speedy Loan's representations were of "the type that may, tends to, or does deceive or mislead any person." Lohman v. Daimler-Chrysler Corp. at 1093.  As stated above, the UPA's prohibition on unfair or deceptive trade practices does not require plaintiffs to prove reliance or make any other individualized showing.  See N.M.S.A. § 57-12-2(D); Lohman v. Daimler–Chrysler Corp., 2007-NMCA-100, ¶ 35, 142 N.M. 437, 444, 166 P.3d 1091(stating that the "UPA does not require that the defendant's conduct actually deceive a consumer; it permits recovery even if the conduct only 'tends to deceive,'" and that "a claimant need not prove reliance upon a defendant's deceptive conduct in this context").  Moreover, Daye can prove a UPA violation using common evidence, because the UPA does not require plaintiffs to show detrimental reliance.  See N.M.S.A. § 57–12–2(D).

Speedy Loan repeatedly asserted during the hearing that the payment schedule's accuracy meant that no borrower ever was deceived about what he or she owed.  See Tr. at 42:4-6 (Kochersberger).   Even one black swan satisfies the third criterion's expansive language,

however, and the TILA subclass members -- who assert that the mismatched language deceived them -- collectively constitute such a black swan.  See Tr. at 38:22-24 (Mattison).  Because intent for UPA purposes requires Daye and TILA subclass members to prove three criteria and, because they in fact prove all three criteria based on the undisputed facts, the Court concludes that Speedy Loan, for UPA purposes, intentionally reported different totals of payments in the TILA Box and the payment schedule for Daye's loans.

## VII.    THE COURT PRESENTLY AWARDS DAMAGES ON THE EFTA AND TILA CLAIMS, BUT IT REFRAINS FROM AWARDING DAMAGES ON THE UPA CLAIM.

The Court may not hold Speedy Loan liable for EFTA damages if it shows by a preponderance of the evidence that its EFTA violations were "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  15 U.S.C. § 1693m(c).  The Court concludes, based on the undisputed facts, that Speedy Loan's policy to require borrowers to preauthorize debit authorizations as a condition for receiving a loan -- a policy repeated numerous times in the Speedy Loan policy manual and conceded to during deposition -- was deliberate and intentional. The Court finds no evidence that the policy arose out of bona fide error, nor does it find evidence that Speedy Loan maintained procedures designed to avoid such an error.   The Court, therefore, concludes that it can hold Speedy Loan liable for EFTA damages.

When a lender fails to comply with any EFTA provision and consequently is liable for damages, the Court may award damages for up to a statutory maximum of "the lesser of $500,000 or 1 per centum of the net worth of the defendant . . . ," 15 U.S.C. § 1693m(a)(2)(B), plus any "reasonable attorney's fee as determined by the court," 15 U.S.C. § 1693m(a)(3).  When the Court computes EFTA damages, it is to account for the "frequency and persistence of

noncompliance, the nature of such noncompliance, and the extent to which the noncompliance was intentional."  15 U.S.C. § 1693m(b)(2).  All three of these factors incline the Court to award the maximum damages that the EFTA permits.  First, Speedy Loan's frequency and persistence of noncompliance is staggering, encompassing 31,082 loans over a four-year period. See MSJ ¶ 13, at 5 (stating this fact); Response ¶ 5, at 4 (not disputing this fact).  Second, Speedy Loan's noncompliance struck at the very heart of the EFTA, when considered in light of Congress' intent as conveyed in the EFTA's conference report.  See H. Rep. No. 90-1397 (1968)(Conf. Rep.), reprinted in 114 Cong. Rec. 14,375 (1968).  Third and last, Speedy Loan, again, adopted its policy violating the EFTA with full knowledge and deliberate intent.

