# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CLARA DAYE,
On behalf of herself and all others similarly situated,

      Plaintiff,

vs.                                                                No. CIV 14-0759 JB/SCY

COMMUNITY FINANCIAL LOAN SERVICE
CENTERS, LLC, d/b/a SPEEDY LOAN

      Defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT,
## CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Requested Findings of Fact and Conclusions of Law, filed May 24, 2017 (Doc. 158)("Daye's FOFs"); (ii) the Defendant's Proposed Findings of Fact and Conclusions of Law, filed May 24, 2017 (Doc. 156)("Speedy's FOFs"); and (iii) the Opposed Motion to Strike Witnesses, filed May 13, 2016 (Doc. 95)("Motion to Strike").[1]  The Court held a bench trial on March 15, 2017.  See Transcript of Bench Trial, held March 15, 2017 ("Tr.").[2]  The primary issues are: (i) how much should the Plaintiffs recover on account of the misrepresentations of Defendant Community Financial Loan Service Centers, LLC, doing business as Speedy Loan, regarding the cost of its loans; and (ii) how much should the Plaintiffs recover on account of Speedy Loan's violations of

---

[1]The Court denied the Motion to Strike in an earlier Order, filed March 15, 2017 (Doc. 154)("Strike Order"), and the Court stated that it would "at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision."  Strike Order at 1 & n.1.  This Memorandum Opinion, Findings of Fact, Conclusions of Law, and Order is the promised opinion.

[2]The Court's citation to the transcript of the bench trial refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

New Mexico law regarding payday loans. The Court determines that Speedy Loan's misrepresentations did not damage the Plaintiffs, because those misrepresentations made Speedy Loan's loans appear more expensive than they actually were. Consequently, the named plaintiff can recover statutory damages and attorney's fees, but the unnamed plaintiffs can recover nothing. The Court also determines that Speedy Loan must return the interest and fees it collected from the Plaintiffs to the extent that it collected more than the New Mexico Small Loan Act, N.M. Stat. Ann. §§ 58-15-1 to -39, permits.

## FINDINGS OF FACT

The Plaintiffs and Speedy Loan have stipulated to some facts. See Pretrial Order ¶¶ 1-53, at 8-19, filed February 15, 2017 (Doc. 144)("Pretrial Order"). The proposed findings of facts and conclusions of law submitted by the parties agree on other facts. See, e.g., Daye's FOFs ¶ 9, at 2 (alleging that Speedy Loan made 31,082 loans during the time period covered by Daye's suit); Speedy's FOFs ¶ 9, at 2 (same).[3] The Court has carefully considered those stipulations and proposed findings, and it sets forth its findings ("FOFs") below.[4]

1.      Speedy Loan is a Delaware LLC. See Pretrial Order ¶ 2, at 8 (stipulated fact).

2.      Speedy Loan is a profitable business. See Pretrial Order ¶ 4, at 8 (stipulated fact).

---

[3]Although the parties express many of the background facts differently, they do not dispute many of those facts. The Court has, throughout its findings, synthesized the parties' proposed findings where they are fully compatible. In many cases, the Court adopts one party's finding and declines to adopt the other's finding for stylistic reasons: for example, where one party's proposed findings more completely discuss a fact than another party, the Court generally has adopted the more thorough discussion.

[4]Where the Court adopts one party's finding and declines to adopt an opposing party's finding for a substantive reason -- that is, because the evidence better supports one finding than another -- the Court explains the reason for that conclusion in the footnotes.

3. Speedy Loan is in the business of providing short term, unsecured loans to individuals and operates twelve loan stores in New Mexico. <u>See</u> Daye's FOFs ¶ 7, at 2; Speedy's FOFs ¶ 1, at 1.

4. Those loans are made "in the regular course of [Speedy Loan's] trade or commerce." Pretrial Order ¶ 15, at 10 (stipulated fact).

5. "Since at least August 22, 2010, Speedy has offered a single loan product, which it calls an 'installment loan.'" Pretrial Order ¶ 12, at 9 (stipulated fact).

6. "Speedy entered into 31,082 loans in New Mexico between August 22, 2010 and August 22, 2014." Pretrial Order ¶ 13, at 10 (stipulated fact). <u>See</u> Daye's FOFs ¶ 9, at 2; Speedy's FOFs ¶ 2, at 1.

7. To qualify for a loan, Speedy Loan required its customers "to have a bank account from which payments could be withdrawn through electronic fund transfer." Pretrial Order ¶ 16, at 10 (stipulated fact).

8. Speedy Loan required its customers to provide the account and routing numbers associated with such an account "[a]s part of the loan application process." Pretrial Order ¶ 17, at 10 (stipulated fact).

9. Speedy Loan required all of its customers to sign both a loan agreement and a "PPD/ACH [Prearranged Payment and Deposit/Automated Clearing House] Authorization" form. Pretrial order ¶¶ 18, 20, at 10-11 (stipulated facts). <u>See</u> Daye's FOFs ¶¶ 35-36, at 5.

10. All of Speedy Loan's loan agreements listed the "Total of Payments," and stated that the Total of Payments is the amount that the borrower "will have paid when [they] have made all scheduled payments." Pretrial Order ¶ 39, at 13 (stipulated fact).

11. Each loan agreement also contained a "Payment Schedule" and stated that the

borrower promised to pay "each installment payment as it becomes due as shown above in the Payment Schedule." Pretrial Order ¶ 38, at 12-13 (stipulated fact).

12. The loan agreements also provided:

> On or about the day each installment payment becomes due, you authorize us to affect [sic] one or more ACH [Automated Clearing House] debit entries to your Account at the Bank.
>
> You acknowledge that the account on which the Check/ACH Authorization is drawn is a legitimate, open, and active account.
>
> This document represents the final agreement between creditor and you and may not be contradicted by evidence of any alleged oral agreement.

Pretrial Order ¶ 19, at 10 (stipulated fact).

13. For each loan, the PPD/ACH Authorization form specified a "schedule of automatic debits from the customer's bank account." Pretrial Order ¶ 20, at 11 (stipulated fact).

14. Speedy Loan used that schedule of automatic debits to remind employees when they should withdraw money from the customer's bank account. See Pretrial Order ¶ 21, at 11 (stipulated fact).

15. The Total of Payments listed in all of the loan agreements was consistent with the schedule of automatic debits contained in the corresponding PPD/ACH Authorization form. See Daye's FOFs ¶ 73, at 17; Speedy's FOFs ¶ 14, at 3.

16. 25,976 of Speedy Loan's loan agreements, however, listed a Total of Payments that was "lower than the sum of payments disclosed in the Payment Schedule." Pretrial Order ¶ 40, at 13 (stipulated fact).

17. The total discrepancy between the Totals of Payments and the Payment Schedules was $783,282.50. See Pretrial Order ¶ 42, at 13 (stipulated fact).

18. Both Speedy Loan and its customers expected payments in accordance with the loan agreement's Total of Payments and the PPD/ACH Authorization form's schedule of

automatic debits and not in accordance with the loan agreement's Payment Schedule.  See Speedy's FOFs ¶ 16, at 3

19.     Speedy Loan "never attempted to collect the amounts identified in the Payment Schedule," and instead "collected the amounts on the PPD/ACH schedule."  Speedy's FOFs ¶ 16, at 3.[5]

20.     Speedy Loan "has known of the New Mexico Small Loan Act's provisions governing payday loans since at least August 22, 2010."  Pretrial Order ¶ 24, at 11 (stipulated fact).

21.     Speedy Loan's employee handbook included the following instructions as part of the process of giving a loan:

> Have the customer sign the PPD/ACH Authorization and again take it to ensure that you have it in your possession.  Remember to tell the customer that if they do not want the payment to come out of their account on the date shown, they must come in to the store and make the payment in cash, before 2:30 p.m. (Central time) on the business day before the ACH date.  You may ask the customer to initial individual items for emphasis but it is not required.  The signature is sufficient.
>
> . . . .
>
> Make copies of all of these documents, Contract, PPD/ACH Authorization (you need the original plus two copies of this document, original for file, one copy for the customer and one copy for the Installment PPD/ACH binder or drawer),

_____

[5]Daye neither stipulates to the facts in ¶¶ 18-19 nor proposes such facts in her FOFs.  The Court, however, credits the testimony of Daye, the named plaintiff, see Tr. at 46:5-10 (Kochersberger, Daye)(stating that Speedy Loan collected money in accordance with the PPD/ACH schedule); Kevin Dabney, President of Speedy Loan's Wisconsin operation, see Tr. at 87:23-24(Dabney)("The payments we were expecting was what was on the PPD/ACH form."); Luana Gaco, an unnamed plaintiff, see Tr. at 183:7-15 (Kochersberger, Gaco)(agreeing that Speedy Loan never tried to collect money "other than in accordance with that [PPD/ACH] payment schedule"); and Charles Robert Foster, another unnamed plaintiff, see Tr. at 201:23-202:13 (Kochersberger, Foster)(indicating that Foster expected to make the payments listed on the PPD/ACH schedule); Tr. at 203:14-16 (Kochersberger, Foster)(stating that none of Foster's loans "turn[ed] out to be different than [he] expected."), on this point.

Privacy Policy Statement, and the Installment Loan disclaimer. The copies go to the customer. We keep the originals! All Originals go in the customer file.

. . . .

Following this procedure is mandatory and will ensure that you are operating within the limits of the Truth in Lending Act [15 U.S.C. §§ 1601-67f] and other laws.

Speedy Loan Policy and Procedure Manual 14.23 (updated November 12, 2014)(CFSC_Daye_Discovery000277)(Exhibit 50). See Tr. at 2:22-3:23 (Mattison, Court, Kochersberger)(admitting, without objection, the fifty exhibits specified in the parties' amended consolidated exhibit list).