The Court concludes that the undisputed facts provide it with sufficient information on which to calculate an EFTA award.  Daye has calculated one percent of Speedy Loan's net worth to be $12,693.40.  See Sealed MSJ at 2.  Nevertheless, the Court identifies two main informational lacunae.  First, it is not clear what Speedy Loan's exact net worth is for purposes of EFTA damages, as Daye's calculations fail to account for the EFTA's silence as to the date upon which Speedy Loan's net worth should be measured.  See 15 U.S.C. §§ 1693*i*-93r.

Daye chose to measure Speedy Loan's net worth during 2013 and 2014 as the "mean average" of its net worth over 2013 and 2014, on the grounds that EFTA subclass members took out their loans from August 22, 2013 through August 22, 2014.  See MSJ at 20.  This methodology is not self-evidently correct.  In fact, there are very few scenarios in which it mathematically would match Speedy Loan's net worth over the relevant time frame, because the methodology falls prey to what statisticians call an ecological fallacy, see, e.g., Victor Jupp, Ecological Fallacy, The SAGE Dictionary of Social Research Methods 82-83 (2006), and to what logicians call a fallacy of division, see Aristotle, On Sophistical Refutations pt. 4 (Loeb

Classical Library ed. 1955).  In short, Daye assumes that what is true for the whole is true for a subset of the whole, i.e. that the "mean average" of Speedy Loan's net worth in 2013 and 2014 equals the "mean average" of Speedy Loan's net worth over the period August 22, 2013, to August 22, 2014.   This assumption can be dramatically wrong. Take as a simplified hypothetical example the three different scenarios tabulated below.

**[REMAINDER OF PAGE PURPOSEFULLY LEFT BLANK]**

| | | Speedy Loan Net Worth Scenarios | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| **2013** | January | 100,000 | 200,000 | - |
| | February | 100,000 | 200,000 | - |
| | March | 100,000 | 200,000 | - |
| | April | 100,000 | 200,000 | - |
| | May | 100,000 | 200,000 | - |
| | June | 100,000 | 200,000 | - |
| | July | 100,000 | - | 200,000 |
| | August | 100,000 | - | 200,000 |
| | September | 100,000 | - | 200,000 |
| | October | 100,000 | - | 200,000 |
| | November | 100,000 | - | 200,000 |
| | December | 100,000 | - | 200,000 |
| | 2013 average | 100,000 | 100,000 | 100,000 |
| **2014** | January | 100,000 | - | 200,000 |
| | February | 100,000 | - | 200,000 |
| | March | 100,000 | - | 200,000 |
| | April | 100,000 | - | 200,000 |
| | May | 100,000 | - | 200,000 |
| | June | 100,000 | - | 200,000 |
| | July | 100,000 | 200,000 | - |
| | August | 100,000 | 200,000 | - |
| | September | 100,000 | 200,000 | - |
| | October | 100,000 | 200,000 | - |
| | November | 100,000 | 200,000 | - |
| | December | 100,000 | 200,000 | - |
| | 2014 average | 100,000 | 100,000 | 100,000 |

| | 1 | 2 | 3 |
|---|---|---|---|
| **"Mean average"** | 100,000 | 100,000 | 100,000 |
| **Monthly average August 2013-2014** | 100,000 | 30,769 | 169,231 |
| **Daily average August 2013-2014** | 100,000 | 28,494 | 171,505 |

In Scenario 1, Speedy Loan has static cash flows throughout the year so that its net worth does not change from month to month.   In Scenario 2, Speedy Loan has static cash flows

through the first half of 2013 before major losses that zero out its net worth until the second half of 2014.   In Scenario 3, Speedy Loan registers a positive net worth for the first time in the second half of 2013 and then experiences static cash flow until its net worth plummets down to zero again in the second half of 2014.[46]

Applying Daye's computational methodology to these hypothetical scenarios, the "mean average" under all three scenarios for 2013 and 2014 is the same: $100,000.00.   Daye's methodology overestimates Speedy Loan's net worth over the relevant time period by approximately 225% in Scenario 2 -- $100,000.00 versus $30,769.00 -- and underestimates it by nearly seventy percent in Scenario 3 -- $100,000.00 versus $169,231.00.   The underestimation and overestimation are even larger if one calculates a daily weighted average to account for the time frame starting in the middle of August, 2013, and ending in the middle of August, 2014. Even assuming, therefore, that Daye correctly calculated the "mean average" of Speedy Loan's net worth over 2013 and 2014, the Court cannot calculate Speedy Loan's net worth over the period August 22, 2013, to August 22, 2014, with absolute precision.