22. Speedy Loan required its customers, as a condition of receiving a loan, to provide a debit authorization giving Speedy Loan the authority to electronically transfer funds from the customer's bank account for repayment.[6]

---

[6]The Court concludes that Speedy Loan required, as a condition of obtaining a loan, its customers to authorize debit withdrawals as stated in the PPD/ACH Authorization form, because it credits Daye's testimony, see Tr. at 34:18-21(Mattison, Daye)(indicating that "Speedy Loan require[d] [Daye] to authorize these automatic withdrawals in order to get a loan"), and Speedy Loan's employee handbook's statements regarding the loan-origination process, see supra FOFs ¶ 21. In reaching that conclusion, the Court declines to credit the testimony of Kevin Dabney to the contrary, see Tr. at 98:14-24 (Dabney)(stating that, if a customer wanted to make all their payments in cash instead of via automated withdrawals, "all they had to do was tell us and we would accept that"), because the experience of Speedy Loan's customers and the instructions given to Speedy Loan's employees are more probative of Speedy Loan's actual practices in New Mexico than the post-litigation opinion of a Speedy Loan executive out of Wisconsin, see Tr. at 62:2-9 (Kochersberger, Dabney). Moreover, one can reconcile Dabney's testimony with Daye's testimony and Speedy Loan's employee handbook by construing Dabney's statement regarding cash payments as references to borrowers' ability to make individual payments in cash to avoid having money withdrawn from their bank account, see supra FOFs ¶ 21, and not to a supposed ability to avoid giving Speedy Loan an ACH authorization in the first place. The Court's conclusion is in accord with the Court's summary-judgment determination, based on undisputed facts, that: "The EFTA [Electronic Fund Transfer Act] explicitly proscribes lenders from requiring borrowers to preauthorize EFTs [Electronic Fund Transfers] as a precondition for a loan. See 15 U.S.C. § 1693k. Speedy Loan nevertheless required all borrowers to preauthorize just such EFTs." Memorandum Opinion and Order, 233 F. Supp. 3d 946, 1011, filed January 20, 2017 (Doc. 138).

23. "Between August 22, 2010 and August 22, 2014, 31,074 of [Speedy Loan's] 31,082 [New Mexico] loans charged more than the legal fee for payday loans." Pretrial Order ¶ 31, at 12 (stipulated fact).

24. Speedy Loan "collected $7,340,471.14 above the legal fee for payday loans." Pretrial Order ¶ 32, at 12 (stipulated fact).

25. Speedy Loan never included in its loan agreements "the disclosures required to accompany a payday loan" under New Mexico law. Pretrial Order ¶ 27, at 11 (stipulated fact).

26. Speedy Loan frequently renewed its loans. See Pretrial Order ¶ 34, at 12 (stipulated fact).

27. Speedy Loan did not afford "borrowers the right to enter an unsecured payment plan." Pretrial Order ¶ 25, at 11 (stipulated fact).

28. Speedy Loan did not afford borrowers "the right to rescind any of its loan documents." Pretrial Order ¶ 28, at 11 (stipulated fact).

29. All of Speedy Loan's loans had "repayment periods exceeding 35 days." Pretrial Order ¶ 29, at 12 (stipulated fact).

30. 12,189 of Speedy Loan's loans were "to be repaid in fewer than four payments" or had a term that was "less than 121 days." Pretrial Order ¶ 23, at 11 (stipulated fact).

31. Daye, the named plaintiff, took out four loans from Speedy Loan. See Daye's FOFs ¶ 10, at 2 ("Speedy made four loans to Ms. Daye."); Speedy's FOFs ¶ 34, at 6 ("Ms. Daye is the named Plaintiff in this case, and obtained and four loans from Speedy.").

32. To obtain those loans, Speedy Loan required Daye to authorize electronic fund transfers from her bank account for repayment of those loans. See supra FOFs ¶ 21. See also Daye's FOFs ¶ 15, at 3.

33.     Speedy Loan used that authorization to withdraw money from Daye's bank account to pay her loan.  See Pretrial Order ¶ 11, at 9 (stipulated fact).

34.     Daye would have preferred to make her loan payments in person, and pays her electricity, water, and car insurance bills in person.  See Tr. at 35:21-25 (Mattison, Daye)(stating that Daye "would have gone into the store to make [her] payments" if Speedy Loan "had given [her] the choice of not paying by automatic withdrawals"); id. at 36:10-15 (Mattison, Daye)(stating that Daye pays her "electricity bill, [her] water bill[,] [a]lso my insurance, my vehicle insurance bill" in person).[7]

35.     Daye repaid her four loans in full.  See Daye's FOFs ¶ 17, at 3; Speedy's FOFs ¶¶ 35-38, at 6.

36.     Daye believed that the PPD/ACH Authorization forms attached to her loan agreements "specified when [her] payments were going to be made and how much" she had to pay.  Tr. at 44:21-24 (Kocherberger, Daye).

37.     Daye "never paid any attention or even noticed" the loan agreements' Payment Schedules.  Tr. at 45:15-18 (Kochersberger, Daye).  See Speedy's FOFs ¶ 41, at 6.

38.     Daye never expected to make the payments that those Payment Schedules specify.  See Tr. at 46:1-4 (Kochersberger, Daye).  See Speedy's FOFs ¶ 41, at 6.

39.     "Speedy Loan never tried to collect payments [from Daye] in accordance with" that schedule.  Tr. at 46:5-7(Kochersberger, Daye).  See Speedy's FOFs ¶ 40, at 6.

40.     Speedy Loan "only took the payments that were reflected" on Daye's PPD/ACH Authorization forms.  Tr. at 46:8-10 (Kochersberger, Daye).  See Speedy's FOFs ¶ 40, at 6.

---

[7]Speedy Loan neither stipulates to this fact nor proposes an FOF to this effect, but the Court credits Daye's testimony on this point, because the record contains no contrary evidence.

41.     The Totals of Payments listed in the loan agreements "match[ed] up with" the payments listed in Daye's ACH/PPD Authorization forms.  Tr. at 47:10-13 (Kochersberger, Daye).[8]

42.     Kevin Dabney is the President of Speedy Loan Wisconsin -- a legal entity distinct from Speedy Loan -- and he acted as a consultant and overseer for Speedy Loan.  See Tr. at 62:14-19 (Kochersberger, Dabney).  See also Daye's FOFs ¶ 6, at 2.

43.     Speedy Loan used eCheckTrac software to generate the Payment Schedules in its loan agreements as well as the schedules on its PPD/ACH Authorizations forms.  See Tr. at 85:16-22 (Kochersberger, Dabney); id. at 86:2-7 (Kochersberger, Dabney).  See also Speedy's FOFs ¶ 11, at 2-3.

44.     Neither Speedy Loan's customers nor New Mexico regulators identified the discrepancies between those two sets of schedules.  See Tr. at 90:19-91:6 (Kochersberger, Dabney).

45.     State regulators regularly audited Speedy Loan, and Speedy Loan regularly conducted internal audits.  See Tr. at 75:11-77:2 (Kochersberger, Dabney); id. at 78:23-84:24 (Kochersberger, Dabney).

46.     Speedy Loan did not use the Payment Schedules in its loan agreements "for any purpose at all."  Tr. at 88:11-15 (Kochersberger, Dabney).[9]

---

[8]The parties did not stipulate to or mutually propose the facts in ¶¶ 36-41, but those facts were elicited by Speedy Loan while cross-examining Daye.  The Court credits that testimony, because the record contains no contrary evidence.

[9]The parties neither stipulate to nor mutually propose ¶¶ 43-46, but the Court credits Dabney's testimony on those points, and the record contains no contrary evidence.

47.     Speedy Loan's inclusion of inconsistent Payment Schedules and Totals of Payments in some of its loan agreements was not willful.[10]

48.     Luana Gaco, an unnamed class member who testified at trial, took out eight loans from Speedy Loan, and took six of them out between August 22, 2010 and August 22, 2014.  See Daye's FOFs ¶¶ 18-19, at 3; Speedy's FOFs ¶ 43, at 7.

49.     Gaco believed that making payments via automatic withdrawals was a requirement for obtaining those loans.  See Tr. at 178:6-7 (Gaco).

50.     Speedy Loan collected money from Gaco only in accordance with the payment schedules on her PPD/ACH Authorization Forms.  See Tr. at 183:7-15 (Kochersberger, Gaco).  See also Speedy's FOFs ¶ 54, at 8.

51.     Gaco relied on Speedy Loan "to give [her] ACH alternate information and [to] follow the law."  Tr. at 186:17-19 (Mattison, Gaco).[11]

52.     Charles Robert Foster is an unnamed class member who took out eight loans from Speedy Loan, and he took six of those loans out between August 22, 2010 and August 22, 2014.  See Daye's FOFs ¶ 27, at 4; Speedy's FOFs ¶ 58, at 8.

---

[10]The Court makes this finding, because Speedy Loan's eChecTrac software -- and not Speedy Loan's deliberate action -- generated the inconsistent Totals of Payments and Payment Schedules.  See supra FOFs ¶ 43.  Those inconsistencies made Speedy Loan's loans appear more expensive than they actually were, see supra FOFs ¶ 16 (stating that some loan agreements contained a Total of Payments that was lower than the sum of the payments specified by its Payment Schedule); supra FOFs ¶¶ 18-19(finding that Speedy Loan collected money from its customers in accordance with the loan agreement's Total of Payments and the PPD/ACH Authorization form and not in accordance with the loan agreement Payment Schedule).  Consequently, Speedy Loan has no apparent motive to include these inconsistencies in its loan agreements.

[11]The parties neither stipulate to nor mutually propose ¶¶ 49-51, but the Court credits Gaco's testimony on these points, and the record contains no contrary evidence.

53.     Speedy Loan told Foster that he "could come in and pay cash," and that he "could come in and pay off the money early."  Tr. at 197:24-198:3 (Kochersberger, Foster).

54.     Foster looked to the payment schedules on his PPD/ACH Authorization forms to determine what he was going to pay and when his payments were due.  <u>See</u> Tr. at 201:23-202:10 (Kochersberger, Foster).

55.     Foster never noticed the Payment Schedule on the first page of his loan agreements.  <u>See</u> Tr. at 202:11-13 (Kochersberger, Foster).[12]

## CONCLUSIONS OF LAW

The Court will now state its conclusions of law ("COLs").  The Court will begin by summarizing the case's procedural history.  It will then set out the law regarding issues relevant to its analysis.  The Court will then present that analysis.

## PROCEDURAL BACKGROUND

1.     The case's procedural history includes Daye's Complaint for Damages, filed August 22, 2014 (Doc. 1)("Complaint"); class certification, <u>see</u> Memorandum Opinion and Order, 313 F.R.D. 147, filed February 9, 2013 (Doc. 82)("Class Certification MOO"); and partial summary judgment, <u>see</u> Memorandum Opinion and Order, 233 F. Supp. 3d 946, filed January 20, 2017 (Doc. 138)("SJ MOO").  It also includes a bench trial; written closing arguments, <u>see</u> Plaintiff's Closing Argument at 2, filed May 24, 2017 (Doc. 159)("Daye's Closing"); Speedy Loan's Closing Argument at 1, filed May 24, 2017 (Doc. 157)("Speedy's Closing"); and proposed FOFs.