All the above notwithstanding, Speedy Loan chose not to dispute Daye's methodology for calculating its net worth in the Response.   Under local rule 56.1(a), "[a]ll material facts set forth . . . will be deemed undisputed unless specifically controverted."  D.N.M. Local R. Civ. P. 56.1(a).   The Court thus deems Daye's methodology for computing Speedy Loan's net worth to be undisputed, and awards Daye and EFTA subclass members $12,693.40.

Daye and the TILA subclass plaintiffs request that the Court award additional damages with respect to Speedy Loan's TILA violations.   See MSJ at 20-25; Tr. at 31:17-32:16

---

[46]The Court uses these scenarios and hypothetical monthly net worth figures to illustrate the fallacy of division mathematically.  The Court does not suggest that Speedy Loan's net worth necessarily follows any of these cycles, nor does the Court suggest that the figure for any listed month is or approximates Speedy Loan's net worth for that month.

(Mattison).   The statutory ceiling on TILA damages is higher than the ceiling for EFTA damages; the Court may award up to the lesser of one million dollars or one percent of Speedy Loan's net worth, see 15 U.S.C. § 1640(a)(2)(B), plus reasonable attorney's fees, see 15 U.S.C. § 1640(a)(3), plus "an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material," 15 U.S.C. § 1640(a)(4).   When the Court computes TILA damages, it "shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional." 15 U.S.C. § 1640(a)(4).

The Court can readily assess many of these factors based on the case's undisputed facts, and all incline the Court to aim for a TILA damages award close to the statutory ceiling.   Speedy Loan's TILA violations were frequent and persistent, encompassing 25,976 loans over the one-year period that falls with the statute of limitations.   See MSJ ¶ 41, at 11 (stating this fact); Response ¶ 41, at 11 (not disputing this fact).[47]   Across these loans, Speedy Loan under-disclosed subclass borrowers' total of payments by $783,282.50.   See MSJ ¶ 43, at 12 (stating

---

[47]As noted on page 9 supra, Speedy Loan purports to dispute this fact.  See Response ¶ 41, at 6.   According to Speedy Loan, "[f]or each of the loans identified by Plaintiff, the payment schedule provided by the **PPD/ACH Authorization** provided with the loan by Speedy Loan . . . disclosed a sum of payments that exactly matched the Total of Payments disclosed on the loan contract."  Response ¶ 41, at 6 (emphasis added).   The Court notes that Daye and Speedy Loan point to two different and distinct documents.  The exhibit to which Daye refers the Court is the loan contract.  In contrast, Speedy Loan refers the Court to a separate document -- the PPD/ACH Authorization form that accompanies the loan contract.  Nowhere in the Response does Speedy Loan dispute the fact that Daye here asserts.   Because Speedy Loan does not dispute the asserted fact, the Court deems it undisputed.

this fact); Response ¶ 43, at 6 (not disputing this fact).[48]   The Court also has deemed Speedy

Loan's TILA violation to be intentional.   Although TILA does not supply the Court with an

algorithm by which to weigh each factor when determining appropriate damages, in this case all

four factors point in the same direction.   TILA offers the Court a bracketed range of damages

that it may award, from zero dollars on the low end to the sum of (i) one percent of Speedy

Loan's net worth; (ii) reasonable attorney's fees; and (iii) "an amount equal to the sum of all

finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure

to comply is not material" on the high end.   15 U.S.C. § 1640(a)(2)-(4).   The Court chooses a

middle way, awarding TILA subclass members one percent of Speedy Loan's net worth --

$12,693.40 -- plus reasonable attorney fees, but not awarding an amount equal to the sum of all

finance charges and fees that the TILA subclass members paid.