---

[12]The parties neither stipulate to nor mutually propose ¶¶ 53-55, but the Court credits Foster's testimony on these points, and the record contains no contrary evidence.

1.      **The Complaint.**

2.      On August 22, 2014, Daye filed her Complaint.  See Complaint at 1.  Daye asserts that Speedy Loan violated both federal law -- specifically the Truth in Lending Act, 15 U.S.C. §§ 1601-67f ("TILA"), and the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693-93r ("EFTA") -- as well as state law -- specifically the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("UPA") and the New Mexico Small Loan Act, N.M. Stat. Ann. §§ 58-15-1 to -39 ("Small Loan Act").  Complaint ¶ 7, at 2.

3.      In the Complaint, Daye asserts four distinct claims for relief.  First, Daye asserts that "[t]he payday loans made to Ms. Daye, along with every other payday loan with like characteristics, violated the New Mexico Small Loan Act" such that those loans are void. Complaint ¶ 75, at 13.  Consequently, according to Daye, "all borrowers who entered into void loans are entitled to the return of all interest and other charges other than principal," Complaint ¶ 76, at 13, and, "[i]n the alternative, Speedy would be unjustly enriched by being permitted to retain or collect amounts in excess of the legally permitted rate [of interest], and should be required to disgorge such amounts and be prohibited from collecting any further unlawful amounts," Complaint ¶ 77, at 13.

4.      Second, Daye asserts a claim for TILA "statutory damages plus costs and reasonable attorney fees."  Complaint ¶ 79, at 13.

5.      Third, Daye asserts a claim for EFTA "statutory damages plus costs and reasonable attorney fees."  Complaint ¶ 81, at 14.

6.      Fourth, Daye asserts a UPA claim for "actual damages, trebled, including all money paid to Speedy in excess of the principal amount loaned, plus costs and reasonable

attorney fees," Complaint ¶ 84, at 14, and for "injunctive relief which enjoins Speedy from continuing to collect unlawful amounts on its illegal payday loans," Complaint ¶ 85, at 15.

### 2. **Class Certification.**

7. On February 9, 2016, the Court certified a class action under rule 23 of the Federal Rules of Civil Procedure. <u>See</u> Class Certification MOO, 313 F.R.D. at 152. The class consists of all persons who entered into a loan with Speedy Loan between August 22, 2010, and August 22, 2014, when Daye filed her Complaint. <u>See</u> Class Certification MOO, 313 F.R.D. at 152.

8. The Court also certified four subclasses. <u>See</u> Class Certification MOO, 313 F.R.D. at 174. The four subclasses are as follows:

1. The "Payday Loan Subclass" consists of all members of the class who entered into a loan with Speedy beginning four years prior to the filing of this action, and EITHER (a) Speedy conditioned the loan upon repayment by means of preauthorized debit authorization OR (b) Speedy accepted preauthorized debit authorization and either the loan was to be repaid in fewer than four payments, or the term of the loan was less than 120 days. The members of the Payday Loan Subclass assert a right to relief under the UPA and other legal theories for Speedy's illegal payday loans.

2. The "EFTA Subclass" consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, and whose loan was conditioned upon repayment by means of preauthorized electronic fund transfer. The members of the EFTA Subclass assert a right to relief under the EFTA.

3. The "TILA Subclass" consists of all members of the class who entered into a loan with Speedy beginning one year prior to the filing of this case, in which EITHER (a) the loan paperwork disclosed a "Total of Payments" and "Finance Charge" lower than the true amounts, OR (b) the form contract did not state the dates upon which the first payment or any subsequent payments were due, or whether the payments were due weekly, monthly, or otherwise, or the number of payments. The members of the TILA Subclass assert a right to relief under the TILA.

4. The "Deceptive Disclosure Subclass" consists of all members of the class who entered into a loan with Speedy that disclosed a "Total of Payments" and

"Finance Charge" lower than the true amounts. The members of the Deceptive Disclosure Subclass assert a right to relief under the UPA.

Class Certification MOO, 313 F.R.D. at 152-53 (quoting Brief in Support of Plaintiff's Opposed Motion for Class Certification at 3-4, filed November 27, 2015 (Doc. 61)).

**3.    The Motion to Strike.**

9.    On March 28, 2016, Speedy Loan submitted a witness list containing five new witnesses -- including two witnesses, Luana Gaco and Charles Robert Foster, who ultimately testified at trial -- whom Speedy Loan had not disclosed. See Community Financial Service Centers, LLC's Witness List 3-4, filed April 18, 2016 (Doc. 95-1); supra FOFs ¶¶ 48, 52 (identifying Gaco and Foster as testifying witnesses). Daye moved the Court to strike the five new witnesses on the grounds that the additional witnesses prejudiced her; she stated that, even if she were able to depose the new witnesses, she would need to review voluminous documents in a short time and would be unable to send follow-up written discovery or take follow-up depositions. See Motion to Strike ¶ 15, at 4.

10.    After Daye filed the Motion to Strike, however, Daye deposed two of the five new witnesses, and Speedy Loan withdrew the other three new witnesses from its witness list. See Transcript of Hearing at 5:24-6:4 (taken September 6, 2016)(Mattison)("Strike Tr.").[13] Daye also conceded at the hearing that she has been able to conduct some written discovery, such that the additional witnesses no longer prejudice her. See Strike Tr. at 6:22-7:3 (Mattison). Accordingly, the Court concludes that Speedy Loan's delay does not prejudice Daye in any way and is harmless.

---

[13]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version. Any final version may contain slightly different page and/or line numbers.

### 4. **Summary Judgment.**

11. On January 20, 2017, the Court granted in part and denied in part the Plaintiff's Opposed Motion for Summary Judgment, filed April 5, 2016 (Doc. 89 Sealed Version)(Doc. 97 Public Version). See SJ MOO, 233 F. Supp. 3d at 1020-21.

12. The Court determined that, under the Small Loan Act, "Speedy Loan's loans at issue in this case are payday loans even though Speedy Loan sometimes characterizes them as installment loans," SJ MOO, 233 F. Supp. 3d at 1012, and that Speedy Loan "require[d] borrowers to preauthorize debit authorizations as a condition for receiving a loan," SJ MOO, 233 F. Supp. 3d at 1016.

13. The Court concluded that Speedy Loan violated the TILA and the EFTA, and awarded damages accordingly. See SJ MOO, 233 F. Supp. 3d at 1011-12 (concluding that Speedy Loan violated the TILA and the EFTA); id. at 1016-1020 (awarding statutory damages under the TILA and the EFTA). The Court also concluded "that Speedy Loan, for UPA purposes, intentionally reported different totals of payments in the TILA Box and the payment schedule for Daye's loans," SJ MOO, 233 F. Supp. 3d at 1012, but "decline[d] to choose a specific UPA damages amount at th[at] time," SJ MOO, 233 F. Supp. 3d at 1020. The Court reasoned that it "could award UPA subclass members up to the difference between the represented cost of their loans and the true costs of their loans," and that "the UPA sets this statutory cap but allows the Court full discretion to award subclass members less than that amount as well." SJ MOO, 233 F. Supp. 3d at 1020.

### 5. **The Bench Trial.**

14. The Court held a bench trial on March 15, 2017, and the parties began with opening statements. See Tr. at 2:14-16 (Court).

15.     In her opening statement, Daye observed that the Court "ha[d] already included in its [SJ MOO] that all of the defendant's loans between August 22, 2010 and August 22, 2014, were payday loans under New Mexico law." Tr. at 11:14-17 (Mattison).  Daye asserted both that Speedy Loan "charged higher rates than what was permitted" for payday loans, Tr. at 12:7-8 (Mattison), and that Speedy Loan "disclosed [a] total of payments on the loans" that was less than "the borrowers' payment obligation," Tr. at 15:15-17 (Mattison).

16.     Speedy Loan, in its opening statement, framed the issues remaining before the Court as questions regarding the "damages suffered by the customers alleg[edly] as a result of these loans being payday loans and not installment loans."  Tr. at 16:16-19 (Kochersberger). Speedy Loan asserted that its violations of New Mexico law were unknowing, see Tr. at 16:21-22 (Kochersberger), that it did not benefit from those violations, see Tr. at 17:9-10 (Kochersberger), and that those violations did not harm its customers, because they "got the exact deal from Speedy Loan that they wanted," Tr. at 17:14-15 (Kochersberger).  Consequently, according to Speedy Loan, this case "is a situation where despite violating the law no one was really damaged."  Tr. at 18:15-16 (Kochersberger).

17.     Daye then began to present her case by calling Daye to the stand.  See Tr. at 26:23-24 (Mattison).  Daye testified that she took out and repaid four loans from Speedy Loan, see Tr. at 30:20-24 (Mattison, Daye), and that Speedy Loan required her to authorize automatic withdrawals from her bank account "in order to get a loan," Tr. at 34:18-21 (Mattison, Daye).

18.     Daye also testified that her payments to Speedy Loan were taken out of her bank account on the day on which she was paid her Navajo Nation retirement benefits.  See Tr. at 34:22-35:1 (Mattison, Daye).  Daye said that, if she had not been required to authorize automatic withdrawals, she would have made her payments in person at Speedy Loan's store just as she

paid her bills for electricity, water, and car insurance.  See Tr. at 35:21-25, 36:10-15 (Mattison, Daye).

19.     On cross-examination, Speedy Loan showed Daye a copy of one of her loan agreements and a copy of her corresponding PPD/ACH Authorization form.  See Tr. at 44:5-20 (Kochersberger, Daye).  Daye stated that the her other loan agreements were "pretty similar" to the one presented to her on the stand, Tr. at 44:12-14 (Kochersberger, Daye), and that a PPD/ACH Authorization form -- "substantially similar" to the one presented to her on the stand -- accompanied each agreement, Tr. at 44:15-18, 44:25-45:2 (Kochersberger, Daye).   Daye admitted: (i) that the PPD/ACH Authorization form "specified when [her] payments were going to be made and how much," Tr. at 44:21-24 (Kochersberger, Daye); (ii) that she "never paid any attention or even noticed" the loan agreement's Payment Schedule, Tr. at 45:15-18 (Kochersberger, Daye); (iii) that she never expected to make the payments specified by that Payment Schedule, see Tr. at 46:1-4(Kochersberger, Daye); (iv) that "Speedy Loan never tried to collect payments in accordance with" that schedule, Tr. at 46:5-7 (Kochersberger, Daye); (v) that Speedy Loan "only took the payments that were reflected" on the PPD/ACH Authorization form, Tr. at 46:8-10 (Kochersberger, Daye); and (vi) that the total of payment listed in the loan agreement "match[ed] up with" the payments listed in the ACH/PPD Authorization form, Tr. at 47:10-13 (Kochersberger, Daye).