Daye and UPA subclass plaintiffs also petition the Court to award them UPA damages.

See MSJ at 17 & 25-26; Tr. at 39:3-5 (Mattison).   Under the UPA, the Court could award UPA

subclass members up to the difference between the represented cost of their loans and the true

costs of their loans if Speedy Loan's violated the UPA.   Daye calculates this amount to add to

$783,282.50.   See MSJ at 26.   The Court notes that the UPA sets this statutory cap but allows the

Court full discretion to award subclass members less than that amount as well.   See N.M.S.A.

1978 §§ 57-12-10(E)("In any class action filed under this section, the court may award damages

to the named plaintiffs as provided in Subsection B of this section and may award members of

---

[48]As noted on page 10 supra, Speedy Loan purports to dispute this fact.   See Response
¶ 43, at 6.   According to Speedy Loan, "[b]ecause the Plaintiff erred in its [sic] identification of
the Total of Payments and Finance Charge, as reflected in Undisputed Material Fact No. 41 and
42, she has erred in her calculation in this Undisputed Material Fact.   In actuality, neither the
Total of Payments nor the Finance Charge, is under-disclosed."   Response ¶ 43, at 6.   The
Court's previous conclusion that neither Undisputed Material Fact No. 41 nor Undisputed
Material Fact No. 42 is disputed fundamentally undermines Speedy Loan's purported dispute of
this fact as well.   The Court, therefore, deems the asserted fact undisputed.

the class such actual damages as were suffered by each member of the class as a result of the unlawful method, act or practice.")(emphases added).  The Court invokes this discretion and declines to choose a specific UPA damages amount at this time.

　　　**IT IS ORDERED** that: (i) Defendant Speedy Loan's Motion to Extend Deadline to File Its Response to Plaintiff's Motion for Summary Judgment, filed May 13, 2016 (Doc. 101), is granted, and the Court extends Speedy Loan's deadline to respond to Daye's motion for summary judgment until one week from the date that Speedy Loan receive the deposition transcripts; and (ii) the Plaintiff's Opposed Motion for Summary Judgment, filed April 5, 2016 (Doc. 89 Sealed Version)(Doc. 97 Public Version), is granted with respect to liability on her claim under the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693*i*-93r ("EFTA"), and damages are awarded to EFTA subclass members[49] in the amount of $12,693.40; (ii) the Plaintiff's Opposed Motion for Summary Judgment on her claim under the Truth in Lending Act, 15 U.S.C. §§ 1601-67f ("TILA") is granted with respect to liability, and damages are awarded to TILA subclass members[50] in the amount of $12,693.40; and (iii) the Plaintiff's Opposed Motion for

---

[49]The EFTA Subclass

consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, and whose loan was conditioned upon repayment by means of preauthorized electronic fund transfer. The members of the EFTA Subclass assert a right to relief under the EFTA.

Class Certification MOO at 3.

[50] The TILA Subclass

consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, in which EITHER (a) the loan paperwork disclosed a "Total of Payments" and "Finance Charge" lower than the true amounts, OR (b) the form contract did not state the dates upon which the first payment or any subsequent payments were due, or whether the payments were due weekly, monthly, or otherwise, or the number of payments.  The members of

- 120 -

Summary Judgment on her claim under the New Mexico Unfair Practices Act, N.M.S.A. 1978

§§ 57-12-1 to -26 ("UPA"), is granted with respect to liability, but denied with respect to present

award of UPA damages.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Charles M. Delbaum
National Consumer Law Center, Inc.
Boston, Massachusetts

-- and --

Richard N. Feferman
Nicholas H. Mattison
Feferman & Warren
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Alicia M. LaPado
Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorneys for the Defendant*

---

the TILA Subclass assert a right to relief under the TILA.

Class Certification MOO at 3.