20.     Once Daye finished testifying, Daye indicated that she had no more witnesses or evidence to present.  See Tr. at 60:12-15 (Court, Mattison).

21.     Speedy Loan called Kevin Dabney to the stand.  See Tr. at 61:19 (Kochersberger). Dabney stated that he was the President of Speedy Loan Wisconsin, which is "a different legal entity from the one that's named in this lawsuit," Tr. at 62:1-9 (Kochersberger, Dabney), and that

he acted as an overseer and consultant for Speedy Loan New Mexico, see Tr. at 62:14-19 (Kochersberger, Dabney).

22. Dabney described the loan application process in New Mexico. See Tr. at 64:1-72:5 (Kochersberger, Dabney).

23. Dabney then described how state regulators audit Speedy Loan, see Tr. at 75:11-77:2, 83:1-84:24 (Kochersberger, Dabney), as well as Speedy Loan's internal audit procedure, see Tr. at 78:23-82:25 (Kochersberger, Dabney).

24. Dabney then stated that the eCheckTrac software used by Speedy Loan generated the Payment Schedule listed on the first page of Speedy Loan's loan agreements. See Tr. at 85:9-11 (Dabney). According to Dabney, the same software generated the payment schedule listed on the "PPD/ACH authorization form," Tr. at 85:16-22 (Kochersberger, Dabney), which matches the "box labeled total of payments" on the first page of Speedy Loan's loan agreements, see Tr. at 86:2-7 (Kochersberger, Dabney).

25. Dabney indicated that Speedy Loan expected to receive payments in accordance with the PPD/ACH form and not the schedule listed on the first page of the loan agreements. See Tr. at 87:20-24 (Kochersberger, Dabney). According to Dabney, Speedy Loan does not "utilize that payment schedule from the first page of the contract for any purpose at all." Tr. at 88:11-15 (Kochersberger, Dabney).

26. Dabney suggested that the payment schedule on the first page is an artifact "from an older contract that we never saw or our attorney never caught," Tr. at 88:14-19 (Kochersberger, Dabney), although he could not determine with specificity how that happened, see Tr. at 89:22-25 (Kochersberger, Dabney). Dabney asserted that neither customers nor

government regulators identified the discrepancies between the two payment schedules.  See Tr. at 90:19-91:6 (Kochersberger, Dabney).

27.     Dabney also asserted that Speedy Loan did not benefit from requiring its customers to authorize automated withdrawals, because, "[p]rior [to] our ability to use ACH, if you look at our bad debt then and you look at our bad debt after the ability to use ACH the bad debt didn't change."  Tr. at 91:13-17 (Dabney).

28.     On cross-examination, Dabney indicated that he did not think that it was possible that borrowers ended up paying more than the amount listed "in the total of payments on the face of the contract."  Tr. at 125:7-11 (Mattison, Dabney).

29.     Speedy Loan then called Luana Gaco, one of unnamed plaintiffs, to the stand.  See Tr. at 171:13-15 (Kochersberger, Gaco).  Gaco stated that she had taken out a loan from Speedy Loan "[a]bout three times, maybe."  Tr. at 173:22 (Gaco).

30.     Gaco also stated that, when she went to Speedy Loan's store to take out her first loan, she wanted Speedy Loan to withdraw her loan payments directly from her bank account, see Tr. at 177:22-182:2 (Kochersberger, Gaco), because "[t]hat's the easiest way for us to pay our bills," Tr. at 178:14-15 (Gaco).

31.     Gaco testified that, when she took out her loans, she "was under the impression that" paying via automatic withdrawal "was a requirement."  Tr. at 178:6-7 (Gaco).

32.     Gaco indicated that Speedy Loan only collected money in accordance with the payment schedule on the PPD/ACH Authorization Form.  See Tr. at 183:7-15 (Kochersberger, Gaco).

33.     On cross examination, Gaco stated that she relied on Speedy Loan "to give [her] ACH alternate information and [to] follow the law."  Tr. at 186:17-19 (Mattison, Gaco).

34. Speedy Loan then called Charles Robert Foster, another unnamed plaintiff, to the stand. See Tr. at 193:2 (Foster). Foster stated that he borrowed money from Speedy Loan. See Tr. at 194:22-24 (Kochersberger, Foster).

35. Foster stated that he wanted to make is payments via automatic deductions from his checking account. See Tr. at 196:14-24 (Kochersberger, Foster). Foster also stated, when asked whether Speedy Loan gave him an option to pay in a different way, that "they told me I could come in and pay cash, I could come in and pay off the money early if I had the money." Tr. at 197:24-198:3 (Kochsberger, Foster).

36. Foster testified that he looked to the payment schedule on the PPD/ACH Authorization Form to determine what he was going to pay and when his payments were due. See Tr. at 201:23-202:10 (Kochersberger, Foster). Foster also testified that he never noticed the Payment Schedule on the first page of his loan contract. See Tr. at 202:11-13 (Kochersberger, Foster).

37. The Court then concluded the bench trial with a determination that the parties were to submit written closing statements and proposed FOFs. See Tr. at 211:14-19, 212:9-12 (Court).

**6.      Closing Statements.**

38. In her closing statement, Daye argues that, "[i]n enacting the 2007 amendments [to the Small Loan Act], the New Mexico legislature focused on payday loans as a particularly risky product for consumers," and concludes that, "if lenders want the competitive advantage provided by debit authorizations, they had to offer lower fees and provide additional protections." Daye's Closing at 2. According to Daye, that lenders use post-dated checks and debit authorizations is dangerous for consumers, because it

puts lenders "first in line" to be paid (rather than being "just another bill"). Because the payday loan is tied to a borrower's payday, the lender can be reasonably sure the check will clear. Most borrowers will simply run out of money to cover their expenses before the end of the month, often taking out more loans (and paying more fees) to pay for the expenses.

Daye's Closing at 2 (quoting Susanna Montezemolo, <u>Center for Responsible Lending</u>, <u>Payday Lending Abuses and Predatory Practices</u> at 2 (2013), http://www.responsiblelending.org/state-of-lending/reports/10-Payday-Loans.pdf).

39.     Daye then argues that the Deceptive Disclosure Subclass should be able to recover -- "as damages pursuant to the UPA" -- the "fees that Speedy actually collected from class members in excess of the return of principal and fees authorized by statute." Daye's Closing at 4.

40.     Daye also argues that the Payday Loan Subclass needs injunctive relief "to prevent Speedy from collecting amounts above the legally permitted amount," because some class members still have outstanding loan balances with Speedy." Daye's Closing at 6.

41.     According to Daye, Speedy Loan "misrepresented and understated the actual cost of its loans" by disclosing, in 25,976 of its loans, a Total of Payments lower than the "contractual payment obligation stated in the Payment Schedule on the face of the loan," which "made Speedy's loans appear less expensive than they actually were." Daye Closing at 12.

42.     Daye thus argues that the Deceptive Disclosure Subclass should be able to recover under the UPA "difference between the true and represented price" of the loans -- $783,282.50. Daye's Closing at 12-13.

43.     Daye asserts that the PPD/ACH Authorization forms' payment schedules are irrelevant to the Deceptive Disclosure Subclass' UPA claims, even if Speedy Loan's customers expected to pay in accordance with those schedules and even if those schedules matched the Total of Payments stated in the loan contracts, because the Payment Schedule on the face of the

loan contracts -- and not the PPD/ACH Authorization forms' payment schedules -- constitutes Speedy Loan's customers' actual legal obligation. <u>See</u> Daye's Closing at 13-14.

44.     In its closing argument, Speedy Loan argues that the "Plaintiffs failed to prove at trial that the class members have been damaged, and Speedy respectfully requests that the award be limited to $400 in statutory damages allowable to Ms. Daye, the only named plaintiff in this case." Speedy's Closing at 1.

45.     Speedy Loan states that it "believed that it was providing installment loans" and that it inadvertently made loans with "terms less than 120 days," which meant that those loans could not qualify as installment loans. Speedy's Closing at 2.

46.     Turning to the discrepancy between the Total of Payments and the Payment Schedule on the face of its loan contracts, Speedy Loan argues that it charged its customers in accordance with the schedule of payments listed on the PPD/ACH Authorization form, which agreed with the Total of Payments, and not in accordance with the Payment Schedule. <u>See</u> Speedy's Closing at 4-5. Consequently, according to Speedy Loan, "[t]he implied calculated larger finance charge from the Payment Schedule was never collected or paid." Speedy's Closing at 5.

47.     Speedy Loan then contends that, under the UPA, unnamed class members can recover only their actual damages. <u>See</u> Speedy's Closing at 10-11.

48.     Speedy Loan also contends that the Payday Loan Subclass has suffered no actual damages, even though Speedy Loan charged more than the "allowable payday loan fees," because Speedy Loan's customers "received exactly the loan that they expected and agreed to." Speedy's Closing at 11-12.

49.     What is more, according to Speedy Loan, the "Plaintiffs now seek the benefits of the lower payday loan fees without the drawbacks (the shorter term and restricted limits on principal, for example)." Speedy's Closing at 13. Thus, again according to Speedy Loan, "[i]t makes little sense to attempt to place the borrowers in the position they would have been in had they been offered payday loans." Speedy's Closing at 14.

50.     Speedy Loan argues that the discrepancy between the Total of Payments and the Payment Schedule on the face of its loan contracts caused no actual damages, because "in every case the borrower actually paid the *lesser* amount of the two incongruous representations." Speedy's Closing at 16 (emphasis in original).

51.     Speedy Loan concludes by observing that its "mistakes did not damage any of the customers" and by "request[ing] that the Plaintiffs' recovery be limited to statutory damages for the named plaintiff and attorney fees." Speedy's Closing at 18.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

52.     Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[14]  If the Court finds only an opinion from the Court of Appeals of New Mexico, the Court "certainly may and will consider the Court of Appeal[s'] decision in making its determination, [but] the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[15]

---

[14]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct; such predictions produce disparate results between cases filed in state and federal courts, because state supreme court precedent, even when it is outdated, usually binds state trial courts.  The factors to which a federal court should look before predicting that a state supreme court will overrule its precedent vary depending upon the case, but such factors consistently include: (i) the age of the state supreme court decision in question -- the younger the state case, the less likely departure is warranted; (ii) the doctrinal reliance, or lack thereof, that the state courts -- especially the state supreme court -- have placed on the state decision; (iii) apparent shifts away from the doctrine that the state decision articulates, especially more recent state supreme court decisions that explicitly call an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if most of the dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, if a federal court predicts that a state supreme court decision would be overruled, that decision is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[15]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The Court may also rely on decisions by the United States Court of Appeals for the Tenth Circuit

interpreting New Mexico law.   See Anderson Living Trust v. WPX Energy Prod., LLC, 27

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> .  .  .   We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

F. Supp. 3d at 1243 & n.30.[16]  Ultimately, "the Court's task is to predict what the state supreme

court would do."  Wade v. EMCASCO Ins. Co., 483 F. 3d at 666.  Accord Mosley v. Titus, 762

_____

[16]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

    The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the judge's identity pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

- 26 -

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.), the Tenth Circuit said that,

     [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp, 353 F.3d at 866. From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

     It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

     In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

     Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, *Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING THE NEW MEXICO UNFAIR PRACTICES ACT

53.     "The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins. Co., at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 22, 227 P.3d 73, 80)). "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096.[17]

54.     To state a claim under the UPA for an unfair or deceptive practice, a complaint must allege:

---

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

[17]In this diversity case, the Court must look to how the Supreme Court of New Mexico, rather than the Court of Appeals of New Mexico, would resolve the case. Federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue. See Erie, 304 U.S. at 78. In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict how the state's highest court would rule if presented with the same case. See Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007). When making an Erie guess, a federal court should follow intermediate state-court decisions "'unless other authority convinces us that the state supreme court would decide otherwise.'" Koch v. Koch Industries, Inc., 203 F.3d 1202, 1230 (10th Cir. 2000)(quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir. 1984)). The Court will, accordingly, apply New Mexico law as articulated in Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332.

(1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 5, 166 P.3d at 1093 (citing N.M. Stat. Ann. § 57-12-12(D); Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311)).  "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338.

55. Under the UPA, unconscionable trade practices include

act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:

(1) take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2) result[] in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57-12-2(E).  Accordingly, a trade practice can be procedurally unconscionable, under § 57-12-2(E)(1), or substantively unconscionable, under § 57-12-2(E)(2). See Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.")

56.    "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08.

57.     Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns." Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907. A contractual term is substantively unconscionable if it is illegal, or if it "is grossly unreasonable and against our public policy under the circumstances," Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 31, 308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," State ex rel. King v. B &B Investment Group, Inc., 2014-NMSC-024, ¶ 33, 329 P.3d 658, 670. Moreover, the UPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits." State ex rel. King v. B &B Investment Group, Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 671.

58.     Under the UPA, "[a]ny person who suffers any loss of money or property, real or personal, as a result of any . . . method, act or practice declared unlawful by the [UPA] may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater." N.M. Stat. Ann. § 57-12-10(B). UPA plaintiffs do not need to show actual damages, or the actual loss of money or property to recover statutory damages, however. See Lohman v.

<u>Daimler-Chrysler Corp.</u>, 2007-NMCA-100, ¶ 44, 166 P.3d at 1099-1100 ("[T]he UPA does not

require proof of actual monetary or property loss.").[18]

---

[18]The Court is at a loss to explain this interpretation of the UPA's statutory language, which makes statutory damages available to "[a]ny person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act." N.M. Stat. Ann. § 57-12-10(B). The Court agrees with the straightforward reading of the statutory text that the Supreme Court of New Mexico articulated:

> The first remedy under the statute, injunctive relief, expressly is not conditioned upon proof of monetary loss. Any person *likely* to be damaged by an unfair or deceptive trade practice of another may obtain such relief; monetary loss is "not required." Section 57-12-10(A). For example, relief under this provision might be had by one commercial enterprise from the deceptive advertising campaign of another. A competitor might complain that their company could suffer loss of market share and profits because the public might be deceived. . . .
> In contrast, recovery of damages under paragraph (B) includes only those persons "who suffer any loss of money or property." The paragraph authorizes recovery of "actual damages" or the sum of one hundred dollars, whichever is greater. Section 57-12-10(B). Such damages might be suffered either by a consumer of goods or services, or the commercial competitor of an enterprise engaged in deceptive trade practices. However, in either case the aggrieved party must produce evidence of "loss of money or property" as a result of the practice.

<u>Page and Wirtz Const. Co. v. Solomon</u>, 1990-NMSC-063, ¶¶ 21-22, 794 P.2d 349, 354-55 (emphasis in original). In the next paragraph, however, the Supreme Court of New Mexico, without explanation, reached a contrary conclusion: "The record in this case reflects no such [monetary or property] loss. Therefore, recovery is limited to one hundred dollars . . . ." 1990-NMSC-063 ¶ 23, 794 P.2d at 355. Eight years later, the New Mexico Court of Appeal elaborated on that head-scratching holding:

> The court [below] erred in linking recovery under the UPA to proof of actual damages. Section 57-12-10(B) authorizes the recovery of "actual damages or the sum of one hundred dollars ($100), whichever is greater." In *Page & Wirtz Construction Co. v. Solomon,* 110 N.M. 206, 212, 794 P.2d 349, 355 (1990) (citing § 57-12-10(B)), the Supreme Court held that if a plaintiff produces no evidence showing loss of money or property, "recovery is limited to one hundred dollars, which may be trebled by the court when the party willfully has engaged in the unfair or deceptive practice." Thus, Plaintiff was only required to put on evidence of his actual losses as it pertained to recovery of actual damages. In the absence of actual losses, Plaintiff is still entitled under UPA to recover the statutory damages of one hundred dollars.

59.     In a class action under the UPA, statutory damages are available only to the named plaintiff whereas class members can recover only their actual damages.  <u>See</u> N.M. Stat. Ann. § 57-12-10(B).

60.     Injunctive relief under the UPA is available to people "likely to be damaged by an unfair or deceptive trade practice . . . under the principles of equity and on terms that the court considers reasonable.  Proof of monetary damage, loss of profits or intent to deceive or take unfair advantage of any person is not required."  N.M. Stat. Ann. § 57-12-10(A).

61.     "The court shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails."  N.M. Stat. Ann. § 57-12-10(C).

## NEW MEXICO LAW REGARDING SMALL LOANS

62.     The Small Loan Act states that a payday loan is "a loan in which the licensee accepts a personal check or debit authorization tendered by the consumer and agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date agreed to by the licensee and the consumer."  N.M. Stat. Ann. § 58-15-2(H).  The term "payday loan":

---

Jones v. General Motors Corp., 1998-NMCA-020, ¶ 23, 953 P.2d 1104, 1109.  The Court cannot, however, take its own, independent view of state law and must, instead, defer to New Mexico courts on questions of New Mexico law.  <u>See</u> <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938)("[W]hether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.").  Consequently, the Court will apply the UPA as the Supreme Court of New Mexico and the Court of Appeals of New Mexico applied the statute in <u>Page and Wirtz Const. Co. v. Solomon</u> and <u>Jones v. General Motors Corp.</u>, respectively.

(1) includes any advance of money or arrangement or extension of credit whereby the licensee, for a fee, finance charge or other consideration:

>   (a) accepts a dated personal check or debit authorization from a consumer for the specific purpose of repaying a payday loan;

>   (b) agrees to hold a dated personal check or debit authorization from a consumer for a period of time prior to negotiating or depositing the personal check or debit authorization; or

>   (c) pays to the consumer, credits to the consumer's account or pays another person on behalf of the consumer the amount of an instrument actually paid or to be paid pursuant to the New Mexico Small Loan Act of 1955; but

(2) does not include:

>   (a) an overdraft product or service offered by a banking corporation, savings and loan association or credit union; and

>   (b) installment loans.

N.M. Stat. Ann. § 58-15-2(H)(1)-(2).

63. An installment loan, on the other hand, is "a loan that is to be repaid in a minimum of four successive substantially equal payment amounts . . . with a period of no less than one hundred twenty days to maturity," for which the lender does not "require[], as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan." N.M. Stat. Ann. § 58-15-2(E).

64. Installment loans cannot be payday loans, see N.M. Stat. Ann. § 58-15-2(H)(2)(b), so when a lender "accepts" -- but does not require -- "a personal check or debit authorization tendered by the consumer," N.M. Stat. Ann. § 58-15-2(H), the loan qualifies is a payday loan only if it does not qualify as an installment loan, i.e., it is to be repaid in less than four payments, it is to be repaid in payments that are not substantially equal, or it has a period "of less than one hundred twenty days to maturity," N.M. Stat. Ann. § 58-15-2(E). When a lender "requires, as a condition of making the loan, the use of post-dated checks or debit

authorizations for repayment of that loan," the loan cannot be an installment loan, N.M. Stat. Ann. § 58-15-2(E), so the loan is a payday loan so long as the lender "agrees in writing to defer presentment of that check or use of the debit authorization until the consumer's next payday or another date," N.M. Stat. Ann. § 58-15-2.

65. The Small Loan Act imposes certain requirements on payday loans. <u>See</u> N.M. Stat. Ann. § 58-15-33.

66. Payday lenders cannot charge interest on a payday loan, but they can charge "an administrative fee of not more than fifteen dollars fifty cents ($15.50) per one hundred dollars ($100) of principal . . . payable in full at the end of the term of the payday loan," and they can charge "an additional administrative fee of not more than fifty cents ($.50) per executed new payday loan agreement." N.M. Stat. Ann. § 58-15-33.

67. Payday loans cannot "have a stated maturity greater than thirty-five days," cannot "have a stated minimum term less than fourteen days unless agreed to in writing by the consumer," and must include "a scheduled pay date for the consumer within [its] term." N.M. Stat. Ann. § 58-15-32(B).

68. Lenders cannot "enter into an agreement for a renewed payday loan or otherwise refinance or extend the term of a payday loan." N.M. Stat. Ann. § 58-15-34(A). A renewed payday loan is "a loan in which a consumer pays in cash the administrative fee payable under a payday loan agreement and refinances all or part of the unpaid principal balance of an existing payday loan with a new payday loan from the same licensee." N.M. Stat. Ann. § 58-15-2(K).

69. Instead, lenders must offer borrowers the opportunity to enter into an interest-free, no-fee "unsecured payment plan for any unpaid administrative fees and principal balance of the unpaid loan" lasting for "a minimum of one hundred thirty days," with "relatively equal

installment payments based upon the consumer's schedule of pay periods." N.M. Stat. Ann.

§ 58-15-35. <u>See also</u> N.M. Stat. Ann. § 58-15-35(D)("A payment plan entered into pursuant to

the provisions of this section shall not be considered an installment loan.").

70.     The Small Loan Act requires payday lenders to

provide a notice immediately above the consumer's signature on each payday
loan agreement in at least twelve-point bold type using the following language:

(1) A payday loan is not intended to meet long-term financial
needs.

(2) You should use a payday loan only to meet short-term cash
needs.

(3) A payday loan is a high-cost loan. You should consider what
other lower-cost loans are available to you.

(4) If you cannot fully repay a payday loan when due, you have a
right to enter into a payment plan requiring payment within a
minimum of one hundred thirty days, in relatively equal
installments, based upon your scheduled pay periods. If you enter
into a payment plan, you will not have to pay an additional
administrative fee or interest on the outstanding principal balance
or any unpaid administrative fees.

(5) If you have had payment obligations under a payment plan
pursuant to Section 58-15-35 NMSA 1978, you may not enter into
a new payday loan until at least ten calendar days have passed
since you have completed all payment obligations pursuant to all
of your outstanding payday loan products, including that payment
plan.

N.M. Stat. Ann. § 58-15-38(A). The Small Loan Act also requires payday lenders to

display in each licensed place of business in a place where it will be readily
legible by consumers, a sign containing the following notice in both English and
Spanish: "If you cannot fully repay a payday loan when due, you have a right to
enter into a payment plan requiring payment within a minimum of one hundred
thirty days, in relatively equal installments, based upon your scheduled pay
periods. If you enter into a payment plan, you will not have to pay an additional
administrative fee or interest on the outstanding principal balance or any unpaid
administrative fees.

N.M. Stat. Ann. § 58-15-38(B).

## LAW REGARDING UNJUST ENRICHMENT

71.     "New Mexico has long recognized actions for unjust enrichment, that is, quantum meruit or assumpsit."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698 (citing Tom Growney Equip., Inc. v. Ansley, 1994-NMCA-159, ¶ 6, 888 P.2d 992, 994).  See United States ex rel. Sun Collector Corp. v. Ins. Co., 695 F.2d 455, 458 (10th Cir. 1982)(stating that, under New Mexico law, "[o]ne who has been unjustly enriched at the expense of another may be required by law to make restitution").  To prevail on an unjust enrichment claim, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.

72.     New Mexico also recognizes "[d]isgorgement [as] an equitable remedy whereby a wrongdoer is forced to give up the benefits obtained as a result of his wrongdoing."  Peters Corp. v. N.M. Banquest Investors Corp., 2008-NMSC-039, ¶ 32, 188 P.3d 1185, 1194.   "[T]he measure of disgorgement is the amount of a defendant's gain, and a [plaintiff] need not suffer any loss at all to be entitled to the remedy."  Miller v. Bank of America, N.A., 2015-NMSC-022, ¶ 23, 352 P.3d 1162, 1169.

73.     In one species of action for unjust enrichment, someone who performs on an illegal contract or on a contract that is unenforceable as against public policy is entitled to restitution "if restitution is required by the policy of the underlying prohibition."  Restatement (Third) of Restitution and Unjust Enrichment § 32(1).  See id. § 32 cmt. c ("Cases within § 32(1) are those in which -- although not specifically directed by statute -- restitution is clearly required by the policy of the statute that makes the underlying contract illegal.").  See also Sunwest Bank

v. Colucci, 1994-NMSC-027, ¶¶ 9-15, 872 P.2d 346, 348-50 (relying heavily on the then-current version of the Restatement of Restitution). The Restatement provides a relevant illustration:

> A borrows money from B at a market rate of interest that the laws of the jurisdiction condemn as usurious, then repays the loan in accordance with its terms. The statute regulating the parties' transaction affords defensive relief only: it provides that the borrower may not be compelled to pay interest exceeding the stated maximum, but it is silent on the borrower's right to restitution of excess interest paid. A has a claim against B under the rule of § 32(1) to recover interest paid in excess of the amount to which the debt could have been legally enforced.

Restatement (Third) of Restitution and Unjust Enrichment § 32 ill. 1. While Erie requires a federal court sitting in diversity to apply state law and not the American Law Institute's Restatements of the Law, the Supreme Court of New Mexico often looks to the Restatement of Restitution when determining the content of New Mexico law. See, e.g., Chase Manhattan Bank v. Candelaria, 2004-NMSC-017, ¶ 10, 90 P.3d 985, 988; Sunwest Bank v. Colluci, 1994-NMSC-027, ¶¶ 9-10, 12, 15, 872 P.2d 346, 349-50.

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

74.     In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶8, 619 P.2d 1226, 1229). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (citation omitted). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12, 817 P.2d 238, 242 (citation omitted). "On the other hand, if the court determines that

the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible <u>to vary or modify its terms</u>." <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991 NMSC-070, ¶ 12, 817 P.2d at 242 (emphasis in original)(citation omitted).

75.    The question whether an agreement contains an ambiguity is a matter of law. <u>See Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing <u>Levenson v. Mobley</u>, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176).  "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted).  If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.  If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing <u>Vickers v. North Am. Land Dev., Inc.</u>, 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606). New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." <u>Mark V. Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)).  Once the court concludes that an ambiguity exists, the resolution of that ambiguity becomes a question of fact. <u>See Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 13, 845 P.2d at

1235.  To decide an ambiguous term's meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  New Mexico contract law "requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract."  Schultz & Lindsay Const. Co., 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614.  See Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977 ("An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language.").

## LAW REGARDING INJUNCTIONS

76.     Under traditional equitable principles, a plaintiff must demonstrate four things to obtain a permanent injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay v. MercExchange, LLC, 547 U.S. 388, 391 (2006)(Thomas, J.).  See Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1180 (10th Cir. 2003)(stating that, to obtain a permanent injunction, the party requesting such relief bears the burden of showing: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  (citations omitted)).  "[I]rreparable injury [is] a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again -- a 'likelihood of substantial and immediate irreparable

injury.'"  City of Los Angeles v. Lyons, 461 U.S. 95, 110 (1983)(quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)).

77. To obtain a preliminary injunction, a plaintiff must show:

(1) a substantial likelihood of success on the merits, (2) that the plaintiff will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to the plaintiff outweighs the injury to the defendant(s) caused by the preliminary injunction, and (4) that an injunction is not adverse to the public interest.

Aid for Women v. Foulston, 441 F.3d at 1115 (citation omitted).  The right to relief under a preliminary injunction "must be clear and unequivocal."  Aid for Women v. Foulston, 441 F.3d at 1115 (citation and internal quotations omitted).  "[A] district court cannot enter a judgment purporting to bind nonparties over whom it does not have jurisdiction, seek to join those nonparties to the underlying litigation, and then issue an injunction against those parties based on a need to protect its earlier judgment."  Steans v. Combined Ins. Co. of Am., 148 F.3d 1266, 1271 (11th Cir. 1998).

## ANALYSIS

78.     The Court concludes that, by listing an inaccurate payment schedule in its loan agreements, Speedy Loan caused no actual damage to the members of the Deceptive Disclosure Subclass.  Accordingly, the unnamed members of the Deceptive Disclosure Subclass cannot recover under the UPA, but the named plaintiff, Clara Daye, can recover statutory damages and attorney's fees.  The Court determines that all of the loans that Speedy Loan made between August 22, 2010 and August 22, 2014 were payday loans.  Speedy Loan, thus, violated the Small Loan Act by charging interest on those loans.  It follows that Speedy Loan's contractual terms requiring the members of the Payday Loan Subclass to pay interest are illegal and, thus, substantively unconscionable under the UPA.  Consequently, Speedy Loan must return the

interest it charged the Payday Loan Subclass to the extent that the interest exceeded the maximum administrative fee permissible under the Small Loan Act, $7,340,471.14.

## I.     THE COURT DENIES THE MOTION TO STRIKE, BECAUSE SPEEDY LOAN'S DELAY WAS HARMLESS.

79.     Rule 26(a)(3)(A) of the Federal Rules of Civil Procedure requires parties to promptly disclose the names of the witnesses it intends to call at trial.  <u>See</u> Fed. R. Civ. P. 26(a)(3)(A).  Rule 37(c) states that, if a party fails to comply with rule 26(a), then "the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).

80.     The Court denies the Motion to Strike, because the Motion to Strike is based on a harmless delay.  <u>See</u> <u>supra</u> COLs ¶ 10.

## II.    THE DECEPTIVE DISCLOSURE SUBCLASS SUFFERED NO ACTUAL DAMAGES, BECAUSE LOAN AGREEMENT INNACURACIES MADE THEIR LOANS APPEAR MORE EXPENSIVE THAN THEY ACTUALLY WERE.

81.     Under the UPA, unnamed class members can recover only to the extent that they suffered actual damages.  <u>See</u> N.M. Stat. Ann. § 57-12-10(B).  Named class members can, however, recover their "actual damages or the sum of one hundred dollars ($100), whichever is greater," and that award of damages is trebled if a defendant "willfully engaged" the practice that violated the UPA.  N.M. Stat. Ann. § 57-12-10(B), (E).  Courts "shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails."  N.M. Stat. Ann. § 57-12-10(C).

82.     Speedy Loan violated the UPA by listing a Total of Payments and a payment schedule that were inconsistent with one another.  <u>See</u> SJ MOO, 233 F. Supp. 3d at 1012.  The members of the Deceptive Disclosure Subclass made payments in accordance with the schedule of automatic debits contained in the PPD/ACH Authorization form; they did not make the

payments prescribed by their loan agreements' Payment Schedules. See supra FOFs ¶¶ 18-19. Speedy Loan's UPA violations, thus, made its loans appear more expensive than they actually were, see supra FOFs ¶ 15 (finding that the Total of Payments listed in Speedy Loan's loan agreements agreed with the payments schedule in the PPD/ACH Authorization forms); supra FOFs ¶ 16 (finding that 25,976 loan agreements contained a Total of Payments lower than the loan agreement's Payment Schedule), so the violations caused no actual damages.

83.    The Court does not agree with Daye's argument that the loan agreements' Payment Schedules reflect the true contractual obligations of the Deceptive Disclosure Subclass' members. The loan agreements simultaneously state that borrowers promise to make payments in accordance with the Payment Schedule, Pretrial Order ¶ 38, at 12-13 (stipulated facts), and that the Total of Payments is the amount that a borrower "will have paid when [they] have made all scheduled payments," Pretrial Order ¶ 39, at 13 (stipulated fact). See supra FOFs ¶¶ 10-11. Speedy Loan generated loan agreements, including both the Total of Payments and the Payment Schedule. See supra FOFs ¶¶ 9-12 (describing the loan agreements); supra FOFs ¶ 43 (describing how Speedy Loan generates the Payments Schedules and Totals of Payments in its loan agreements). New Mexico contract law "requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract." Schultz & Lindsay Const. Co., 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614. See Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977 ("An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language."). Accordingly, when the Payment Schedule and Total of Payments in one of Speedy Loan's are inconsistent, a borrower's true legal obligation is the smaller amount. Additionally, the parties' course of performance -- making and accepting

payments according to the PPD/ACH Authorization form and the Total of Payments, see supra FOFs ¶¶ 18-19 -- supports the conclusion that the members of the Deceptive Disclosure Subclass were not obliged to make the payments stated by the Payment Schedules on their loan agreements when those Payment Schedules and the PPD/ACH Authorization forms were inconsistent.

84.     The Court, consequently, concludes that Daye can recover $400.00 in statutory damages -- $100.00 for each of her loans.  See N.M. Stat. Ann. § 57-12-10(B), (E)(stating that a named plaintiff in a class action under the UPA can recover statutory damages, $100.00 per violation).  Daye cannot recover actual damages, because she suffered none.  See supra COLs ¶ 82.  She cannot recover treble damages, because Speedy Loan's UPA violations were not willful.  See supra FOFs ¶ 47.  Recovering statutory damages means that Daye is a "party complaining of an unfair or deceptive trade practice" who prevails, so she is entitled to recover "attorney fees and costs."  N.M. Stat. Ann § 57-12-10.  See Jones v. General Motors Corp., 1998-NMCA-020, ¶¶ 23-25, 953 P.2d 1104, 1109 (awarding UPA statutory damages to a plaintiff and stating that "the attorneys' fees to be awarded in this case are not nominal; they should reflect the full amount of fees fairly and reasonably incurred by Plaintiff in securing an award under the UPA").[19]

85.     The unnamed members of the Deceptive Disclosure Subclass cannot recover actual damages, because they suffered none.  See supra COLs ¶ 82.  The unnamed members of the Deceptive Disclosure Subclass cannot recover statutory damages, because the UPA permits

---

[19]The Court is aware that, under Erie, it is not bound to follow Court of Appeals of New Mexico decisions if it concludes that the Supreme Court of New Mexico would decide the issue differently.  See supra n.17.  The Court will follow the Court of Appeals of New Mexico's decision in Jones v. General Motors Corp., however, because the Court has found no indication that the Supreme Court of New Mexico would apply a contrary rule.

unnamed class members to recover only actual damages.  See N.M. Stat. Ann. § 57-12-10(E).

"[T]he prevailing party is the party who wins the lawsuit -- that is, a plaintiff who recovers a

judgment or a defendant who avoids an adverse judgment."  Dunleavy v. Miller, 1993-NMSC-

059, ¶ 28, 862 P.2d 1212, 1219.  Accordingly, the unnamed members of the Deceptive

Disclosure Subclass did not prevail on their UPA claims, so they cannot recover attorney's fees

or costs under N.M. Stat. Ann. § 57-12-10(C).

### III.    THE PAYDAY LOAN SUBCLASS CAN RECOVER TO THE EXTENT THAT ITS MEMBERS PAID MORE THAN THE SMALL LOAN ACT PERMITS SPEEDY LOAN TO CHARGE.

86.     Although Speedy Loan marketed its loans as installment loans, none of its loans

were installment loans -- as the Small Loan Act defines that term -- because Speedy Loan

"require[d], as a condition of making the loan[s], the use of post-dated checks or debit

authorizations for repayment of that loan."  N.M. Stat. Ann. § 58-15-2(E).  See supra FOFs ¶ 22.

All of Speedy Loan's loans were, instead, payday loans, because they were not installment loans,

see N.M. Stat. Ann. § 58-5-2(H)(2)(b)(stating that the term "payday loan" does not include

installment loans), and because, for each loan, Speedy Loan "accept[ed] a personal check or

debit authorization tendered by the consumer and agree[d] in writing to defer presentment of that

check or use of the debit authorization until the consumer's next payday or another date agreed

to by [Speedy Loan] and the consumer," N.M. Stat. Ann. § 58-15-2(H).  See supra FOFs ¶ 22.

87.     Speedy Loan afforded its customers with almost none of the consumer protections

that the Small Loan Act requires for payday-loan borrowers.  All of its loans exceeded the

maximum permissible term for payday loans -- thirty-five days.  See Pretrial Order ¶ 29, at 12;

N.M. Stat. Ann. § 58-15-32(B)(1).  Speedy Loan did not offer a 130-day interest-free payment

plan to any of its borrowers.  See Pretrial Order ¶ 25, at 11; N.M. Stat. Ann. § 58-18-35.  See

also N.M. Stat. Ann. § 58-15-35(E)(stating that a payday lender who "fails to offer a consumer

the opportunity to enter into a payment plan for a payday loan . . . shall not commence a legal proceeding against a consumer to collect on that payday loan if it has not been fully repaid"). Speedy Loan frequently refinanced its loans.  See Pretrial Order ¶ 34, at 12; N.M. Stat. Ann. § 58-15-34("A [lender] shall not . . . enter into an agreement for a renewed payday loan or otherwise refinance or extend the term of a payday loan . . . .").  Speedy Loan did not make the Small Loan Act's required disclosures in its loan agreements or in its offices.  See Pretrial Order ¶ 27, at 11; N.M. Stat. Ann. § 58-15-38.

88.     Most important for the Plaintiffs, Speedy Loan charged interest on its payday loans, see Pretrial Order ¶ 30, at 12, while the Small Loan Act states that payday lenders "shall not charge a consumer interest on the outstanding principal owed on a payday loan product," N.M. Stat. Ann. § 58-15-33(D).   The Small Loan Act permits, however, payday lenders to "impose an administrative fee of not more than fifteen dollars and fifty cents ($15.50) per one hundred dollars ($100) of principal," but unlike interest, the fee "is fully earned and nonrefundable at the time a payday loan agreement is executed and payable in full at the end of the term of the payday loan or upon prepayment of the payday loan."  N.M. Stat. Ann. § 58-15-33(B).  Speedy Loan collected an additional $7,340,471.14 by charging interest instead of the largest administrative fee that the Small Loan Act allows.  See supra FOFs ¶ 24.

89.     Violating the Small Loan Act is a criminal offense, albeit a misdemeanor, see N.M. Stat. Ann. § 58-15-30, but the Small Loan Act neither explicitly permits nor forbids private parties to sue because of Small Loan Act violations.  The Plaintiffs, however, do not need a cause of action directly under the Small Loan Act to sue Speedy Loan for its statutory violations. The UPA allows people to sue based on unconscionable trade practices, and Speedy Loan's contractual terms requiring borrowers to pay interest on payday loans are substantively

unconscionable, because they violate the Small Loan Act. See State ex rel. King v. B & B

Investment Group, Inc., 2014-NMSC-024, ¶ 32, 329 P.3d 658, 670 (stating that "[s]ubstantive

unconscionability is found" when a contract term is illegal as well as when a term is contrary to

public policy or grossly unfair). See also Fiser v. Dell Computer Corp., 2008 NMSC-046, ¶ 20,

188 P.3d 1215, 1221 ("Substantive unconscionability relates to the content of the contract terms

and whether they are illegal, contrary to public policy, or grossly unfair.").[20]  Accordingly, the

---

[20]The Court is skeptical that every illegal contractual term constitutes an unconscionable trade practice under the UPA, although there is a dearth of case law on this point.  For example, a contract where one party promises to pay five million dollars and the other party promises to murder a third party is an illegal contract, but it is difficult to see how such a contract would "result[] in a gross disparity between the value received by a person and the price paid."  N.M. Stat. Ann. § 57-12-2(E)(2).

To determine what sorts of illegality render contractual terms unconscionable, the Court draws guidance from negligence per se, which determines when a statutory violation renders conduct negligent.  Negligence per se requires a plaintiff to prove:

> (i) that there is a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly; (ii) that the defendant violated the statute; (iii) that the plaintiff must be in the class of persons that the statute seeks to protect; and (iv) that the harm or injury to the plaintiff must generally be of the type the legislature, through the statute, sought to prevent.

Rimbert v. Eli Lilly and Co., 577 F. Supp. 2d 1174, 1205 (D.N.M. 2008)(Browning, J.).  Given that "[c]onduct is negligent because it tends to subject the interests of another to an unreasonable risk of harm," Restatement(Second) of Torts § 281 cmt. e, it makes sense that only violations of "legislation directed to the safety of persons or property," are negligent per se, Restatement(Second) of Torts § 286 cmt. d.  See Coffey v. United States, 906 F. Supp. 2d 1114, 1170 n.31 (D.N.M. 2012)(Browning, J.)("The New Mexico courts often look to the law as stated in the Restatement (Second) of Torts.").

The UPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, . . . and empower[] courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits." State ex rel. King v. B &B Investment Group, Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 671.  By analogy to negligence per se, it would thus make sense for the UPA's prohibition on unconscionable trade practices to impose liability when a contract term is illegal because it violates a consumer-protective statute.

The Court is hesitant to articulate and apply a novel understanding of New Mexico state law.  The Court concludes, however, that the above discussion is appropriate, even though and, potentially, because it does not impact this case's outcome.  Speedy Loan violated the Small

Plaintiffs can recover, under the UPA, to the extent that Speedy Loan's violations of the Small Loan Act damaged them.

90.     In the alternative, the Court determines that the Plaintiffs can recover from Speedy Loan to the extent necessary to vindicate the principle that "[a] person is not permitted to profit by his own wrong."  Restatement(Third) of Restitution and Unjust Enrichment § 3.  See Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698 (stating that, to prevail on an unjust enrichment claim, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.").[21]  Speedy Loan benefitted from its violations of the Small Loan Act, because, but for those violations, it would not have been able to collect any interest on its loans and would have been limited to the financing fees that the Small Loan Act permits.  See N.M. Stat. Ann. § 58-15-33(B).

91.     The Court's alternative determination is in accord with the Supreme Court of New Mexico's decision in State ex rel. King v. B & B Investment Group, Inc.  In that case, the defendants made "signature loans" that carried annual percentage rates ("APRs") "ranging from 1,147.14 to 1,500 percent."  2014-NMSC-024, ¶ 1, 329 P.3d at 662.  The Supreme Court of New Mexico determined that the signature loans were procedurally and substantively unconscionable

---

Loan Act, which is meant, in part, "to facilitate the elimination of abuse of borrowers."  N.M. Stat. Ann. § 58-15-1(D).  Speedy Loan's contract terms are, thus, unconscionable no matter whether the Court applies a blanket rule rendering all illegal contract terms unconscionable or a more nuanced rule -- perhaps termed "unconscionability per se" -- that renders unconscionable only contract terms that violate consumer-protective statutes.

[21]The Court is aware that, under Erie, it is not bound to follow Court of Appeals of New Mexico decisions if it concludes that the Supreme Court of New Mexico would decide the issue differently.  See supra n.17.  The Court will follow the Court of Appeals of New Mexico's decision in Ontiveros Insulation Co. v. Sanchez, however, because the Court has found no indication that the Supreme Court of New Mexico would apply a contrary rule.

even though the loans did not otherwise violate any New Mexico statutes.  See 2014-NMSC-024, ¶¶ 33-36, 329 P.3d at 670-71.  The Supreme Court of New Mexico determined that restitution was the appropriate remedy, and it measured restitution by striking the unconscionable contract term and instead "apply[ing] the statutory default interest rate of 15 percent simple annual interest to these loans."  2014-NMSC-024, ¶¶ 47-50, 329 P.3d at 675-76.  Consequently, the court ordered the defendants "to refund all money [they] collected . . . on their signature loans in excess of 15 percent of the loan principal as restitution for their unconscionable trade practices." State ex rel. King v. B & B Investment Group, Inc., 2014-NMSC-024, ¶¶ 47-50, 329 P.3d at 675-76.  The Court reaches an analogous result in this case by replacing the loan-agreement provisions that violate the Small Loan Act by charging interest with terms imposing the maximum administrative fee that the Small Loan Act permits.  Accordingly, the Court will order Speedy Loan to refund the "$7,340,471.14 above the legal fee for payday loans" that it collected. Pretrial Order ¶ 32, at 12 (stipulated fact).  See supra FOFs ¶ 23.

92.    Speedy Loan, on the contrary, argues that it should not be forced to return its illegally collected interest.  Speedy Loan reaches that conclusion by measuring its benefit and the Plaintiffs' damages against a baseline where -- instead of making payday loans without complying with the Small Loan Act's payday-lending restrictions -- Speedy Loan made loans that were not subject to those restrictions.  See Speedy Loan Closing at 11-12.  According to Speedy Loan, it did not benefit, relative to that baseline, because "the fact that it required its customers to authorize debit transactions as a condition of its loans" did not impact its profitability.  See Tr. at 91:13-16(Dabney)("Prior to our ability to use ACH, if you look at our bad debt then and you look at our bad debt after the ability to use ACH, the bad debt didn't change . . . .").  Speedy Loan also contends that its Small Loan Act violations did not harm the

members of the Payday Loan Subclass, because they received exactly the loans they wanted. <u>See</u> Speedy Loan Closing at 14.

93.     Speedy Loan argues that its baseline is the appropriate measure of damages for two reasons.  First, Speedy Loan argues that the only reason why its loans qualify as payday loans and not installment loans is because an inadvertent software error caused some of its loans to have fewer than four payments or terms less than 120 days.  Second, Speedy Loan argues that the Plaintiffs would obtain a windfall at its expense if the Court measured damages relative to a scenario where Speedy Loan made payday loans that complied with the Small Loan Act.  <u>See</u> Speedy Loan Closing at 14 ("In effect, counsel for the class ask the Court to put the borrowers in the position they would be in had they been offered installment loans at payday price.").  According to Speedy Loan, that measure of damages would allow the Plaintiffs to benefit from the longer repayment terms that its loans provide while, at the same time, allowing the Plaintiffs to avail themselves of the Small Loan Act's finance-charge limitations, which apply to loans that last no longer than thirty-five days.  <u>See</u> Speedy Loan Closing at 14 ("This is better than any outcome [the Plaintiffs] could actually have enjoyed under a lawful small loan product.").

94.     Both of the reasons Speedy Loan proffers are unconvincing.  First, Speedy Loan cannot plausibly assert that it inadvertently made payday loans.  Its loans qualify as payday loans because Speedy Loan required its customers to provide debit authorizations.  <u>See</u> <u>supra</u> FOFs ¶ 22 (finding that Speedy Loan required debit authorizations); <u>supra</u> COLs ¶ 86 (concluding that Speedy Loan's made payday loans).  No one forced Speedy Loan to require those authorizations.  While Speedy Loan did not intend to subject itself to the Small Loan Act's payday-lending restrictions, Speedy Loan chose to make loans that qualify as payday loans under the Small Loan Act.

95. Second, the Plaintiffs would not receive a windfall if the Court forced Speedy Loan to return the excess finance charges. The Small Loan Act restricts payday-loan repayment terms to thirty-five days, but it also requires payday-lenders to offer their customers interest-free payment plans that last, at a minimum, 130 days. <u>See</u> N.M. Stat. Ann. § 58-15-35. Rather than being a windfall or a contractual "benefit," permitting the Plaintiffs to benefit from the Small Loan Act's finance-charge limitation while repaying their loans over several months is what the Small Loan Act requires.

96. As described above, the Payday Loan Subclass is able to recover $7,340,471.14 under the UPA. Accordingly, the Payday Loan Subclass is a prevailing party such that it can recover its "attorney fees and costs." N.M. Stat. Ann. § 57-12-10(C).

## IV. INJUNCTIVE RELIEF FOR THE PAYDAY LOAN SUBCLASS IS NOT APPROPRIATE.

97. Daye requests, on behalf of the Payday Loan Subclass, "injunctive relief which enjoins Speedy from continuing to collect unlawful amounts on its illegal payday loans." Complaint ¶ 85, at 14.

98. Under traditional equitable principles, a plaintiff must demonstrate four things to obtain a permanent injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

<u>eBay v. MercExchange, LLC</u>, 547 U.S. 388, 391 (2006)(Thomas, J.). "[I]rreparable injury [is] a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again -- a 'likelihood of substantial and immediate irreparable injury.'" <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 110 (1983)(quoting <u>O'Shea v. Littleton</u>,

414 U.S. 488, 502 (1974)).  Under the UPA, courts can grant injunctions "under the principles of equity," but a UPA plaintiff does not need to show that they have already been harmed to obtain an injunction, because the UPA states that anyone who "is likely to be damaged by [a UPA violation] may be granted an injunction against" such violations.  N.M. Stat. Ann § 57-12-10(A).

99.     On April 6, 2017, the Governor of New Mexico signed a bill -- passed by the New Mexico House of Representatives on March 11, 2017 and by the New Mexico Senate on March 17, 2017 -- that amends the Small Loan Act such that it no longer permits payday loans at all. See 2017 N.M. Laws ch. 110 § 17(H) ("No lender shall make a loan pursuant to the New Mexico Small Loan Act of 1955 unless the loan is an installment loan or a refund anticipation loan."). The Amendments take effect January 1, 2018.  See 2017 N.M. Laws ch. 110 § 27.  The Amendments define an installment loan as a loan of "five thousand dollars ($5,000) [or less] that is to be repaid in a minimum of four substantially equal payments . . . with an initial stated maturity of not less than one hundred twenty days to maturity."  2017 N.M. Laws ch. 110 § 11(F).  Conspicuously absent from that legislative language is the Small Loan Act's present statement that "a loan in which a licensee requires, as a condition of making the loan, the use of post-dated checks or debit authorizations for repayment of that loan" does not qualify as an installment loan.  N.M. Stat. Ann. § 58-15-2(E).  The amendments to the Small Loan Act cap the interest rates that lenders can charge.  See 2017 N.M. Laws ch. 110 § 17(J)("No lender shall make a loan pursuant to the New Mexico Small Loan Act of 1955 that has an annual percentage rate greater than one hundred seventy-five percent . . . .").

100.     Daye has not established that any member of the Payday Loan Subclass "will again be wronged in a similar way" before the amendments to the Small Loan Act become effective on January 1, 2018.  City of Los Angeles v. Lyons, 461 U.S. at 111.  Nor has Daye

established that any member of the Payday Loan Subclass "will again be wronged in a similar way" after those amendments become effective. City of Los Angeles v. Lyons, 461 U.S. at 111. In fact, it is impossible for the Payday Loan Subclass to be wronged in a similar way once those amendments become effective. Speedy Loan injured the Payday Loan Subclass by charging more for its payday loans than the Small Loan Act permits, but on January 1, 2018 the Small Loan Act will cease to permit payday loans at all. Further, any loan that complies with the new interest-rate cap would also comply with the Small Loan Act's present restrictions on payday loan charges.[22]

101.    Speedy Loan could still injure members of the Payday Loan Subclass after January 1, 2018, but such injuries would be new and distinct harms caused by violating new and distinct laws. Accordingly, the prospect that members of the Payday Loan Subclass will suffer such harms does not satisfy the irreparable injury requirement for an injunction, i.e., that there is "a sufficient likelihood that he will again be wronged in a similar way," and the proper remedy would be a second suit for damages and not an injunction. City of Los Angeles v. Lyons, 461 U.S. at 111. Moreover, Daye has not shown that monetary damages are an inadequate remedy for such harms -- or for violations of the currently applicable version of the Small Loan Act -- so Daye has not shown that the members of the Payday Loan Subclass lack an adequate remedy at law. Consequently, the Court will deny Daye's request for injunctive relief.

---

[22]The amendments to the Small Loan Act prevent lenders from charging interest rates greater than 175%. See 2017 N.M. Laws ch. 110 § 17(J). The Small Loan Act's present restriction on payday loan charges -- lenders can charge only an "administrative fee of not more than fifteen dollars fifty cents ($15.50) per one hundred dollars ($100) of principal," N.M. Stat. Ann. § 58-15-33(B), for a loan lasting between fourteen and thirty-five days, see N.M. Stat. Ann. § 58-15-32(B)(1)-(2) -- effectively caps interest rates at approximately 400%.

**IT IS ORDERED** that: (i) the Deceptive Disclosure Subclass cannot recover anything; (ii) Plaintiff Clara Daye, as an individual, shall recover $400.00 in statutory damages as well as her attorney's fees; (iii) the Payday Loan Subclass shall recover $7,340,471.14 as well as attorney's fees; (iv) the Payday Loan Subclass is not entitled to injunctive relief; and (v) the Opposed Motion to Strike Witnesses, filed May 13, 2016 (Doc. 95) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Charles M. Delbaum
National Consumer Law Center, Inc.
Boston, Massachusetts

-- and --

Richard N. Feferman
Nicholas H. Mattison
Feferman & Warren
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Donald Kochersberger
Alicia M. LaPado
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorneys for the Defendant*